LAW OFFICES OF

**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

KHALDOUN A. BAGHDADI (State Bar #190111)
kbaghdadi@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
JADE SMITH-WILLIAMS (State Bar #318915)
jsmithwilliams@walkuplawoffice.com

WENDI J. BERKOWITZ (State Bar #145624)
MESSING ADAM & JASMINE LLP
235 Montgomery Street, Suite 828
San Francisco, CA 94104
Telephone: (415) 266-1800
Facsimile: (415) 266-1128
wendi@majlabor.com

**ATTORNEYS FOR PLAINTIFFS**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KEVIN ABBEY, et al., | Case No. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** |
| v. | **[Negligence; Negligent Misrepresentation; Negligence Per Se; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Loss of Consortium; Wrongful Death; Amount in Controversy Exceeds $25,000]** |
| UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY, | |
| Defendants. | |
| | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through undersigned counsel Walkup, Melodia, Kelly &

Schoenberger, A Professional Corporation, and Messing Adam & Jasmine LLP, as

their Complaint against Defendant United States of America, (hereafter, "the Navy")

hereby allege as follows:

1

**INTRODUCTION**

1.      This case is brought on behalf of the men and women who serve and protect the citizens of and visitors to San Francisco, California. As discussed more fully herein, due to Defendant's negligent acts, officers and other employees of the San Francisco Police Department ("SFPD") were exposed, at Hunters Point Naval Shipyard ("HPNS"), to unsafe levels of radioactive and otherwise hazardous substances. Defendant's failure to disclose the truth about the hazardous substances present at HPNS, and Defendant's subsequent failure to follow proper decontamination procedures, and decision to conceal information about their failure from the City and County of San Francisco ("the City") in violation of federal law, were a substantial factor in causing the Plaintiffs' acute symptoms and elevated risk of developing life-threatening cancers and other diseases.

2.      From the mid-1800s to about 1989, HPNS was used by private entities and the Navy for ship maintenance and repair activities.

3.      Over the decades, these ship maintenance and repair activities caused the release of waste oils, cleaning solvents, sandblasting materials, acid, and other hazardous substances throughout the HPNS base.

4.      From about 1946 to 1969, the Navy used HPNS as the site of extensive radioactive research, testing, and cleanup, resulting in widespread radioactive contamination of the entire HPNS base.

5.      In particular, from 1946 to 1955, during a period when there was no regulation of its radioactive facilities, the Navy operated a radioactive laundry on the property that would later be the site of Building 606 (the "Building 606 Property" as defined in paragraphs 84 and 85), releasing hazardous radionuclides into the soil and groundwater there.

6.      In the 1980s, pipes carrying waste oil contaminated with polychlorinated biphenyls ("PCBs") broke and spilled PCBs on and around the Building 606 Property.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES

7.      Before or during the construction of Building 606, the Navy excavated contaminated soil from under Building 606. Instead of properly containing and safely disposing of the soil so as not to further release or spread any contamination, the Navy lay the excavated soil on the surface of the ground surrounding Building 606.

8.      In light of the extensive history of hazardous substances being used, stored, and released at HPNS, the United States Environmental Protection Agency ("U.S. EPA") found, in 1989, that HPNS met the criteria under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for inclusion on the list of U.S. EPA-regulated "Superfund" sites. As such, the Navy would have to comprehensively evaluate and remediate HPNS, under U.S. EPA supervision, before the base could be reused.

9.      Between 1989 and 1996, although the Navy had not yet performed any comprehensive evaluation or remediation, it entered into discussions with the City about a potential short-term lease of the Building 606 Property to the City for use by the SFPD.

10.      Between 1989 and 1996, the Navy contracted with Tetra Tech, Inc. (including with predecessor corporation PRC Environmental Management, Inc. and then successor corporation Tetra Tech EM, Inc.) to perform studies and review Navy records for the purpose of (1) determining whether the Building 606 Property could be safely leased to the City for use by the SFPD and (2) complying with the statutory requirement that the Navy notify the City of the full history of hazardous substances that had been used or released at the Building 606 Property.

11.      Despite the existence of Navy records stating that a radioactive laundry had operated on the Building 606 Property, the Navy negligently told the City that there was no history of any radioactive substances at the Building 606 Property.

12.      Despite the fact that the extent of persistent contamination and human health risk at HPNS (and in particular, at the Building 606 Property) remained unknown, and was subject to ongoing and future testing, the Navy told the City that

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  the SFPD could use the Building 606 Property without exposing SFPD employees to

2  health risk from exposure to hazardous substances.

3        13.     In connection with the lease of the Building 606 Property, the Navy

4  provided the City with a Finding of Suitability to Lease and property-specific

5  environmental baseline survey results that included numerous material

6  misrepresentations regarding the release of hazardous substances at and around the

7  Building 606 Property, including but not limited to the following false statements:

8        a.     "[T]here are no known health risks associated with the use of

9  Building 606 for office administration and staging by the SFPD."

10       b.     Former Building 503, which had been on the site of the Building

11 606 Property, "did not have uses consistent with the storage or use of hazardous

12 materials."

13       c.     Hunters Point Annex ("HPA") had been used for only "limited

14 radiological operations."

15       d.     As part of the disestablishment of the Naval Defense Radiological

16 Laboratory ("NRDL") "all sites were surveyed for radiological contamination and

17 decontaminated if necessary. No radiological hazards are expected."

18       14.     These statements were not only false, but were clearly and

19 unambiguously false according to then-existing Navy records.

20       15.     Relying on these representations, the SFPD relocated hundreds of its

21 police employees to begin working at HPNS in 1997.

22       16.     Plaintiffs in this action are former and active SFPD employees (most of

23 whom were members of specialized police units including the SWAT team, bomb

24 squad, tactical unit, K9 unit, dirt bike unit, crime lab, property control, and crowd

25 control divisions) who worked at HPNS, as well as those Plaintiffs' spouses, domestic

26 partners, and surviving family members and personal representatives who have

27 standing to bring wrongful death and survival actions.

28       17.     From 1992 until at least 2014 (including all the times when Plaintiffs

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

4

COMPLAINT FOR DAMAGES

were working at HPNS), Tetra Tech (including Tetra Tech EC, Inc., its predecessors, and Tetra Tech, Inc.) was required by contracts with the Navy, to act as the Navy's agent in planning, overseeing, and performing extensive testing and remediation throughout HPNS.

18.     Pursuant to the Navy contracts, Tetra Tech was required to, as the Navy's agent, move through the base, parcel by parcel, performing sampling and testing of soil to determine whether suspected hazardous substances were present in levels above the cleanup goals set by the Navy in conjunction with the U.S. EPA and other agencies. When Tetra Tech found elevated levels of hazardous substances, it was required to perform additional sampling and testing until it found soil that tested clean, thus demarcating the boundaries of the contaminated areas.

19.     Pursuant to the Navy contracts, Tetra Tech was required to, as the Navy's agent, safely contain and dispose of any contaminated soil it processed. Depending on the type and extent of contamination in each soil unit, processing requirements varied. Radioactive soil was to be sealed in steel drums and processed in a specialized manner. Non-radioactive soil that contained industrial chemicals was to be loaded into trucks, driven through portal monitors to screen it for radioactivity before exiting the base, and then taken to off-site landfills. Clean soil could be reused on site as backfill, with minimal processing.

20.     Pursuant to the Navy contracts, Tetra Tech was required to, as the Navy's agent, ensure that the testing and remediation activities at HPNS did not cause injury to Plaintiffs who were working there.

21.     From 1992-2014, while Tetra Tech was performing testing and remediation at HPNS, the Navy applied pressure to Tetra Tech to reduce the time and expense of the project. The Navy's contracts with Tetra Tech provided financial incentives for performing work quickly and efficiently. Some of the contracts had budget caps built in, and others were fixed price, requiring Tetra Tech to bear the expense if its test results showed more contamination than expected, and thus

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1    required more extensive remedial action. Initial estimates regarding the scope,

2    duration, and expense of the HPNS remediation proved to be inaccurate. Whereas

3    the Navy originally anticipated that it would be able to fully remediate HPNS and

4    then sell it to the City within a handful of years, the remediation work has now been

5    ongoing for 28 years.

6       22.    Given the Navy's motivation and efforts to save time and cost, from

7    1997 to 2014, the Navy failed to adequately oversee and monitor Tetra Tech's

8    fraudulent testing and remediation work. While acting as the Navy's agent, subject

9    to the Navy's control, and working on a base owned and controlled by the Navy, Tetra

10   Tech engaged in ongoing fraud, including swapping out contaminated samples for

11   clean samples, running scanning belts at high speeds, watering down soil to block

12   detection of radioactivity, destroying test results at its on-site laboratory, and

13   reducing the sensitivity of its test instruments. Tetra Tech's fraudulent activity

14   resulted in two criminal convictions of Tetra Tech employees, as well as False Claims

15   Act lawsuits brought by the Navy and former Tetra Tech employees (the

16   whistleblowers or relators) against Tetra Tech.

17      23.    From 1997 to 2014, Tetra Tech and the Navy concealed from the City

18   and Plaintiffs the actual extent of contamination they knew or suspected was present

19   throughout HPNS, understated the human risk at HPNS, and failed to warn the City

20   of the risk to its employees who were working at HPNS.

21      24.    As a result of Tetra Tech and the Navy's misrepresentations and

22   concealment, the City continued to have Plaintiffs work at HPNS during Tetra Tech's

23   remediation activities.

24      25.    In addition, while acting as the Navy's agent, subject to the Navy's

25   control, and working on a base owned and controlled by the Navy, Tetra Tech

26   processed soil and materials that it knew or suspected were contaminated and

27   potentially injurious to humans, handling such soil and materials as if they were

28   clean, without taking safety precautions to protect the lives and safety of Plaintiffs

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

6
COMPLAINT FOR DAMAGES

1    who were working at HPNS. The Navy, through Tetra Tech and its other agents,

2    dangerously:

3           a.     Created Radiation Screening Yards ("RSYs") on the land directly

4    surrounding the Building 606 Property, where Plaintiffs were working,

5           b.     Routed trucks so that they used the roadways bordering the

6    Building 606 Property to carry contaminated soil to and from the RSYs,

7           c.     Failed to secure the truckloads of soil, so that soil dropped on the

8    roadways shared with Plaintiffs and/or contaminants in the soil became airborne

9    along the roadways,

10          d.     Dumped soil in unsecured piles surrounding the Building 606

11   Property,

12          e.     Created extensive soil disruption in the area of the Building 606

13   Property, which forced Plaintiffs to inhale contaminated airborne particulate matter

14   (dust), and substantially increased Plaintiffs' exposure.

15       26.    As a result of the Navy and Tetra Tech's negligent and reckless acts and

16   omissions as described herein, Plaintiffs were exposed, via numerous exposure

17   pathways, to multiple hazardous substances at HPNS.

18       27.    Plaintiffs' exposure to hazardous substances at HPNS was a substantial

19   factor in causing Plaintiffs' acute symptoms, including rashes, wheezing, coughing,

20   shortness of breath, and headaches. It was also a substantial factor in causing

21   Plaintiffs' heightened risk of developing cancer, lung disease, and other adverse

22   medical conditions in the future. For some Plaintiffs, who have already been

23   diagnosed with cancer, lung disease, and other medical conditions, the exposure to

24   hazardous substances at HPNS was likely a substantial factor in causing these

25   diseases.

26       28.    By virtue of Tetra Tech's fraudulent testing, and its intentional

27   destruction of test results and samples, Tetra Tech, while acting as the Navy's agent,

28   subject to the Navy's control, and working on a base owned and controlled by the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

7

COMPLAINT FOR DAMAGES

1 Navy, destroyed evidence of the actual and full extent of contamination at HPNS. It

2 also shipped hazardous materials off- site, and/or relocated them within the base,

3 such that the full extent of contamination may now never be knowable. As a result of

4 the Navy's vicarious spoliation of evidence, through its agent Tetra Tech, the full

5 extent of Plaintiffs' exposure is still unknown and likewise may never be knowable,

6 and this is a source of ongoing distress to Plaintiffs.

7 **CLASS ACTION ALLEGATIONS**

8          29.     In addition to, and in the alternative to, commencing this action in their

9 individual capacities, Plaintiff Abbey brings this action pursuant to Federal Rule of

10 Civil Procedure 23 on behalf of himself and all others similarly situated, as members

11 of the proposed Plaintiff class defined as follows:

12              All persons employed by the SFPD who, as a result of the
                Navy's 1996 leases of HPNS property to the SFPD, worked
13              at HPNS at any time from 1996 to the present.

14          30.     Plaintiffs reserve the right to amend the Class definition if discovery

15 and further investigation reveal that the Class should be expanded or otherwise

16 modified.

17          a.     **Numerosity**: Although the exact number of Class members is

18 uncertain and can only be ascertained through discovery, the Class is so numerous

19 that their individual joinder in this case is impracticable. The disposition of the

20 Class's claims in a single action will provide substantial benefits to all parties and to

21 the Court. Upon information, belief, and reasonable research, hundreds or thousands

22 of individuals have suffered losses, injuries, and damages due to Defendant Tetra

23 Tech's legal fault as alleged herein. Moreover, Class members are readily

24 ascertainable from information and records kept by the SFPD. Class members may

25 be notified of the pendency of this action by mail and/or electronic mail,

26 supplemented (if deemed necessary or appropriate by the Court) by published notice.

27          b.     **Commonality**: Common questions of law and fact exist as to

28 Plaintiffs and all other Class members and predominate over questions affecting only

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1  individual Class members. These questions, which arise from Defendants' common

2  course of conduct, include what Defendants knew and have known, and did and

3  failed to do, about the risk of Plaintiffs' exposure to carcinogens, whether Defendants

4  misled the City, SFPD, regulators, and members of the public; and whether

5  Defendants tried to cover up the existence and severity of their failures as alleged

6  herein. Among these questions of law and fact are:

7          i.     Whether Defendant's acts and omissions were a

8  legal/proximate cause of Plaintiffs' injuries;

9          ii.    Whether Defendant's conduct constitutes violation of the

10  laws asserted herein;

11      c.   **Typicality**: Plaintiff Abbey's claims are typical of the other Class

12  members' claims and arise from Defendant's uniform course of conduct with respect

13  to misrepresenting the risk of carcinogenic and other toxic exposures as alleged

14  herein. The relief Plaintiff Abbey seeks individually is typical of the relief sought for

15  the other Class members.

16      d.   **Adequacy**: Plaintiff Abbey will fairly and adequately protect the

17  interests of the other Class members. Plaintiff Abbey's interests do not conflict with

18  the interests of the other Class members he seeks to represent. Plaintiff Abbey and

19  Plaintiffs generally have retained counsel experienced in complex class litigation,

20  and Plaintiffs intend to vigorously prosecute this action. The interests of the Class

21  members will be fairly and adequately protected by Plaintiff Abbey and Plaintiffs'

22  counsel.

23      e.   **Superiority**: Plaintiff Abbey and the other Class members have

24  all suffered and will continue to suffer harm and damages as a result of Defendant's

25  unlawful and wrongful conduct. A class action is superior to other available means

26  for the fair and efficient adjudication of the claims of the Class members. While

27  substantial, the damages suffered by each individual Class member do not justify the

28  burden and expense of individual prosecution of the complex and extensive litigation

1  required by Defendants' conduct. Further, it would be extremely burdensome for

2  Class members to individually and effectively redress the wrongs done to them. Even

3  if Class members themselves could afford individual litigation, the court system

4  could not. Individualized litigation presents a potential for inconsistent or

5  contradictory judgments. Individualized litigation increases the delay and expense to

6  all parties and the court system presented by the complex legal and factual issues of

7  this case. By contrast, the class action device presents far fewer management

8  difficulties, and it provides the benefits of single adjudication, economy of scale, and

9  comprehensive supervision by a single court. Moreover, the litigation and trial of

10 Plaintiff Abbey's and other Class members' claims is manageable.

## PARTIES

12     31.     Group A Plaintiffs are individual employees and former employees of

13 the SFPD who are listed on Exhibit A hereto. Each Group A Plaintiff worked at

14 HPNS for some duration between 1997 and the present, whether in a full-time, part-

15 time, or intermittent capacity, and each was exposed to hazardous substances there.

16     32.     Group B Plaintiffs are the lawful spouses and domestic partners of

17 Group A Plaintiffs, as specified within Exhibit B. Exhibit B, which identifies each

18 Group B Plaintiff, is incorporated herein by this reference. Group B Plaintiffs, and

19 each of them, have sustained a loss of consortium as a result of the Group A

20 Plaintiffs' injuries.

21     33.     Group C Plaintiffs are surviving family members or personal

22 representatives of deceased former employees of the SFPD who worked at HPNS for

23 some duration between 1997 and the present, whether in a full-time, part-time, or

24 intermittent capacity, and who were exposed to hazardous substances there.

25     34.     At all relevant times, Defendant United States of America was the

26 owner of the Subject Leased Property.

27     35.     At all times herein mentioned, the Navy and its agents, servants,

28 employees, partners, aiders and abettors, co-conspirators, and/or joint venturers were

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

10

1   at all times operating and acting within the purpose and scope of said agency,

2   service, employment, partnership, enterprise, conspiracy, and joint venture, and have

3   ratified and approved the acts of each of the other.

4   ## JURISDICTION AND VENUE

5   36.     Subject matter jurisdiction against Defendant exists pursuant to United

6   States Constitution, article III, section 2, subdivision 2, and Title 28 United States

7   Code §§ 1331 & 1346 (Federal Tort Claims Act).

8   37.     Pursuant to the provisions of the Federal Tort Claims Act, within two

9   years of the accrual of the cause of action and prior to the filing of this Complaint,

10   Plaintiffs presented written claims and lodged them with the appropriate agency of

11   Defendant, specifically the Navy, setting forth the events and circumstances

12   complained of herein.  Claims were presented to the Navy on or about February 5,

13   2020.  On August 5, 2020 the claims presented were deemed rejected by operation of

14   law under 28 U.S.C. § 2675.

15   38.     Venue is proper in the Northern District of California under 28 U.S.C. §

16   1391 because the Navy transacts business in this District, and because a substantial

17   part of the events or omissions giving rise to the claim occurred in the Northern

18   District of California.

19   ## FACTUAL ALLEGATIONS

20
21   **A.     Hunters Point Naval Shipyard Administrative Background (1869-Present)**

22   39.     The property that is referred to in this complaint as HPNS, but which

23   has been known by other names as well, is a 965-acre former naval base (half of

24   which is underwater), located in southeast San Francisco on a peninsula that extends

25   eastward into the San Francisco Bay.

26   40.     In about 1869, HPNS began to be used as the first west coast drydock

27   facility. It was operated by the California Drydock Company, with construction

28   subsidized by the Navy, for the purpose of docking both private and Navy ships.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

11
COMPLAINT FOR DAMAGES

41.     In 1939, the Navy purchased HPNS, and leased the subject base to Bethlehem Steel Company.

42.     In 1941, days after the United States entered World War II in response to the attacks on Pearl Harbor, the Navy took possession of HPNS. To support the war effort, the Navy constructed numerous buildings, and excavated surrounding hills to expand the shoreline into the Bay. During this time, HPNS was used for the accelerated production of Liberty ships for use in World War II, as well as the modification, maintenance, and repair of Navy ships and submarines.

43.     For 23 years, from 1946-1969, the Naval Radiological Defense Laboratory ("NRDL") operated at HPNS.

   a.      The NRDL existed for the primary purposes of decontaminating radioactive ships, and broadly studying the nature and effects of ionizing radiation.

   b.      For the first 8 years, the NRDL operated under the command of the Shipyard Commander, with no regulatory oversight.

   c.      Beginning in September 1955, the NRDL became a separate Navy command.

   d.      Beginning in approximately 1958, the NRDL came under regulation by the Atomic Energy Commission ("AEC"), which subsequently became the Nuclear Regulatory Commission ("NRC").

44.     In 1974, the Navy decommissioned HPNS as part of the Navy's broader Department of Defense Shore Establishment Realignment Program, and designated the base an "industrial reserve."

45.     In 1976, the Navy leased over 80% of HPNS to Triple A Machine Shop Incorporated ("Triple A"), a commercial ship repair company, for a five-year term, which was extended in 1981 for a second five-year term. Triple A Machine Shop vacated the shipyard in mid-1987.

46.     In 1984, the Navy initiated site investigations as part of the Navy's Internal Assessment and Control of Installation Pollutants ("NACIP") program,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

12
COMPLAINT FOR DAMAGES

1  subsequently renamed the Installation Restoration (IR) program, which is the Navy's

2  internal regulatory scheme designed to identify and control environmental

3  contamination from past hazardous materials use and disposal activities. In October

4  1984, pursuant to NACIP, the Navy released its Initial Assessment Study ("IAS")

5  Report, identifying twelve sites at HPNS where hazardous materials were disposed

6  of or spilled.

7       47.    In 1985, the Navy announced its intention to reopen the base and

8  homeport the USS Missouri at HPNS. The Navy resumed operation of the shipyard

9  in 1986.

10       48.    From 1985 through 1988, the Navy received multiple remedial action

11  orders and site cleanup orders from the California Department of Health Services

12  ("DHS"), now the California Department of Toxic Substance Control ("DTSC"), and

13  the California Regional Water Quality Control Board ("CRWQCB"), ordering

14  investigation and remediation by both the Navy and Triple A.

15       49.    On November 21, 1989, based on the recent assessments and findings by

16  the Navy, DHS, and CRWQCB, the U.S. EPA placed HPNS on the National Priorities

17  List ("NPL"), as a designated "Superfund" site governed by CERCLA as amended by

18  the Superfund Amendments and Reauthorization Act ("SARA").

19       50.    Navy shipyard operations were permanently terminated on December

20  29, 1989.

21       51.    In about 1991, the Department of Defense Base Realignment and

22  Closure Commission selected HPNS for closure under the Base Closure Act of 1988,

23  Public Law [PL] 100-526, and the Defense Base Closure and Realignment Act of

24  1990, PL 101-510; 10 U.S.C § 2687, as amended, 1991 ("DBRCA").

25       52.    On January 22, 1992, the Navy entered into a Federal Facilities

26  Agreement ("FFA") with the U.S. EPA, DTSC, and the CRWQCB. The purpose of the

27  agreement was to "ensure that the environmental impacts associated with past and

28  present activities at [HPNS] are thoroughly investigated and appropriate remedial

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1   action taken necessary to protect the public health, welfare and the environment."

2   The FFA established a procedural framework and schedule for cleanup actions, and

3   defined the HPNS base's five parcels (A through E), which could be remediated and

4   transferred individually.

5           53.   Pursuant to the 1992 FFA and federal regulation, prior to disposal or

6   transfer (including lease or sale) of HPNS or any of its parcels, the Navy was and is

7   required to meet the CERCLA requirements, and to comply with the Defense

8   Authorization Amendments, the National Environmental Policy Act (NEPA), the

9   DBCRA, the FFA, and other laws, regulations, and conditions.

10           54.   On January 21, 1994, the City and Navy executed a Memorandum of

11   Understanding establishing a process allowing for the parcel-by-parcel transfer, as

12   remediation of each parcel was completed and approved by the U.S. EPA, of HPNS to

13   the City for redevelopment.

14           55.   In February 1999, the U.S. EPA deemed Parcel A to be fully remediated,

15   removed it from the NPL and cleared it for purchase. The City purchased Parcel A in

16   December 2004.

17           56.   At present, in the year 2020, the Navy is still engaged in investigation

18   and remediation activities, through its contractors, in an attempt to meet the

19   CERCLA requirements for the remaining four parcels at HPNS.

20           57.   For the past 28 years, from 1992 to 2020, the Navy (directly and

21   through its contractors) has been attempting to conduct an environmental cleanup

22   that meets the CERCLA and other applicable requirements, so that it can deed each

23   parcel of HPNS to the City. The City, for the past 28 years, been waiting to purchase

24   HPNS from the Navy.

25       **B.**   **For Decades, Large Quantities of Hazardous Substances Were**
          **Released throughout Hunters Point Naval Shipyard**

26

27           58.   From 1946 to 1989, the Navy owned HPNS and caused, allowed, and

28   recorded in its agency files the widespread release of large quantities of radiological

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

14

COMPLAINT FOR DAMAGES

1   and non-radiological hazardous substances throughout HPNS. Specific releases of

2   hazardous substances include but are not limited to the following.

3       **1.    Release of Radiological Contamination by the Naval**
        **Radiological Defense Laboratory (1946-1969)**
4

5       59.    In 1946, the United States conducted a pair of nuclear weapon tests

6   (known as Operation Crossroads) at Bikini Atoll, to investigate the effects of nuclear

7   weapons on warships. A fleet of 95 ships was assembled at Bikini Lagoon, and two

8   nuclear weapons were detonated there. The extent of contamination was unforeseen.

9   Almost the entire target fleet was drenched by falling water, and contaminated

10  beyond redemption. The extent of radioactive fallout caused chemist Glenn Seaborg

11  of the AEC to call the Bikini Atoll detonation "the world's first nuclear disaster."

12      60.    In 1946, the United States Navy established its NRDL at its San

13  Francisco base, HPNS.

14      61.    The original purpose of the NRDL was to manage the testing,

15  decontamination, and disposition of ships contaminated in the Operation Crossroads

16  nuclear disaster.

17      62.    For its first approximately 12 years, from 1946 to 1958, the NRDL

18  operated under the command of the Shipyard Commander, with no regulatory

19  oversight, with safety equipment consisting entirely of two Geiger counters. During

20  this unregulated time period, NRDL engaged in activities that resulted in the

21  widespread release of numerous hazardous materials throughout HPNS.

22      63.    From at least 1946 to 1951, the Navy engaged in unregulated efforts to

23  clean up radioactive ships, including but not limited to the following activities:

24          a.    The Navy brought the 79 "most heavily contaminated ships" from

25  the Bikini Atoll tests back to HPNS. At least 100 different radionuclides were

26  brought back to HPNS in this manner.

27          b.    The Navy used deck swabs, sandblasting, acid, steam-cleaning,

28  and other materials  and methods in an attempt to clean the ships at HPNS. The fine

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

15

COMPLAINT FOR DAMAGES

1  sand and dust created by sandblasting were initially airborne and were blown by the

2  wind throughout the HPNS base.

3         c.      Since radioactivity cannot be neutralized, "decontamination" in

4  practical effect meant merely moving contaminated material from the radioactive

5  ships to the air, soil, and other materials at HPNS.

6         d.      The Navy burned more than 600,000 gallons of radioactively

7  contaminated fuel oil that it had removed from the ships at HPNS. Again, the effect

8  was not to destroy the radioactivity, but rather to move it from the fuel oil to the air

9  and soil at HPNS.

10         e.      Navy records indicate that the NRDL decontamination processes

11  were overseen and conducted by a "small band" of "junior Navy officers," who "carried

12  out decontamination on a sort of trial and error basis." They formed "the first such

13  [Radiological Safety] group ever organized." "[T]heir equipment consisted of one

14  coffee pot and six Geiger counters, only two of which worked."

15         f.      The efforts to decontaminate affected ships proved largely futile.

16  All but 9 of the original 95 ships eventually had to be destroyed.

17       64.      The NRDL's focus shifted in approximately 1950. From 1950-1958, the

18  NRDL at HPNS participated in every nuclear weapons test carried out by the United

19  States during that time period. Large amounts of highly radioactive nuclear weapons

20  debris were brought to HPNS from these A- and H-bomb tests, resulting in

21  widespread release of hazardous radioactive materials throughout HPNS. These pre-

22  1958 activities were performed without any regulatory oversight.

23       65.      From 1946 to 1969, the Navy used the HPNS site for the broad purpose

24  of studying nuclear contamination, and the first 8-9 years of this work was

25  unregulated. The NRDL nuclear research resulted in the widespread release of

26  hazardous radioactive materials throughout HPNS. Among other things, the NRDL:

27         a.      Conducted a wide variety of radiation experiments on materials

28  and animals at its HPNS laboratory buildings;

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES

b.      Intentionally raised animal colonies on site, then intentionally irradiated, studied, and disposed of tens of thousands of mice, rats, dogs, goats, mules, and pigs, among other animals, at HPNS;

c.      Intentionally spread radioactive material at the HPNS base, as if it were fertilizer, to practice decontamination;

d.      Conducted human experiments at HPNS, including requiring people to drink radioactive elements.

e.      Constructed and used a cyclotron (a type of particle accelerator) at HPNS for use in radiation experiments, which generated radiation and charged particles;

f.      Received and stored radiological waste from the University of California at Berkeley and Lawrence Livermore Laboratories.

66.     Additionally, the Navy manufactured radioactive sources on site. For example, the Navy used large quantities of radium-226, strontium-90, tritium and promethium-147 for radioluminescent devices and deck markers. On-site radioactive paint shops produced these radioluminescent instruments, with radioactive wastes poured down drains and leaking into soil from breaks in sewer lines. An estimated 6000 pounds of radioluminescent dials and knobs were disposed of at the HPNS landfill site, and also strewn about the base.

67.     The Navy disposed of HPNS radioactive waste by placing irradiated animal carcasses and 55-gallon drums of radioactive waste on a barge, until the barge was full, then towing it out to the Farallon Islands (a National Marine Sanctuary) and sinking the waste there (sometimes by shooting holes in the drums to help them sink). AEC researcher Arnold Joseph estimated that 47,500 barrels of radioactive waste were processed in this manner.

68.     In 1958, the NRDL became a regulated facility licensed by the AEC.

69.     Pursuant to the NRDL's licenses with the AEC:

a.      The licensed amount of strontium-90 was sufficient to

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1    contaminate ten trillion tons of soil at or above the U.S. EPA's preliminary

2    remediation goals ("PRGs").

3            b.      The licensed amount of uranium was enough to contaminate

4    about 200 million tons of soil at or above U.S. EPA's PRGs.

5            c.      The AEC allowed the NRDL to use 2000 grams of plutonium-239,

6    a hazardous substance known to cause lung cancer if only one millionth of an ounce

7    is inhaled.

8            **2.      Navy's Release of Non-Radiological Hazardous Substances
                       (1941-1974)**
9

10   70.     From approximately 1942 to 1974, the Navy as part of its (non-NRDL)

11   shipyard operations, used, released, and stored numerous hazardous substances

12   throughout HPNS. These releases include but are not limited to the following specific

13   instances of contamination.

14   71.     From 1942 to 1977, sandblasting operations in the dry dock area

15   discharged blasting grit, paint scrapings, metal rust, and other debris from cleaning

16   ships (including nuclear-powered ships) into the Bay and throughout HPNS.

17   72.     From at least 1942 to 1977, the shipyard had a combined sanitary and

18   storm sewer system. Industrial shop wastewater was discharged to this system and

19   was pumped to the City's sewage collection system and treatment plant.

20   73.     In periods of high storm water runoff, which occurred about 9-12 times

21   annually, diversion structures would direct the flow into the San Francisco Bay,

22   including via overflow outlets near Berth 15 and southwest of Mahan and J Street.

23   74.     In 1975, a lawsuit filed by the Bay Area Water Quality Control Board

24   was brought against the US Navy's Supervisor of Shipbuilding, Conversion and

25   Repair ("SUPSHIP") division, seeking to prohibit the ongoing direct discharge of

26   sanitary and industrial wastes into the San Francisco Bay. In response to the 1975

27   lawsuit, the Navy conducted a project to separate storm drains from sanitary sewers

28   at HPNS. This project was completed in 1977.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18
COMPLAINT FOR DAMAGES

75.     From 1947 to 1973, the Navy operated a 120,000 square foot Pickling and Plate Yard on the north end of Hussey Street between Building 411 and 402. The operation of the Pickling and Plate Yard involved dipping steel plates into acid tanks, then drying the plates on racks and painting them with zinc chromate-based corrosion resistant primer. Sodium dichromate, sulfuric and phosphoric acids, and zinc chromate were used on site. Most of the structures were coated with acid and zinc chromate.

76.     The Navy created and used a succession of coal- and oil-fired power generation facilities which resulted in the release of hazardous substances throughout HPNS, both from smokestack effluvium and leftover byproducts that were dumped in the vicinity. Former Building 521 was a power plant.

### 3.     Triple A Machine Shop Release of Hazardous Industrial Substances (1976-1987)

77.     From 1976 to 1987, while HPNS remained under the Navy's ownership and control, Triple A conducted commercial ship repair operations at HPNS that resulted in widespread releases of hazardous substances, including instances of illegal dumping of hazardous wastes at more than 20 locations throughout HPNS.

78.     In 1986, the San Francisco District Attorney's Office charged Triple A with illegally disposing of hazardous wastes. In 1992, Triple A's management was convicted of five counts of illegal hazardous waste disposal at HPNS.

79.     In 1986, when the lease expired, Triple A refused to vacate. The Navy began legal proceedings which forced Triple A to vacate the facility in mid-1987.

80.     In 1988, following the discovery of PCB-contaminated waste oils at the southeast portion of Building 606, the Navy conducted an emergency removal action, removing about 1,255 cubic yards of soil with PCBs at concentrations exceeding 25 mg/kg. Excavation was conducted to depths ranging from 3 to 10 feet below the ground surface within an area measuring 50 by 150 feet.

81.     In 1984, an Initial Assessment Study team concluded that the Bay

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

19
COMPLAINT FOR DAMAGES

1  bottom sediments found immediately below the shipyard shoreline were

2  contaminated with heavy metals and other hazardous pollutants.

3  **C.    The Transfer of the Subject Leased Property to the City**
   **(Beginning in 1996)**

4

5      82.    In 1996, and on other dates thereafter, the Navy transferred to the City

6  real property at HPNS (the Subject Leased Property, including but not limited to the

7  Building 606 Property and the Helipad Property, all defined hereinbelow), via lease

8  contracts, knowing and intending that the Subject Leased Property would be used by

9  the City as work facilities for SFPD employees, including Group A Plaintiffs and

10  Group C Decedents and each of them.

11      83.    This 1996 transfer was accompanied by false statements from the Navy,

12  including through its agent Tetra Tech, on which the City relied, misrepresenting the

13  history of HPNS, and misrepresenting the type and quantity of hazardous substances

14  released at and about the Subject Leased Property, as described in more detail below.

15              **1.    The Subject Leased Property**

16      84.    The SFPD, from 1997 to the present, has leased and occupied an 89,600

17  square foot steel-construction industrial building (Building 606) at HPNS, along with

18  approximately 33,000 square feet of land surrounding Building 606 (collectively

19  referred to as the "Building 606 Property").

20      85.    The Building 606 Property is bordered by 3rd Avenue to the north,

21  Hussey Street to the east, H Street to the west, and the radiologically impacted sites

22  of Former Buildings 507 and 508 to the south.

23      86.    The SFPD, from 1999 to 2007, also leased and occupied a 3.30-acre

24  vacant lot adjacent to Building 606 for use as a helicopter landing pad ("Helipad

25  Property").

26  / / / /

27  / / / /

28  / / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

20
COMPLAINT FOR DAMAGES

**D.     Before It Could Transfer the Subject Leased Property to the City, the Navy Was Legally Required to Disclose to the City the Type and Quantity of Hazardous Substances Released at and Around Building 606**

87.     In 1996, pursuant to the FFA, CERCLA, and other regulations and agency policies, the Navy was required to (i.e. was under a mandatory duty to) accurately disclose, before leasing out the Subject Leased Property, the type, quantity, and timing of any prior release of hazardous substances at the Subject Leased Property, to the extent such information was available on the basis of a complete search of Navy files. These regulations and statutes include but are not limited to 42 U.S.C. § 9620(h)(1) (of CERCLA), which reads in pertinent part:

> [W]henever any department, agency, or instrumentality of the United States enters into any contract for the sale or other transfer of real property which is owned by the United States and on which any hazardous substance was stored for one year or more, known to have been released, or disposed of, the head of such department, agency, or instrumentality **shall include in such contract notice of the type and quantity of such hazardous substance and notice of the time at which such storage, release, or disposal took place, to the extent such information is available on the basis of a complete search of agency files**. [Emphasis added.]

88.     The Navy is and was at all relevant times a department of the United States.

89.     At all relevant times, the Navy owned the Subject Leased Property.

90.     HPNS and the Subject Leased Property are real property.

91.     The Building 606 Property was, at all relevant times, real property on which hazardous substances were known to have been released and disposed, and where hazardous substances had been stored for one year or more.

92.     The Helipad Property was, at all relevant times, real property on which hazardous substances were known to have been released and disposed, and where hazardous substances had been stored for one year or more.

////

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1
2
3

**E.**      **Beginning in or About 1996, the Navy Negligently Misrepresented the Type and Quantity of Hazardous Materials Released at the Leased Property, Causing the City to Enter into the Subject Lease Agreements**

4      93.      In, about, and after 1995-1996, the Navy, both directly and through its

5   agents Tetra Tech EM, Inc. and Tetra Tech EM, Inc.'s predecessor corporation PRC,

6   made false, misleading, and incomplete disclosures to the City, related to the release

7   and use of hazardous substances at the Subject Leased Property.

8      94.      In, about, and after 1995-1996, the Navy, both directly and through its

9   agents Tetra Tech EM, Inc. and PRC, failed to provide notice of the type, quantity,

10   and time of each release, storage, and/or use of hazardous materials at the Subject

11   Leased Property.

12      95.      In January 1996, the Navy, both directly and through its agents Tetra

13   Tech EM, Inc. and PRC, published a Draft Basewide Environmental Baseline Survey

14   for HPNS, which was later published as the June 3, 1996 Final Basewide

15   Environmental Baseline Survey ("1996 Basewide EBS").

16      96.      The stated purpose of the 1996 Basewide EBS was in part to facilitate

17   the transfer of the HPNS base, and to fulfill the requirements of CERCLA as

18   amended by the Community Environmental Response Facilitation Act of 1992

19   (CERFA).

20      97.      The 1996 Basewide EBS stated that it was intended to "support

21   conclusions that portions or subparcels of the base, although not CERFA clean, are in

22   such a condition that the Navy may issue deeds to transfer the property on the basis

23   that "no remedial action is required."

24      98.      The Navy, both directly and through its agents Tetra Tech EM, Inc. and

25   PRC, in the 1996 Basewide EBS stated that:

26          a.      Former Building 503 had never been used for past storage or use

27   of hazardous materials, and had no known history of hazardous materials, hazardous

28   waste, or radiological contamination.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

b.     Building 606 had no history of hazardous material, hazardous waste, or radiological contamination.

c.     Whereas virtually all other property at HPNS was "Category 6," indicating that additional work was needed, Building 606 alone was placed in Category 4, classified as an "area where . . . all remedial actions have been taken" and "remedial actions are complete. . . ."

99.     On February 7, 1996, pursuant to contract 7609-0012, the Navy, both directly and through its agents Tetra Tech EM, Inc. and PRC, prepared a Property Specific Environmental Baseline Survey for Building 606 ("Building 606 EBS") and a Finding of Suitability to Lease for Building 606 ("Building 606 FOSL") and the surrounding area.

100.     The purpose of the Building 606 EBS was to provide a basis for the Building 606 FOSL, to provide a basis for any recommended use restrictions for the Building 606 Property, to establish the current physical and environmental conditions of Building 606, and to comply with the Navy's obligations under CERCLA § 9620(h) to disclose the full history of the release of hazardous substances at the Building 606 Property.

101.     The Building 606 EBS included numerous material misrepresentations, regarding the release of hazardous substances at and including but not limited to the following:

a.     [T]here are no known health risks associated with the use of Building 606 for office administration and staging by the SFPD.

b.     Former Building 503, which was on the Building 606 site, "did not have uses consistent with the storage or use of hazardous materials."

c.     During the NRDL years, HPA was used for "limited radiological operations."

d.     As part of the disestablishment of NRDL all sites were surveyed for radiological contamination and decontaminated if necessary. No radiological

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

Case 3:20-cv-06443-JD   Document 1   Filed 09/14/20   Page 24 of 58

1  hazards are expected.

2      e.    The IR-08 PCB spill area was "previously remediated."

3      f.    "[R]emedial actions are complete" at the Building 606 Property.

4      g.    The condition of all the spaces [in Building 606] is excellent with

5  no signs of the use, storage, or spillage of hazardous materials or petroleum

6  products."

7      h.    "There are no potential interior sources" of hazardous exposure in

8  Building 606.

9      i.    Known contamination of Parcel D steam lines with TPH-gasoline,

10  oil, grease, and mercury is not of concern at Building 606 because "[t[[here are no

11  steam lines indicated in or around Building 606."

12      102.    The February 7, 1996 Building 606 FOSL was written in explicit

13  reliance on the Building 606 EBS. It contained no additional information regarding

14  the release of hazardous substances at the Building 606 Property, beyond that

15  information contained in the Building 606 EBS. It concluded that the "lease does not

16  present a risk to human health of the future lessee or the environment if the

17  restrictions and requirements as detailed above are followed."

18      103.    On December 30, 1996, in reliance upon the Building 606 EBS and the

19  Building 606 FOSL, the Redevelopment Agency of the City of San Francisco ("SFRA")

20  entered into lease contract N6247497RPOOP45 ("Subject Lease") for the transfer

21  (lease) of real property, specifically the Building 606 Property, with the stated

22  intention that it would be subleased to the SFPD. The leased premises were

23  described therein as follows:

24

25      Government does hereby lease, rent, and demise to Lessee and Lessee
does hereby hire and rent from Government, Building 606 and adjacent

26  parking areas to be used to house the following units of the [SFPD]:
Field Operations Bureau, which includes the Canine Unit; Muni Detail

27  Unit; Tactical Squad Unit; Property Control Unit; Narcotics Unit; and
the Police Department's Crime Lab.

28      104.    The Subject Lease was accompanied by the Building 606 FOSL and

24
COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1  Building 606 EBS.

2      105.   Together, the lease and its attachments failed to accurately represent

3  the type and quantity of hazardous substances released at and about the Building

4  606 Property, and contained numerous other material representations related to the

5  hazards associated with occupancy and use of the Building 606 Property.

6      106.   The Subject Lease, along with the Building 606 FOSL and Building 606

7  EBS, were created with the intention that they would be sent to, and relied upon by,

8  the SFPD and its employees in deciding whether to sublease and use the Building

9  606 Property.

10      107.   The Subject Lease, along with the Building 606 FOSL and Building 606

11  EBS, were in fact sent to, and relied upon by, the SFPD and its employees in deciding

12  whether to sublease and use the Building 606 Property.

13      108.   On May 1, 1997, the SFPD, in reliance on the Navy's direct and

14  vicarious misrepresentations and concealment, subleased the Building 606 Property

15  from the SFRA, and began stationing SFPD employees, including Group A Plaintiffs

16  and Group C Decedents at and about the Building 606 Property.

17      **F.**    **Before 1996, a Complete Search of the Navy's Files Would Have**
18              **Revealed that Voluminous Hazardous Substances, Including**
                **Radionuclides, Were Known to Have Been Released at and**
19              **Around the Subject Leased Property and that the Navy's Lease**
                **Representations Were False**

20      109.   The Navy negligently failed to provide notice to the City of the type and

21  quantity of hazardous substances released at the Building 606 Property, which

22  information was available from a complete search of agency files.

23      110.   PRC, Tetra Tech, and the Navy, in the Subject Lease, negligently and

24  materially misrepresented the history of HPNS and the Building 606 Property.

25      111.   The radiologically-impacted site of Former Building 503 is fully

26  incorporated within the footprint of Building 606.

27      112.   The Building 606 Property includes within it the radiologically-impacted

28  sites of Former Buildings 501, 502, 503, and 504, as well as radiologically-impacted

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

25
COMPLAINT FOR DAMAGES

1    steam lines, sewer lines, and storm drain lines.

2        113.   The statement in the Building 606 EBS that Former Building 503 "did

3    not have uses consistent with the storage or use of hazardous materials," was false

4    when made, and contrary to existing records.

5            a.    The 500-series buildings, of which Former Building 503 was a

6    central building, constituted the first site of the NRDL at HPNS, during the period of

7    heaviest radioactive cleanup activity, and lowest regulatory oversight.

8            b.    Pre-1996 Navy records stated that, during operation of the

9    NRDL, radioactivity in the area of the 500-series buildings (which include Building

10   503) was such that the Navy found it could not continue carrying out biological

11   medical research work in Building 506 since it was, according to a November 1948

12   Navy report, "located among a group of chemistry laboratories where prevailing

13   levels of radioactivity render the delicate detection incident to the biological

14   investigations impossible."

15           c.    Former Building 503 was used from approximately 1946 to 1955

16   as a radioactive laundry, where harsh chemicals including sodium hypochlorite were

17   used to repeatedly clean radioactive clothing and protective apparel.

18           d.    A series of memoranda in 1946 document that a new laundry was

19   being installed in Building 503, jointly by "Crossroads" (the NRDL project) and by

20   SUPSHIP.

21           e.    A 1949 HPNS map, shows that, during that time period of peak

22   radioactive activity, Building 503 was the base's only laundry facility.

23           f.    A January 4, 1952 NRDL Bulletin referred to Building 503 as the

24   "NRDL laundry."

25           g.    An April 10, 1953 Navy document described the "U.S. Naval

26   Radiological Defense Laboratory Clothing Decontamination Procedure." Under the

27   procedure, all clothing was assessed for excessive radiological contamination. Any

28   clothing found to be excessively contaminated was to be washed using 1/2 pound of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1    Versene Soap and 1/2 pint of sodium hypochlorite, along with hot water, for 30

2    minutes, rinsed in hot water, washed again with 1/4 pound of Versene soap for

3    another 20 minutes, and transferred to the extractor to remove all water possible.

4    This procedure was repeated three times, upon which any clothing that still did not

5    meet tolerance levels would be "either stored until the radioactive decay reduces the

6    intensity to this level or it must be disposed of as radioactive waste."

7               h.    A February 1, 1955 special report from the Commanding Officer

8    of the NRDL to the Chief of SUPSHIP, declassified in 1991, stated:

9                    The San Francisco Naval Shipyard has, pending
                     completion of Building 815, allowed NRDL personnel to use
10                   the space and equipment in Building 503 . . . . Clothing and
                     apparel accepted at the subject facility is limited to items
11                   that have been exposed to radioactive contamination, and
                     the sole purpose is to reduce the radiological contamination
12                   to the accepted safe level....All SFNS "hot" clothing
                     received at the subject facility is monitored, processed, re-
13                   monitored, and returned to SFNS for laundering and
                     pressing as required. . . . This clothing decontamination
14                   facility is housed in one room of SFNS Building 503 . . . .
                     The service consists of reducing the level of contamination
15                   in Navy-owned protective wearing apparel to the point
                     where it can safely be sent to a Navy-operated or
16                   commercial laundry. . . . The equipment used consists of
                     two industrial-type washing machines, two extractors, and
17                   one dryer.

18              i.    Two grease traps related to the radioactive laundry facility were

19   located south and west of Building 503 until the 1980s.

20              j.    Building 503 was also reportedly used, from approximately 1946

21   to 1955, to house a small animal (radioactive) exposure facility.

22         114.   The statement in the Building 606 EBS that known contamination of

23   Parcel D steam lines with TPH-gasoline, oil, grease, and mercury is not of concern at

24   Building 606 because "[t]here are no steam lines indicated in or around Building 606"

25   was false when made, and contrary to existing records.

26         115.   In fact, pre-1996 Navy records showed that a steam line near Building

27   503 had been used by Triple A in the 1970s and 1980s to transport waste oils

28   containing PCBs, that during construction activities near Building 503 in the early

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  1980s, a section of this line broke, spilling an unknown quantity of waste oils and

2  PCBs directly onto the Building 606 Property; and that the spill was not fully

3  remediated at any point prior to 1996.

4       116.   Pre-1996 Navy records showed that Polynuclear Aromatic Hydrocarbons

5  ("PAHs") had been discovered at or near the southeast corner of the Building 606

6  Property. However, this was not disclosed to the City in connection with the Subject

7  Lease.

8       117.   Pre-1996 Navy records showed that electrical transformers containing

9  PCB oil were located on power poles north and south of Former Building 503 until

10 1988. These transformers were removed from service by American Environmental

11 Management Corporation ("AEMC") and the Navy Public Works Department in

12 1988. However, this information was not disclosed to the City in connection with the

13 Subject Lease.

14      118.   The statement in the Building 606 EBS that "the condition of all the

15 spaces [in Building 606] is excellent with no signs of the use, storage, or spillage of

16 hazardous materials or petroleum products" was false when made, and contrary to

17 existing records.

18        a.    In fact, a walk-through of Building 606 in 1996, as described in

19 the 1996 Basewide EBS, revealed evidence of recent use of hazardous materials in

20 Building 606, including a "large stain in northwest section of shop," "stained

21 cardboard run[ning] from southeast rollup door to outside drain," as well as "six 30-

22 gallon black Nalgene drums (four on east side, two on west; PVC pipes run from

23 building and drop into these drums)."

24      119.   The statement in the Building 606 EBS that, during the NRDL years,

25 HPA was used for "limited radiological operations," was false when made and

26 contrary to existing records, which showed that HPA had been used for some of the

27 most extensive radiological operations in history, as described hereinabove.

28      120.   The statement in the Building 606 EBS that, as part of the

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  disestablishment of NRDL, "all sites were surveyed for radiological contamination

2  and decontaminated if necessary," was false when made and contrary to existing

3  records.

4      121.   In fact, the Navy's pre-1996 records demonstrate that Building 503 was

5  never decontaminated or remediated.

6          a.   In 1955, the NRDL began consolidating most of its facilities from

7  the 20 widely-separated HPNS buildings to its own new Building 815, a 6-story

8  windowless structure of reinforced concrete, and Building 816, which housed the 2-

9  million electron volt Van de Graaff accelerator, as well as 250 Kev x-ray machines

10  and eight-curie cobalt source.

11          b.   In 1955, using the limited radiological detection equipment

12  available at the time and in an era before the development of survey or

13  decontamination procedures, the NRDL conducted its own surveys of NRDL

14  Buildings 313, 313A, 322, 351, 351A, 366 (formerly known as 351B), 506, 507, 508,

15  and 510 and, despite noting evidence of contamination of the sewer systems and

16  drain lines, released these buildings for unrestricted use.

17          c.   The 1955 cleanup did not include remediation of soil and

18  groundwater.

19          d.   The 1955 cleanup did not include Building 503 or the surrounding

20  area.

21          e.   The consolidation of activities in Building 815 did not include all

22  activities of the NRDL. Buildings 364, 365, 506, 529, 707, 816, 820, 821, 830, 831,

23  and ICW 418 were also used by the NRDL until it closed in 1969.

24          f.   In April 1969, the Navy's Chief of Naval Material issued an

25  announcement that the NRDL would be disestablished (closed).

26          g.   In the nine months between April 1969 and January, 1970, the

27  NRDL Health Physics Division engaged in efforts, using then-existing standards,

28  methods, and equipment, to decontaminate Buildings 364, 506, 529, 707, 815 and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

816.

       h.     The 1969 cleanup effort used guidelines that are unsafe by modern standards.

       i.     The 1969 cleanup did not include remediation of soil and groundwater.

       j.     The 1969 cleanup did not include Building 503 or the surrounding area.

       k.     Between 1969 and 1979, it became known to AEC scientists that the radiation standards of 1969 were inadequate and unsafe.

       l.     In 1979, in recognition that the 1969 decommissioning standards were unsafe by 1979 standards, the Navy conducted a second effort at radioactive decontamination. These 1979 decontamination efforts, conducted by the Navy SUPSHIP, in consultation with the Navy Radiological Affairs Support Officer of the Naval Nuclear Power Unit, included only buildings 364, 815, and 816.

       m.     The 1979 cleanup did not include any base-wide remediation of soil and groundwater.

       n.     The 1979 cleanup did not include the Building 503 site or the surrounding area.

       o.     In or about the 1970s, Building 503 was demolished. On information and belief, no original records related to the demolition of Building 503 have been found, and the demolition of Building 503 was not associated with any radiological remediation. On information and belief, the foundation of Building 503 was left in place at the time of its demolition. A 21,000-gallon AST used to store fuel oil was also associated with Building 503 and was also reportedly demolished at an unknown time.

       p.     In approximately 1989, Building 606 was built on top of the site of Former Building 503. On information and belief, this construction caused a steam line beneath the Building 606 Property to break, causing a spill of hazardous PCB oil

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

into the Building 606 Property. In or about 1989, soil excavated from beneath Former

Building 503 was spread around Former Buildings 507 and 508, as well as in the

"laydown" area depicted in the following image. (In the following image, Building 606

is outlined in red, Former Building 503 is filled in yellow, and the laydown area is

depicted as a series of light blue squares.



122.    Additionally, pre-1996 records showed that, in fact, the soil, steam lines,

storm drains, and sanitary sewer that were known to be radiologically contaminated

during the NRDL's operation had never been systematically decontaminated.

        a.      Pre-1996 Navy records showed that the storm drain lines

throughout HPNS, including at the Building 606 Property, were contaminated,

including with radionuclides Cs-137, Ra-226, and Sr-90. In the 1940s, the system had

been built as a combined sanitary and storm sewer system using the same

conveyance piping. During storm events, storm water flows would overwhelm the

pump at Building 819 and much of the sewage and storm water was diverted to

various existing outfalls in the Bay. Despite a series of separation projects, complete

separation of the combined systems was never achieved. Due to the evolutionary

nature of the separation process, radiological contamination from the same source

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

31
COMPLAINT FOR DAMAGES

1   could have impacted the piping and other components of both systems.

2       123.    The Navy's statements, including those it made through its agent PRC,

3   in the Building 606 EBS, that "[n]o radiological hazards are expected," that "there

4   are no known health risks associated with the use of Building 606 for office

5   administration and staging by the SFPD," that Building 606 belonged in category 4,

6   that there are "no potential interior sources" of hazardous exposure in Building 606

7   were negligently made.

8               a.    The Navy's 1996 lease of the Building 606 Property to the City

9   occurred after the 1975 lawsuit by the Bay Area Water Quality Control Board for

10  illegal discharges of waste, after the 1984 Initial Assessment Study identifying 12

11  contaminated sites, after the DHS and CRWQCB remedial action orders demanding

12  cleanup in the mid-1980s, after the EPA's 1989 order listing HPNS listed as an NPL

13  Superfund site, after the 1992 criminal convictions of Triple A for illegal dumping,

14  and after the 1992 FFA ordered thorough investigation and remedial action.

15              b.    As of 1996, the Building 606 Property was the site of numerous

16  releases of hazardous substances, both known to the Navy and unknown.

17              c.    As of 1996, the presence of hazardous substances at and about the

18  Building 606 Property were never thoroughly studied, and future studies were

19  known by the Navy to be needed.

20              d.    Among other things, as of 1996, internal sources of contamination

21  that had not been studied at Building 606 included the water supply, the sanitary

22  sewer (which was connected to the storm drain system and was known to back up

23  into Building 606), and the large rollup doors which allowed free communication with

24  external airborne contamination.

25              e.    As of 1996, the Building 606 Property was not remediated.

26              f.    The Navy's transfer of the Building 606 Property to the City

27  occurred before the responsive CERCLA remediation had been completed or

28  approved.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

32
COMPLAINT FOR DAMAGES

**G.    After 1996, While Plaintiffs Were Working at Hunters Point Naval Shipyard, the Navy Continued to Misrepresent the True Extent of Hazardous Contamination Affecting Plaintiffs' Safety**

124.    From 2003 through 2014, the Navy entered into a series of contracts with Tetra Tech, including its predecessor company Foster Wheeler Environmental Corporation, as well as Tetra Tech EC, Inc. and Tetra Tech, Inc. to provide remediation services at HPNS ("Remediation Contracts"). These contracts required Tetra Tech, among other things, to investigate radiological contamination of soil and buildings, remediate and remove waste as necessary, and provide status reports to the Navy.

125.    The stated objective of the Remediation Contracts was to achieve "free-release" of radiologically impacted areas by testing soil and buildings in those areas, and remediating as necessary until test results demonstrated that radiation levels were below applicable release criteria and regulatory limits.

126.    Tetra Tech's representations to the City and the SFPD regarding contamination, lack of contamination, health, and safety were made within the course and scope of Tetra Tech's agency with the Navy.

127.    During the performance of the Remediation Contracts at HPNS, the Navy, directly and through its agent Tetra Tech, negligently and/or fraudulently concealed the true extent of contamination at HPNS.

128.    The Navy, directly and through its agent Tetra Tech and other intermediaries and agents, reassured the City, and Group A Plaintiffs and Group C Decedents that HPNS and the Subject Leased Property in particular remained safe for the City and Group A Plaintiffs' and Group C Decedents' continued use during the remediation, and that Group A Plaintiffs and Group C Decedents were not being exposed to hazardous substances.

129.    The Navy and/or its agent Tetra Tech knew or should have known that these representations were false when made.

130.    The Navy and/or its agent Tetra Tech knew or should have known that

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES

the City, and Group A Plaintiffs and Group C Decedents, were using the Subject

Leased Property for outdoor training, dirt-biking, biking, running, crawling, drilling,

police helicopter use, and other activities that brought them into contact with

contaminated soil, air, and water, and the Navy and/or its agent Tetra Tech knew or

should have known that, even when indoors, Group A Plaintiffs and Group C

Decedents had to keep windows and roll-up doors open for ventilation and were not

protected from external contamination and dust.

131.   The City and Group A Plaintiffs and Group C Decedents, in reliance on

the Navy's direct and vicarious representations regarding safety, continued to use

and occupy the Subject Leased Property and the roadways and other land at HPNS.

132.   While acting within the course and scope of its agency with the Navy,

Tetra Tech misrepresented the source of soil samples submitted to the laboratory for

testing, manipulated data from radiological testing of buildings, and reported false

results from the radiological soil and building tests.

133.   At all relevant times, Tetra Tech knew and intended that its fraudulent

representations regarding its findings at HPNS would be communicated to the City

(including the SFRA, the SFPD, and individual employees of the SFPD) both directly

by Tetra Tech and indirectly through the Navy. At all relevant times, the Navy did in

fact negligently convey these misrepresentations to the City (including the SFRA, the

SFPD, and individual employees of the SFPD).

134.   At all relevant times, the Navy and Tetra Tech knew that these

representations regarding the findings at HPNS were being relied upon by the City

of San Francisco (including the SFRA, the SFPD, and individual employees of the

SFPD) in deciding to renew the lease of Building 606, and to continue conducting

SFPD business at the HPNS base.

135.   Tetra Tech whistleblowers, in declarations that were originally

submitted under seal in False Claims Act litigation, and in declarations that were

submitted to the Nuclear Regulatory Commission, admitted to systematic fraudulent

1    activity by Tetra Tech at HPNS, including but not limited to the following:

2          a.      For radiological scans of buildings throughout HPNS, Tetra Tech

3    manipulated and falsified building scan data, rather than providing actual radiation

4    detection results from a full building survey. Duplicated strings of data have thus far

5    been discovered in the results of surveys conducted in 14 of 28 buildings.

6          b.      In or about July of 2006, Tetra Tech began speeding up (to a

7    speed of 6-9 times the approved speed) a conveyor belt system that was used to run

8    potentially contaminated soil through a radiation scanner in order to decrease

9    identification and remediation of radiological contamination of the soil, taken from

10   the PCB Hot Spot and IR-02. Tetra Tech also took actions to cripple the conveyor belt

11   system's ability to detect radiation by intentionally disabling its radiation detection

12   alarm.

13         c.      When Tetra Tech sampled contaminated soil and found that it

14   was too contaminated to be released, Tetra Tech intentionally and fraudulently

15   collected soil from different areas known to have lower radioactivity, and represent

16   that those samples had come from the location being investigated.

17         d.      Tetra Tech falsified chain-of-custody forms to support the false

18   sample collection information.

19         e.      Samples, data, and analytical results were discarded when the

20   results were above the release criteria.

21         f.      During the screening of soil at RSYs, Tetra Tech pulled the towed

22   array (scanning device) at speeds much higher than proper procedure dictated, in

23   order to intentionally reduce the probability of radiation detection.

24         g.      Tetra Tech intentionally used handheld detectors improperly to

25   reduce the probability of radiation detection.

26         h.      Tetra Tech blocked the shipment of samples to an offsite lab if

27   there was a high chance that the release criteria would be exceeded.

28         i.      Tetra Tech watered down soil before scanning it to reduce the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

35

COMPLAINT FOR DAMAGES

1   probability of radiation detection.

2          j.      At the portal monitors designed to detect high levels of gamma

3   radiation in trucks leaving HPNS, Tetra Tech decreased the sensitivity of scanners,

4   wetted the soil, and scanned through the steel sides of the trucks rather than over

5   the top of the soil, all in order to decrease the probability of radiation detection.

6          k.      In a December 1, 2017 Draft Radiological Data Evaluation

7   Findings Report for Parcel E Soil, the Navy found evidence of potential data

8   manipulation or falsification at 26 out of 57 trench units, evidence of biased sample

9   collection (to avoid the highest gamma scan measurements) at 64 out of 96 fill units,

10  and evidence of potential data manipulation or falsification at 61 out of 102 building

11  site survey units.

12         136.   The whistleblower allegations have been corroborated with findings that

13  indicate widespread fraud in the HPNS remediation efforts, including but not limited

14  to the following findings:

15         a.      The December 1, 2017 Draft Radiological Data Evaluation

16  Findings Report for Parcel E Soil specifically found evidence of fraudulent

17  investigation, including but not limited to sample collection, gamma scanning

18  techniques, and data manipulation, at Trench Survey Units 300, 309, 310, 311, which

19  include Former Building 503 Site Survey Units 12, 15, 16, 18, 23, 24, 31, 34, 35;

20         b.      On December 27, 2017, in reviewing the Draft Radiological Data

21  Evaluation Findings Reports for Parcels B and G Soil, the U.S. EPA acknowledged

22  that 97% of survey units in Parcel B were suspect;

23         c.      The U.S. EPA found signs of falsification in 100% of Parcel D-2

24  sampling data, 100% of UC-1 sampling data, 95% of UC-2 data, 97% of UC-3 data,

25  90% of Parcel B radiological data, 97% of Parcel G radiological data,

26         137.   According to Whistleblower Bowers, "soil that was contaminated with

27  non-radiological contamination, such as oils, PCBs, or asbestos, once processed on the

28  RSY pads and cleared, went through a portal monitor and was shipped off Hunters

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1  Point to third-parties. Soil that did not have these other forms of contamination, once

2  processed through the RSY pad and the samples approved by the lab, were returned

3  to Hunters Point and used as backfill for the trenches on site. It was much less

4  expensive for Tetra Tech to have the soil falsely cleared for use as backfill, than to

5  have the soil repeatedly subjected to remediation of radiological contamination, and

6  the associated time and expense of separating the non-impacted soil from portions

7  with elevated radioactive contaminants that would have to be shipped to a low level

8  rad waste infill."

9      138.   According to Whistleblower Bowers, "very, very high percentages of the

10  soil removed from Hunters Point were deemed "cleared," and used as backfill into the

11  Hunters Point trenches.

12      139.   On March 15, 2017, Tetra Tech manager Stephen Rolfe pleaded guilty to

13  destruction, alteration, or falsification of records in violation of 18 U.S.C. section

14  1519. Rolfe admitted that he had instructed other Tetra Tech employees to get "clean

15  dirt" from areas known to be clean and taken from outside the marked Survey Unit

16  areas to be used as substitute samples for the dirt from the Survey Unit, and that he

17  falsified chain of custody forms.

18      140.   On May 18, 2017, Tetra Tech manager Justin Hubbard pleaded guilty to

19  destruction, alteration, or falsification of records in violation of 18 U.S.C. section

20  1519, and admitted substantially the same fraudulent conduct as Stephen Rolfe had

21  admitted.

22      141.   On May 3, 2018, Tetra Tech supervisors Justin Hubbard and Stephen

23  Rolfe were sentenced to eight months in federal prison for falsifying records. Both

24  admitted that they were repeatedly ordered by supervisors to "get the hell out" of

25  contaminated areas and to "get clean dirt." They admitted that, in response to this

26  pressure, they substituted 5-gallon buckets of clean soil for potentially contaminated

27  soil at HPNS, and then filled out fraudulent chain of custody forms, which were

28  submitted to the Navy as evidence that the soil was free of harmful radiation.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

37

COMPLAINT FOR DAMAGES

142.    While remediation activities were ongoing, the Navy intentionally transferred Building 606 from Parcel D to Parcel E to delay its investigation and remediation.

**H.    As a Result of the Foregoing, Plaintiffs Were Exposed to Hazardous Substances and Injured**

143.    Group A Plaintiffs and Group C Decedents, and each of them, were exposed via inhalation, ingestion, and dermal exposure, as well as other exposure routes, to radiological and non-radiological contamination at HPNS, resulting in cellular, immunologic, acute, and chronic injuries to them.

**1.    Extensions and Expansions of the Subject Lease**

144.    The Subject Lease was originally set to expire June 30, 1998.

145.    On July 1, 1998, as a proximate and legal result of the City's original lease of the Building 606 Property, the Subject Lease was extended for an additional six-month period expiring December 31, 1998 (1998 Amended Lease).

146.    On February 1, 1999, as a proximate and legal result of the City's lease of the Building 606 Property, the Subject Lease was amended to add to the scope of the lease a 3.3-acre vacant lot area east of Building 606 and across Hussey Street (the Helipad Property), labeled "Proposed HLP Area" in the map below, for construction and use as a helicopter landing facility. (This February 1, 1999 lease is hereafter referred to as the 1999 Amended Lease.) The 1999 Amended Lease was for a term originally set to expire June 30, 2002. The 1999 Amended Lease also extended the lease term for the Building 606 Property through June 30, 2002.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES



147.   On September 30, 2002, as a proximate and legal result of the original Subject Lease, the Lease Agreement N6247497RPOOP45 was amended a fourth time so that it would continue to automatically extend on a month-to-month basis.

148.   Effective February 1, 2007, the 1997 Lease of the Helipad Property terminated and the SFPD no longer leased that 3.3-acre vacant lot area east of Building 606.

149.   As a direct and legal result of the ongoing lease of the Subject Leased Property by the SFPD, the SFPD also conducted training activities (during the same time period) near the Subject Leased Property as well as in Parcel A, with the Navy and Tetra Tech's approval and consent. In June 1998, pursuant to Navy contract number N62474998RP00P79, the Navy granted the SFPD authority to use Parcel A for training exercises.

150.   Most but not all of Group A Plaintiffs and Group C Decedents were relocated off base by 2009.

151.   SFPD's lease of the Building 606 Property is continuing, and some Group A Plaintiffs have continuing exposure.

**2.     Hazardous Substances Present at the Building 606 Property**

152.   Building 606 had been built in 1989 as a Shore Intermediate Maintenance Facility. It is an 89,600 square foot steel-construction industrial building. The front part (north end) of the building includes an entry lobby and 2

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1   stories of office and conference room spaces. The rear of the building (south portion)

2   is a 2-story high bay open area with concrete flooring.

3       153.   Building 606 was at all relevant times the site of dangerous

4   radionuclides, given that it had been the location of a radioactive laundry that had

5   discharged radioactive waste into the soil and groundwater under and immediately

6   around Building 606, and given that there had never been remediation of that

7   radioactive waste.

8       154.   Building 606 was at all relevant times the site of contamination,

9   including PCB oil, from on-site transformers.

10      155.   Sampling at Building 606 discovered volatile organic compounds

11   (VOCs), semi-volatile organic compounds (SVOCs), total petroleum hydrocarbons

12   (TPHs), total organic gasses (TOGs), and metals detected in soil.

13      156.   Polyaromatic hydrocarbons (PAHs) were discovered in the groundwater

14   at Building 606.

15      157.   A soil pit at the southeast corner of Building 606 was the site of a PCB

16   spill and, at all relevant times, of continuing PCB contamination that had not been

17   fully remediated.

18      158.   During Building 606's operation as the radioactive laundry, it had been

19   the site of a solvent (trichloroethane) spill.

20      159.   While Group A Plaintiffs and Group C Decedents were working at

21   Building 606, the roll-up bay doors and windows were often left open, allowing free

22   communication of outdoor air with the indoor spaces where Group A Plaintiffs and

23   Group C Decedents worked.

24      160.   When Group A Plaintiffs and Group C Decedents began working at

25   Building 606, some of them were initially drinking the tap water, and drinking from

26   the drinking fountain, in Building 606.

27      161.   Water sampling in Building 606 identified and verified elevated levels of

28   an unidentified petroleum product in the hot water system, as well as from the water

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1   main supplying the building; identified trihalomethane concentrations in excess of

2   state Maximum Contaminant Levels (MCLs) in both the hot and cold portions of the

3   Building 606 water system; and identified intermittent lead concentrations in excess

4   of State MCLs, in both the hot and cold portions of the Building 606 water system.

5       162.   Although bottled water was eventually provided to Group A Plaintiffs

6   and Group C Decedents, they at all relevant times brushed their teeth, showered,

7   and washed their hands in the Building 606 water.

8       163.   Contamination was, at all relevant times, present in the drain piping for

9   Building 606.

10       164.   Samples collected in the storm water drain to the northwest of Building

11   606 identified vinyl chloride and Aroclor-1260 at concentrations above levels of

12   concern for human health.

13       165.   Water samples collected from the Parcel D sewer lines indicated the

14   presence of arsenic, lead, manganese at concentrations above levels of concern to

15   human health.

16       166.   The drain pipes in and immediately outside Building 606 would

17   frequently overflow, causing Group A Plaintiffs and Group C Decedents to be directly

18   exposed to contamination from within old sanitary sewer and storm drain pipes.

19       167.   Sampling of the steam lines in Parcel D indicated the presence of

20   contaminants. Total Petroleum Hydrocarbons (TPH)-gasoline, total oil and grease,

21   and mercury were detected in Parcel D steam lines at concentrations above levels of

22   concern to human health.

23       168.   The landfill near Building 606 was at all times emitting methane gas, to

24   which Group A Plaintiffs and Group C Decedents were exposed.

25       169.   The landfill near Building 606 was at all times emitting chlorine gas

26   from underground cylinders, to which Group A Plaintiffs and Group C Decedents

27   were exposed.

28   / / / /

LAW OFFICES OF
Walkup, Melodia, Kelly
& Schoenberger
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

### 3.     Hazardous Substances Present at the Helipad Property

170.    During the operation of NRDL, the Helipad Property, unlike much of HPNS, was unpaved soil. It was in a location downwind of most of the sandblasting and other radioactive cleanup activities while the NRDL was in operation.

171.     The Helipad Property is adjacent to a "Former NRDL Site" on Mahan Street, which was hand drawn on a 1949 map and annotated "Buildings Now Occupied by NRDL." The site is approximately 300 feet north-northwest of Berth 21. It was used for unknown radiological activities.

172.    The Helipad Property was at all relevant times contaminated by Cs-137 and Ra-226 exceeding release limits.

173.    Groundwater from IR-44 and IR-70 flows toward and into the Helipad Property, causing contamination of its soil and groundwater with multiple hazardous substances.

174.    The SFPD constructed an approximately 144,000 square-foot paved helicopter takeoff and landing pad. The helicopter conducted approximately two routine flights per day, plus eight to ten additional emergency response flights each month.

175.    Effective September 3, 2002, the Helipad started to be used for emergency medical aircraft.

176.    When helicopters would take off and land at the Helipad Property, their rotors would stir up dust and fling rocks, created increased exposure to Group A Plaintiffs and Group C Decedents.

### 4.     Hazardous Substances Present Around the Building 606 Property

177.    The Building 606 Property was, at all times prior to about March of 2005, included as part of Sub-parcel S-41 within Parcel D.

178.    The Building 606 Property was, after about March of 2005, moved into and considered a part of Parcel E.

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

179.    The Building 606 Property is now part of Redevelopment Block MU-2 within Parcel E, at the edge of reuse area EOS-4, and at the edge of Parcel G and Parcel D-1. It is involved in IR sites IR-08 and IR-38.

180.    EOS-4, where Building 606 is located, is also the site of Building 521, Triple A Sites 6, 7, 12, and 13, former NRDL buildings 506, 509, 510, 510A, 517, and 529, which were used for oily liquid waste disposal, incineration of unknown industrial materials (Triple A Site 12), waste pond area (Triple A Site 13) steam generating power plant in Building 521.

181.    EOS-4 used to store PCB-containing liquid waste that was dumped along the shoreline, and was the site of a former burn disposal area.

182.    EOS-4 also contained IR-73, consisting of removed AST's (former asphalt manufacturing plant, removed AST's, and storage of drums containing unidentified oily liquids.

183.    The Building 606 Property is at the epicenter of the cluster of buildings that initially were the NRDL, and which were known to have been highly radioactive, and known to have released radionuclides into the surrounding soil and drains.

184.    Building 606 is either on or immediately adjacent to the sites of former buildings used by NRDL including the following:

    a.    An electrical substation (Building 527, IR-40, EOS-4);

    b.    A radioactive chemistry laboratory (Building 509);

    c.    A radioactive physics laboratory (Buildings 510 and 510A),

    d.    A radioactive biomedical facility (Building 517);

    e.    Radioisotope storage and Cockroft-Walton accelerator (Building 529);

    f.    Radioactive biomedical laboratory (Building 507);

    g.    Radioactive health physics office (Building 508);

185.    Other nearby buildings include Building 707, which had a pole-mounted

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1 | transformer and was used by the NRDL for animal research; Building 708, which

2 | was a Biomedical facility (IR-39); Building 406, which was the site of a groundwater

3 | plume involving trichloroethene ("TCE"), 1,4-DCB, carbon tetrachloride, 1,2-DCE,

4 | PCE, and vinyl chloride; Building 413, which showed elevated chemical

5 | concentrations of metals, SVOCs, and TPH; and a landfill containing known benzene,

6 | chlorine, radium dials, and methane.

7 |       186.    During the time that Group A Plaintiffs and Group C Decedents worked

8 | at HPNS, the Navy implemented several Time Critical Removal Actions ("TCRAs") to

9 | remove PCB spills in the immediate vicinity of Building 606. Along the western

10 | excavation sidewall, one sample had a PCB concentration of approximately 12,000

11 | milligram per kilogram (mg/kg) and another sample had a TPH concentration of

12 | 34,120 mg/kg.

13 |       187.    The steam line system (IR-45) which crosses through MU-2 and EOS-4

14 | was used by Triple A for transporting waste oil from Berth 29 in Parcel D and Dry

15 | Dock 4 in Parcel C to Building 521 and former AST S-505.

16 |       188.    The fuel distribution lines (IR-47) were used by Triple A for waste oil

17 | transportation from Berth 29 in Parcel D and Dry Dock 4 in Parcel C to Building 521

18 | and former AST S-505, and to the former oil reclamation ponds.

19 |       189.    The soil in the immediate vicinity of and directly in and on the Subject

20 | Leased Property was at all relevant times contaminated by numerous hazardous

21 | substances, some of which are still unknown. These substances include but are not

22 | limited to arsenic, chloroform, beryllium, benzene, hexavalent chromium,

23 | trichloroethylene, vinyl chloride, tetrachloroethylene, benzo(a)anthracene,

24 | benzo(a)pyrene, benzo(b)fluoranthene, 4,4'-DDE, 4,4'-DDD, Aroclor-1260, Aroclor-

25 | 1254, petroleum hydrocarbons, oil and grease, 3,3'-dichlorosbenzidine, 4-nitrophenol,

26 | 4, aldrin, alpha-BHC, antimony, Aroclor-1254, , , bis(2-ethylhexyl)phthalate,

27 | cadmium, carbazole, copper, dibenz(a, h)anthracene, dieldrin, gamma-BHC,

28 | heptachlor epoxide, indeno(1,2,3-cd)pyrene, iron, lead, manganese, mercury, n-

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1   nitroso-di-n-propylamine, n-nitrosodiphenylamine, naphthalene, pentachlorophenol,

2   thallium, vanadium, zinc, copper, iron, lead, manganese, mercury, and xylene, PCB,

3   TPH, cesium-137, radium-226, and strontium-90, as well as numerous other

4   radionuclides of concern.

5       190.   In 2013, the Navy's internal reports acknowledged that there was an

6   elevated risk. It specifically acknowledged the following (grossly understated) risks:

7           a.    Even using Tetra Tech's fraudulently understated test results,

8   and even using a "recreational" scenario that assumed people would be on the land

9   no more than 1-2 hours per day, 2 days per week, for 100 days, the recreational

10  radiological cancer risk estimate for EOS-4 was 7 in 1,000 (meaning that there is a

11  probability that 7 in 1,000 people using the land for such light recreational purposes

12  would get cancer as a result of this exposure), and for MU-2, it was 9 in 10,000).[1]

13          b.    Using the same assumptions, the pre-cleanup residential cancer

14  risk from breathing indoor air from shallow groundwater in MU-2 was estimated as 1

15  in 1,000.

16          c.    Using the same assumptions, the pre-cleanup residential cancer

17  risk from showering with deep groundwater in MU-2 was estimated as 4 in 10,000.

18          d.    Even using Tetra Tech's fraudulently understated test results,

19  and even using a "recreational" scenario, the non-radiological chemical cancer risk for

20  MU-2 was 3 in 1,000, and for EOS-4 was 3 in 10,000.

21          e.    Even using the understated findings, the pre-cleanup recreational

22  hazard index (for non-cancer disease) was 54 for MU-2 (i.e., 54 times the maximum

23  permissible hazard level of 1) and 9.6 for EOS-4 (i.e., 9.6 times the maximum

24  permissible hazard level of 1).

25      191.   On or about August 16, 2000, a 14-acre landfill near Building 606

26

27  ───────────────

28  [1] For comparison, the U.S. EPA considers a cancer risk of 1 in 1 million to be the
    maximum permissible cancer risk level for a resident.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1   ignited and burned for at least six hours. Several areas of landfill continued to

2   smolder, creating smoke, for at least one month. Group A Plaintiffs and Group C

3   Decedents, and each of them, were exposed to this smoke. On information and belief,

4   the landfill fire caused the release of underground vapors including methane gas,

5   arsenic, chloroform, trichloroethylene, tetrachloroethylene, benzene, and vinyl

6   chloride, which Group A Plaintiffs and Group C Decedents inhaled and which caused

7   them harm.

8       192.   During remediation activities, the levels of airborne particulate matter

9   (dust) became so severe that Group A Plaintiffs and Group C Decedents complained

10  regarding dust levels, and were awarded free car washes for their vehicles. However,

11  the Navy continued to reassure Plaintiffs that the dust, which Plaintiffs carried home

12  on their personal vehicles and clothing, was non-hazardous and did not present any

13  health risk. This was untrue, and the particulate matter that Group A Plaintiffs and

14  Group C Decedents inadvertently inhaled, ingested, and dermally contacted was

15  hazardous and caused them injury.

16      193.   During the time that Group A Plaintiffs and Group C Decedents worked

17  at Building 606, the majority of them developed acute symptoms, which

18  predominantly included rashes and other skin conditions, adult-onset asthma, other

19  respiratory complaints, headaches, and fatigue. At the time, based on the Navy's

20  direct and vicarious misrepresentations regarding the levels of known and suspected

21  contamination, Group A Plaintiffs and Group C Decedents were reassured that their

22  symptoms could not possibly be a result of any hazardous exposure at HPNS.

23      **I.      Concealment and Delayed Discovery**

24      194.   As a result of the Navy's direct and vicarious negligent and fraudulent

25  concealment and misrepresentations, Group A Plaintiffs and Group C Decedents

26  were kept ignorant and unaware of Tetra Tech's wrongdoing until at least July 26,

27  2018 or later. Their discoveries in this regard are ongoing.

28      195.   As a result of the Navy's direct and vicarious negligent and fraudulent

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1   concealment and misrepresentations, Group A Plaintiffs and Group C Decedents

2   were kept ignorant and unaware of their own exposure to hazardous materials until

3   at least July 26, 2018 or later. Their discoveries in this regard are ongoing.

4       196.   As a result of the Navy's direct and vicarious negligent and fraudulent

5   concealment and misrepresentations, Group A Plaintiffs and Group C Decedents

6   were kept ignorant the true causation of their diseases, injuries and conditions until

7   at least July 26, 2018 or later. Their discoveries in this regard are ongoing.

8                        **FIRST CAUSE OF ACTION**

9   **(Negligent Undertaking, Negligence Per Se, Negligent Misrepresentation)**

10      197.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

11  forth herein.

12      198.   Pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b),

13  and § 2674, et seq., the United States is liable in tort to the same extent as a private

14  individual under the law of the place where an injury occurs.

15      **Negligent Undertaking to Investigate and Provide Notice of**

16  **Hazardous Substances in 1996**

17      199.    The Navy undertook to and did, both directly and through its agents,

18  prepare Environmental Baseline Surveys and Findings of Suitability to Lease for the

19  express purpose of providing the legally required lease notifications to the City in

20  connection with the lease of the Subject Leased Property.

21      200.   The Navy, both directly and through its agents, undertook to review all

22  available information regarding the Subject Leased Property, survey the condition of

23  the Subject Leased Property, determine the nature, magnitude, and extent of any

24  contamination of the Subject Leased Property, and provide notice to the City as

25  required under § 120(h) of CERCLA of the type, quantity, and time frame of any

26  storage, release, or disposal of a hazardous substance on the property.

27      201.   The Navy, both directly and through its agents, undertook to identify,

28  obtain, and review all data, documents, and records relevant to determining the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210
COMPLAINT FOR DAMAGES

1    potential for present and past contamination of the Subject Leased Property,

2    including a review of historical records, and other available documents to ascertain

3    prior uses of the Subject Leased Property that may have involved hazardous

4    substances or otherwise contaminated the Subject Leased Property.

5        202.   The Navy, both directly and through its agents, undertook to notify the

6    City (and, through the City, Group A Plaintiffs and Group C Decedents) of any

7    known release of hazardous substances at the Subject Leased Property.

8        203.   The Navy, both directly and through its agents, undertook to provide an

9    accurate and thorough review of the past use and current condition of the Subject

10   Leased Property and the HPNS Base, as of 1996, and to accurately and thoroughly

11   communicate that past use and current condition to the City.

12       204.   In preparing the Subject Lease, the Building 606 EBS, and the Building

13   606 FOSL, the Navy was performing its duty owed to third party transferees and

14   tenants at HPNS, including the City and Group A Plaintiffs.

15       205.   The Navy, both directly and through its agents, rendered investigation

16   services for the City, and knew or should have realized that these services were of a

17   kind that were needed for the protection of the City and its employees, including

18   Group A Plaintiffs and Group C Decedents, as they prepared to receive and occupy

19   the Subject Leased Property.

20       206.   In compiling and reviewing its records regarding the Subject Leased

21   Property, and publishing disclosures regarding the Subject Leased Property for the

22   benefit of the City in and about 1996, the Navy, both directly and through its agents,

23   failed to exercise reasonable care.

24       207.   The Navy's failure to exercise reasonable care in investigating the

25   Subject Leased Property, and in publishing its disclosures regarding the Subject

26   Leased Property, added to the risk of harm to Plaintiffs, and each of them.

27       208.   As a direct and legal result of the Navy's failure to exercise reasonable

28   care in investigating the Subject Leased Property, and in publishing its disclosures

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1  regarding the Subject Leased Property, Plaintiffs, and each of them, sustained

2  damages as set forth hereinabove.

3  **Violation of 42 U.S.C. § 9620(h)(1)**

4  209.   Pursuant to 42 U.S.C. § 9620(h)(1),

5  [W]henever any department, agency, or instrumentality of
   the United States enters into any contract for the sale or
6  other transfer of real property which is owned by the
   United States and on which any hazardous substance was
7  stored for one year or more, known to have been released,
   or disposed of, the head of such department, agency, or
8  instrumentality shall include in such contract notice of the
   type and quantity of such hazardous substance and notice
9  of the time at which such storage, release, or disposal took
   place, to the extent such information is available on the
10 basis of a complete search of agency files.

11  210.   At all relevant times, the Navy owned and controlled the Subject Leased

12 Property.

13  211.   At all relevant times, the Navy knew or, in the exercise of reasonable

14 care, should have known that hazardous substances, including but not limited to

15 radionuclides, had been released at the Subject Leased Property.

16  212.   Prior to 1996, the Navy was aware, or should have been aware from a

17 complete review of its own agency records, of past releases of hazardous substances

18 at the Subject Leased Property.

19  213.   In or about 1996, the Navy was transferring the Subject Leased

20 Property to the City, knowing that it would be used as a workplace by SFPD

21 employees (including Group A Plaintiffs and Group C Decedents).

22  214.   In or about 1996, through the Subject Lease, the Building 606 EBS, and

23 the Building 606 FOSL, the Navy was obligated to notify the City (and, through the

24 City, Group A Plaintiffs and Group C Decedents) of any known release of hazardous

25 substances at the Subject Leased Property.

26  215.   As of and after 1996, hazardous substances were still present at the

27 Subject Real Property.

28  216.   At all relevant times, the history of past releases of hazardous

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1  substances at the Subject Leased Property, and the continuing presence of hazardous

2  substances at the Subject Leased Property, were hidden and latent dangers from the

3  perspective of the City and Plaintiffs.

4        217.   In or about 1996, the Navy violated 42 U.S.C. § 9620(h)(1) by failing to

5  provide notice of the type and quantity of hazardous substances known to have been

6  released at the Subject Leased Property, and of the time at which such release took

7  place, to the extent that information was available on the basis of a complete search

8  of agency files.

9        218.   The Navy's failure to provide notice of the type and quantity of

10  hazardous substances known to have been released at the Subject Leased Property,

11  and of the time at which such release took place, was a proximate cause of injury to

12  Plaintiffs, and each of them as set forth hereinabove.

13        219.   Plaintiffs belong to the class of persons 42 U.S.C. § 9620(h)(1) was

14  intended to protect.

15        220.   Plaintiffs' injuries resulted from the type of occurrence 42 U.S.C. §

16  9620(h)(1) was designed to prevent.

17  **Negligent Misrepresentations in 1996**

18        221.   In or about 1996, the Navy negligently failed to warn the City (and,

19  through the City, Group A Plaintiffs and Group C Decedents) of the known release of

20  hazardous substances, including radionuclides and other substances, at the Subject

21  Leased Property.

22        222.   At all relevant times, the Navy negligently misrepresented facts

23  regarding the Subject Real Property, and surrounding property at HPNS.

24        223.   These misrepresentations include, but are not limited to, the Navy's

25  statements to the City, in the 1996 Building 606 EBS, that:

26        a.     "[T]here are no known health risks associated with use of

27  Building 606."

28        b.     Former Building 503, which was on the Building 606 site, "did not

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1    have uses consistent with the storage or use of hazardous materials."

2         c.    During the NRDL years, HPA was used for "limited radiological

3    operations."

4         d.    "As part of the disestablishment of NRDL all sites were surveyed

5    for radiological contamination and decontaminated if necessary."

6         e.    PRC "placed building 606 in category 4, since remedial actions

7    are complete, and the building was recently leased by the movie industry."

8         f.    The "condition of all the spaces [in Building 606] is excellent with

9    no signs of the use, storage, or spillage of hazardous materials or petroleum

10   products."

11        g.    "There are no potential interior sources" of hazardous exposure in

12   Building 606.

13        h.    Known contamination of Parcel D steam lines with TPH-gasoline,

14   oil, grease, and mercury is not of concern at Building 606 because "[t[[here are no

15   steam lines indicated in or around Building 606."

16   224.    The Navy's representations to the City were not true.

17   225.    The Navy had no reasonable grounds for believing these representations

18   were true when it made them.

19   226.    When the Navy made these representations, it intended that the City

20   rely on them in exposing its employees to the Subject Leased Property, and

21   surrounding property and hazardous materials.

22   227.    The City, in exposing its employees to the Subject Leased Property and

23   surrounding property and materials, reasonably relied on the Navy's representations.

24   228.    As a result of their exposure at HPNS, Group A Plaintiffs and Group C

25   Decedents, and each of them, were harmed in that they sustained acute physical

26   injuries at or near the time of their exposure (including, for example, rashes and

27   other skin conditions, adult onset asthma, other respiratory complaints, fatigue, and

28   headaches).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

51
COMPLAINT FOR DAMAGES

229.   As a further legal result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, were also harmed in that they suffered from past and future chronic illnesses and diseases both diagnosed and undiagnosed, and known and presently unknown (including, for example, immune compromise, cellular dysfunction, lung cancer, melanoma, basal cell carcinoma, squamous cell carcinoma, thyroid cancer, lymphoma, reproductive cancer, thyroid disease, heart disease, blood disorders, and other chronic medical conditions related to environmental exposure).

230.   As a further legal result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, were also harmed in that they are at an elevated risk of developing future illnesses and diseases (including, for example, immune compromise, cellular dysfunction, lung cancer, melanoma, basal cell carcinoma, squamous cell carcinoma, thyroid cancer, lymphoma, reproductive cancer, thyroid disease, heart disease, blood disorders, and other chronic medical conditions related to environmental exposure).

231.   As a further legal result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, have suffered past and future pain and suffering, including fear of cancer, mental suffering, anxiety, emotional distress, loss of enjoyment of life, and physical impairment.

232.   As a further legal result of their exposure at HPNS, Group A Plaintiffs, and each of them, have incurred past and future expenses for medical monitoring and diagnostic services; past and future expenses for medical care and related treatment; and past and future wage loss and loss of earning capacity.

233.   The City's reliance on the Navy's representation was a substantial factor in causing Plaintiffs' harm as set forth hereinabove.

/ / / /

/ / / /

/ / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

## SECOND CAUSE OF ACTION

### (Public Nuisance)

234.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

235.    The Navy, by its representations, and the representations of its agents, to the City and Plaintiffs, and by its sponsored remediation activity, increased the proximity of hazardous substances, including but not limited to radiation and toxic dust, to the Group A Plaintiffs and Group C Decedents.

236.    The Navy thereby created a condition that was harmful to health, and interfered with Plaintiffs' comfortable enjoyment of life and property.

237.    The condition the Navy created affected a substantial number of people at the same time.

238.    An ordinary person would be reasonably annoyed or disturbed by the condition the Navy created.

239.    The seriousness of the harm the Navy created outweighs the social utility of its conduct.

240.    Group A Plaintiffs and Group C Decedents, by virtue of their presence at HPNS in the epicenter of the remediation activities, suffered harm that was different from the type of harm suffered by the general public.

241.    The Navy's conduct was a substantial factor in causing Group A Plaintiffs and Group C Decedents' harm.

242.    As a direct and legal result of the Navy's negligent cleanup and negligent representations, Group A Plaintiffs and Group C Decedents, and each of them, sustained damages as set forth hereinabove.

## THIRD CAUSE OF ACTION

### (Loss of Consortium)
### (By Group B Plaintiffs)

243.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES

1  forth herein.

2  244.   Each Group B Plaintiff was and is at all relevant times the lawful

3  spouse or domestic partner of a Group A Plaintiff, as set forth in Exhibit B, which is

4  incorporated herein by this reference.

5  245.   Each Group B Plaintiff was harmed by the injury to his or her spouse or

6  domestic partner.

7  246.   As a direct and legal result of the conduct of Defendants, and each of

8  them, as set forth hereinabove, and of the injuries to the Group A Plaintiffs, each

9  Group B Plaintiff suffered a loss of consortium, including but not limited to the loss

10 of his or her spouse or domestic partner's companionship, comfort, care, assistance,

11 protection, affection, society, and support.

12 ## FOURTH CAUSE OF ACTION

13 ### (Wrongful Death)
### (By Group C Plaintiffs)
14

15 247.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

16 forth herein.

17 248.   This cause of action is brought on behalf of Group C Plaintiffs.

18 249.   By reason of the premises, and as a direct and legal result of the Navy's

19 acts and omissions as set forth above, Group C Decedents, whose identities are stated

20 in Exhibit C, were exposed at HPNS to hazardous substances and radiation, which

21 were a substantial factor in causing each of them to suffer from fatal diseases.

22 250.   Group C Plaintiffs are those surviving family members of Group C

23 Decedents, who have standing to bring a wrongful death action, as well as personal

24 representatives of the estates of Group C Decedents, who have standing to bring a

25 wrongful death action on behalf of the surviving family members.

26 251.   As a direct and legal result of the Navy's acts and omissions as set forth

27 above, Group C Plaintiffs and each of them, have been deprived of the

28 companionship, comfort, care, assistance, protection, affection, society, and support of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  their loved ones, as set forth in Exhibit C.

2      252.   As a further direct and legal result of the Navy's actions and/or

3  omissions, Group C Plaintiffs, and each of them, have incurred medical, funeral and

4  burial expenses in an amount to be shown according to proof at trial.

5      253.   As a further direct and legal result of the Navy's actions and/or

6  omissions, and/or each of them, Group C Plaintiffs suffered economic losses,

7  including but not limited to the loss of financial support, and/or the loss of household

8  services in an amount according to proof of trial.

9                **FIFTH CAUSE OF ACTION**

10        **(Negligent Infliction of Emotional Distress—Fear of Cancer)**

11     254.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

12  forth herein.

13     255.   As the direct and legal result of the Navy's negligence, carelessness, and

14  other culpable acts and/or omissions, Plaintiffs were exposed to carcinogenic and

15  additional toxic substances at HPNS from 1996 to the present.

16     256.   Plaintiffs were kept ignorant of their exposure to these carcinogenic and

17  additional toxic substances until at least July 26, 2018 or later, due to the Navy's

18  negligence and carelessness.

19     257.   As a direct and legal result of the Navy's negligence, and carelessness,

20  Plaintiffs have suffered serious emotional distress from a fear that they will develop

21  various forms of cancer as a result of their exposure to carcinogenic substances at

22  HPNS. Plaintiffs' serious emotional distress includes suffering, anguish, fright,

23  horror, nervousness, grief, anxiety, worry, and shock.

24     258.   Plaintiffs, as a result of the Navy's conduct, and upon learning of their

25  increased risk of cancer, suffered emotional distress so serious that an ordinary

26  person would be unable to cope with it.

27     259.   Reliable medical or scientific opinion can and will confirm that

28  Plaintiffs' risks of developing cancer and additional maladies were significantly

COMPLAINT FOR DAMAGES

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1   increased by the exposure and has resulted in an actual risk of cancer that is

2   significant in nature.

3       260.   The Navy's negligence, carelessness, and other culpable actions and/or

4   omissions were a substantial factor in causing Plaintiffs' serious emotional distress

5   upon learning of their heightened risks of cancer due to exposure to known radiation

6   at HPNS.

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

9       261.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

10  forth herein.

11      262.   The Navy, at all relevant times, knew that its misrepresentations,

12  concealment, and failure to comply with its statutory duty to investigate were likely

13  to cause harm to the plaintiffs, whom the Navy knew were spending time at HPNS in

14  reliance on the Navy's representations.

15      263.   The Navy, through its agent Tetra Tech, intentionally misrepresented

16  the true levels of radioactive contamination at HPNS, knowing that plaintiffs would

17  continue to be exposed to increasing levels of contamination in reliance on those

18  misrepresentations.

19      264.   The Navy knew that Plaintiffs were present at HPNS when this conduct

20  occurred, and the Navy knew that Plaintiffs would probably suffer emotional distress

21  as a result of the Navy's conduct, and the conduct of its agent Tetra Tech.

22      265.   The Navy's conduct described herein was a substantial factor in causing

23  Plaintiffs, and each of them, to suffer severe emotional distress.

## PRAYER FOR RELIEF

25      WHEREFORE, Plaintiffs, and each of them, demand and pray that judgment

26  be entered in their favor against Defendants, and each of them, as follows:

27      A.     For noneconomic damages according to proof at trial;

28      B.     For economic damages according to proof at trial;

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

56

COMPLAINT FOR DAMAGES

1      C.      For costs of suit and attorneys' fees to the fullest extent permitted by

2  law;

3      D.      For pre-judgment and post-judgment interest according to law;

4      F.      For such other and further relief as the Court may deem proper.

5

6  Dated:  September 14, 2020          WALKUP, MELODIA, KELLY & SCHOENBERGER

7

8                                      By: _____

9                                           KHALDOUN A. BAGHDADI

10                                          SARA M. PETERS
                                            JADE SMITH-WILLIAMS
11                                          Attorneys for PLAINTIFFS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs hereby demand a jury trial.

3

4   Dated:  September 14, 2020        WALKUP, MELODIA, KELLY & SCHOENBERGER

5

6                                     By: _____

7                                          KHALDOUN A. BAGHDADI
8                                          SARA M. PETERS
                                           JADE SMITH-WILLIAMS
9                                          Attorneys for PLAINTIFFS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES