LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

KHALDOUN A. BAGHDADI (State Bar #190111)
kbaghdadi@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
KELLY L. GANCI (State Bar #335658)
kganci@walkuplawoffice.com

WENDI J. BERKOWITZ (State Bar #145624)
MESSING ADAM & JASMINE LLP
235 Montgomery Street, Suite 828
San Francisco, CA 94104
Telephone: (415) 266-1800
Facsimile: (415) 266-1128
wendi@majlabor.com

**ATTORNEYS FOR PLAINTIFFS**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KEVIN ABBEY, et al., | Case No. 3:20-cv-06443-JD |
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR DAMAGES** |
| v. | **[Negligence; Negligent Misrepresentation; Negligence Per Se; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Loss of Consortium; Wrongful Death; Amount in Controversy Exceeds $25,000]** |
| UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY, | |
| Defendants. | |
| | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................5

CLASS ACTION ALLEGATIONS.......................................................11

PARTIES.................................................................................................13

JURISDICTION AND VENUE ............................................................14

FACTUAL ALLEGATIONS .................................................................15

    A.    Hunters Point Naval Shipyard Administrative Background
        (1869-Present) ...................................................................15

    B.    For Decades, Large Quantities of Hazardous Substances Were
        Released Throughout Hunters Point Naval Shipyard .........................18

        1.    Release of Radiological Contamination by the Naval
              Radiological Defense Laboratory (1946-1969) ...........................18

        2.    Release of Non-Radiological Hazardous Substances by the
              Navy (1941-1974) .........................................................21

        3.    Release of Hazardous Industrial Substances by Triple A
              Machine Shop (1976-1987)...............................................23

    C.    The Transfer of the Subject Leased Property to the City
        (Beginning in 1996) .........................................................23

    D.    Before It Could Transfer the Subject Leased Property to the
        City, the Navy Was Required by Statute to Disclose to the City
        the Type and Quantity of Hazardous Substances Released at
        and Around Building 606.....................................................24

    E.    Beginning in or About 1996, the Navy Negligently
        Misrepresented the Type and Quantity of Hazardous Materials
        Released at the Subject Leased Property, Causing the City to
        Enter into the Subject Lease Agreements...............................25

    F.    Before 1996, a Complete Search of the Navy's Files Would Have
        Revealed That Voluminous Hazardous Substances, Including
        Radionuclides, Were Known to Have Been Released at and
        Around the Subject Leased Property and That the Navy's Lease
        Representations Were False ..................................................29

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

**TABLE OF CONTENTS**
(Continued)

Page

G.   After 1996, While Plaintiffs Were Working at Hunters Point Naval Shipyard, the Navy Continued to Misrepresent the True Extent of Hazardous Contamination Affecting Plaintiffs' Safety, and Negligently Supervised the Investigation and Remediation Work Performed by Its Contractor, Tetra Tech ......................................37

    1.   Tetra Tech's Widespread Fraud and Criminal Convictions ......39

    2.   The Navy's Mandatory Duties Under the Federal Facilities Agreement ........................................................................43

    3.   The Navy's Mandatory Duties Under the Construction Quality Control Program Manual .................................................44

    4.   The Navy's Mandatory Duties Under Work Plans, Sampling Plans, and QAPPs ........................................................48

H.   As a Result of the Foregoing, Plaintiffs Were Exposed to Hazardous Substances and Injured ........................................................49

    1.   Extensions and Expansions of the Subject Lease ......................49

    2.   Hazardous Substances Present at the Building 606 Property ........................................................................................50

    3.   Hazardous Substances Present at the Helipad Property ..........53

    4.   Hazardous Substances Present Around the Building 606 Property ........................................................................................53

I.   Concealment and Delayed Discovery .......................................................57

FIRST CAUSE OF ACTION (Negligent Undertaking, Negligent Failure to Warn, Negligent Supervision, Negligence Per Se, and Negligent Misrepresentation) ......................................................................................................58

    Negligent Undertaking to Investigate, Inspect, and Provide Notice and Warning of Hazardous Substances in 1996; Negligent Failure to Warn; and Negligent Supervision .................................................................58

    Violation of 42 U.S.C. § 9620(h)(1) (Negligence Per Se) .................................60

    Negligent Misrepresentations in 1996 ............................................................62

SECOND CAUSE OF ACTION (Public Nuisance) ...........................................64

THIRD CAUSE OF ACTION (Loss of Consortium) (By Group B Plaintiffs) ....................................................................................65

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1

## <u>TABLE OF CONTENTS</u>
### (Continued)

2

Page

3
FOURTH CAUSE OF ACTION (Wrongful Death)

4
    (By Group C Plaintiffs) ............................................................................................66

5
FIFTH CAUSE OF ACTION (Negligent Infliction of Emotional Distress—

6
    Fear of Cancer) ...........................................................................................................67

7
SIXTH CAUSE OF ACTION (Intentional Infliction of Emotional Distress) ............68

8
PRAYER FOR RELIEF ...............................................................................................68

9
DEMAND FOR JURY TRIAL......................................................................................70

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

Plaintiffs, by and through undersigned counsel Walkup, Melodia, Kelly & Schoenberger, A Professional Corporation, and Messing Adam & Jasmine LLP, as their Complaint against Defendant United States of America (hereafter, "the Navy"), hereby allege as follows:

**INTRODUCTION**

1.      This case is brought on behalf of the men and women who serve and protect the citizens of and visitors to San Francisco, California. As discussed more fully herein, due to Defendant's negligent acts, officers and other employees of the San Francisco Police Department ("SFPD") were exposed, at Hunters Point Naval Shipyard ("HPNS"), to unsafe levels of radioactive and otherwise hazardous substances. Defendant's failure to warn the City and County of San Francisco ("the City") about the hazardous substances used and released at HPNS was a substantial factor in causing the Plaintiffs' acute symptoms and elevated risk of developing life-threatening cancers and other diseases.

2.      From the mid-1800s to about 1989, HPNS was used by private entities and the Navy for ship maintenance and repair activities.

3.      Over the decades, these ship maintenance and repair activities caused the release of waste oils, cleaning solvents, sandblasting materials, acid, and other hazardous substances throughout the HPNS base.

4.      From about 1946 to 1969, the Navy used HPNS as the site of extensive radioactive research, testing, and cleanup, resulting in widespread radioactive contamination of the entire HPNS base.

5.      In particular, from 1946 to 1955, during a period when there was no regulation of its radioactive facilities, the Navy operated a radioactive laundry on the property that would later be the site of Building 606 (the "Building 606 Property" as defined in paragraphs 84 and 85), releasing hazardous radionuclides into the soil and groundwater there.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

5

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

6.     In the 1980s, pipes carrying waste oil contaminated with polychlorinated biphenyls ("PCBs") broke and spilled PCBs on and around the Building 606 Property.

7.     Before or during the construction of Building 606, the Navy excavated contaminated soil from beneath Building 606. Instead of properly containing and safely disposing of the soil so as not to further release or spread any contamination, the Navy lay the excavated soil on the surface of the ground surrounding Building 606.

8.     In light of the extensive history of hazardous substances being used, stored, and released at HPNS, the United States Environmental Protection Agency ("U.S. EPA") found, in 1989, that HPNS met the criteria under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for inclusion on the list of U.S. EPA-regulated "Superfund" sites. As such, the Navy would have to comprehensively evaluate and remediate HPNS, under U.S. EPA supervision, before the base could be reused.

9.     Between 1989 and 1996, although the Navy had not yet performed any comprehensive evaluation or remediation, it entered into discussions with the City about a potential short-term lease of the Building 606 Property to the City for use by the SFPD.

10.     Between 1989 and 1996, the Navy contracted with Tetra Tech, Inc. (including with predecessor corporation PRC Environmental Management, Inc. and then successor corporation Tetra Tech EM, Inc.) to perform studies and review Navy records for the purpose of (1) determining whether the Building 606 Property could be safely leased to the City for use by the SFPD, and (2) complying with the statutory requirement that the Navy notify the City of the full history of hazardous substances that had been used or released at the Building 606 Property.

11.     Despite the existence of Navy records stating that a radioactive laundry had operated on the Building 606 Property, the Navy negligently performed its

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

6

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  inspection, investigation, and record review, and negligently told the City that there

2  was no history of any radioactive substances at the Building 606 Property.

3       12.    Despite the fact that the extent of persistent contamination and human

4  health risk at HPNS (and in particular, at the Building 606 Property) remained

5  unknown, and was subject to ongoing and future testing, the Navy so negligently

6  performed its inspection, investigation, and record review that it told the City that

7  the SFPD could use the Building 606 Property without exposing SFPD employees to

8  health risk from exposure to hazardous substances.

9       13.    In connection with the lease of the Building 606 Property, the Navy so

10  negligently performed its inspection and review of its own historic records, and of the

11  relevant property, that it provided the City with a Finding of Suitability to Lease and

12  property-specific environmental baseline survey results that included numerous

13  material misrepresentations regarding the release of hazardous substances at and

14  around the Building 606 Property, including but not limited to the following false

15  statements and failures to warn:

16       a.    "[T]here are no known health risks associated with the use of

17  Building 606 for office administration and staging by the SFPD."

18       b.    Former Building 503, which had been on the site of the Building

19  606 Property, "did not have uses consistent with the storage or use of hazardous

20  materials."

21       c.    Hunters Point Annex ("HPA") had been used for only "limited

22  radiological operations."

23       d.    As part of the disestablishment of the Naval Defense Radiological

24  Laboratory ("NRDL"), "all sites were surveyed for radiological contamination and

25  decontaminated if necessary. No radiological hazards are expected."

26       14.    These statements were not only false, but were clearly and

27  unambiguously false according to then-existing Navy records.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

15.     Relying on these representations and omissions, the SFPD relocated hundreds of its police employees to begin working at HPNS in 1997.

16.     Plaintiffs in this action are former and active SFPD employees (most of whom were members of specialized police units including the SWAT team, bomb squad, tactical unit, K9 unit, dirt bike unit, crime lab, property control, and crowd control divisions) who worked at HPNS, as well as those Plaintiffs' spouses, domestic partners, and surviving family members and personal representatives who have standing to bring wrongful death and survival actions.

17.     From 1992 until at least 2014 (including all the times when Plaintiffs were working at HPNS), Tetra Tech (including Tetra Tech EC, Inc., its predecessors, and Tetra Tech, Inc.) was required by contracts with the Navy to plan, oversee, and perform extensive testing and remediation throughout HPNS.

18.     Pursuant to the Navy contracts, Tetra Tech was required to move through the base, parcel by parcel, performing sampling and testing of soil to determine whether suspected hazardous substances were present in levels above the cleanup goals set by the Navy in conjunction with the U.S. EPA and other agencies. When Tetra Tech found elevated levels of hazardous substances, it was required to perform additional sampling and testing until it found soil that tested clean, thus demarcating the boundaries of the contaminated areas.

19.     Pursuant to the Navy contracts, Tetra Tech was required to safely contain and dispose of any contaminated soil it processed. Depending on the type and extent of contamination in each soil unit, processing requirements varied. Radioactive soil was to be sealed in steel drums and processed in a specialized manner. Non-radioactive soil that contained industrial chemicals was to be loaded into trucks, driven through portal monitors to screen it for radioactivity before exiting the base, and then taken to off-site landfills. Clean soil could be reused on site as backfill, with minimal processing.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

20.     Pursuant to the Navy contracts, Tetra Tech was required to ensure that the testing and remediation activities at HPNS did not cause injury to Plaintiffs who were working there.

21.     From 1992 to 2014, while Tetra Tech was performing testing and remediation at HPNS, the Navy applied pressure to Tetra Tech to reduce the time and expense of the project. The Navy's contracts with Tetra Tech provided financial incentives for performing work quickly. Some of the contracts had budget caps built in, and others were fixed price, requiring Tetra Tech to bear the expense if its test results showed more contamination than expected, and thus required more extensive remedial action. Initial estimates regarding the scope, duration, and expense of the HPNS remediation proved to be inaccurate. Whereas the Navy originally anticipated that it would be able to fully remediate HPNS and then sell it to the City within a handful of years, the remediation work has now been ongoing for 28 years.

22.     Given the Navy's motivation and efforts to save time and cost, from 1997 to 2014, the Navy failed to adequately oversee and monitor Tetra Tech's fraudulent testing and remediation work, thereby violating numerous specific and mandatory duties imposed on the Navy by federal statutes, regulations, policy manuals, guidance documents, work plans, and contractual agreements. Under the Navy's negligent supervision, Tetra Tech engaged in ongoing fraud, including swapping out contaminated samples for clean samples, running scanning belts at high speeds, watering down soil to block detection of radioactivity, destroying test results at its on-site laboratory, and reducing the sensitivity of its test instruments. Tetra Tech's fraudulent activity resulted in two criminal convictions of Tetra Tech employees, as well as False Claims Act lawsuits brought by the Navy and former Tetra Tech employees (the whistleblowers or relators) against Tetra Tech.

23.     From 1997 to 2014, the Navy and Tetra Tech, under the Navy's negligent supervision, concealed from the City and Plaintiffs the actual extent of contamination they knew or suspected was present throughout HPNS, understated

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

9

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  the human risk at HPNS, and failed to warn the City of the risk to its employees who

2  were working at HPNS.

3      24.    As a result of these misrepresentations, concealments, omissions, and

4  failures to warn by the Navy and by Tetra Tech, under the Navy's negligent

5  supervision, the City continued to have Plaintiffs work at HPNS during Tetra Tech's

6  remediation activities.

7      25.    Under the Navy's negligent supervision, Tetra Tech also processed soil

8  and materials that it knew or suspected were contaminated and potentially injurious

9  to humans, handling such soil and materials as if they were clean, without taking

10 safety precautions to protect the lives and safety of Plaintiffs who were working at

11 HPNS. Specifically, under the Navy's negligent supervision, Tetra Tech dangerously:

12      a.    Created Radiation Screening Yards ("RSYs") on the land directly

13 surrounding the Building 606 Property, where Plaintiffs were working.

14      b.    Routed trucks so that they used the roadways bordering the

15 Building 606 Property to carry contaminated soil to and from the RSYs.

16      c.    Failed to secure the truckloads of soil, so that soil dropped on the

17 roadways shared with Plaintiffs and/or contaminants in the soil became airborne

18 along the roadways.

19      d.    Dumped soil in unsecured piles surrounding the Building 606

20 Property.

21      e.    Created extensive soil disruption in the area of the Building 606

22 Property, which forced Plaintiffs to inhale contaminated airborne particulate matter

23 (dust), and substantially increased Plaintiffs' exposure.

24      26.    As a result of the Navy's negligent and reckless acts and omissions as

25 described herein, including its catastrophic failure to comply with mandatory

26 statutory, regulatory, and contractual obligations in supervising Tetra Tech's

27 investigation and remediation work, Plaintiffs were exposed, via numerous exposure

28 pathways, to multiple hazardous substances at HPNS.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

10

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

27.     Plaintiffs' exposure to hazardous substances at HPNS was a substantial factor in causing Plaintiffs' acute symptoms, including rashes, wheezing, coughing, shortness of breath, and headaches. It was also a substantial factor in causing Plaintiffs' heightened risk of developing cancer, lung disease, and other adverse medical conditions in the future. For some Plaintiffs, who have already been diagnosed with cancer, lung disease, and other medical conditions, the exposure to hazardous substances at HPNS was likely a substantial factor in causing these diseases.

28.     By virtue of Tetra Tech's fraudulent testing, and its intentional destruction of test results and samples, Tetra Tech, while acting as the Navy's agent and while subject to the Navy's control, destroyed evidence of the actual and full extent of contamination at HPNS. It also shipped hazardous materials off-site, and/or relocated them within the base, such that the full extent of contamination may now never be knowable. As a result of the Navy's vicarious spoliation of evidence, through its agent Tetra Tech, the full extent of Plaintiffs' exposure is still unknown and likewise may never be knowable, and this is a source of ongoing distress to Plaintiffs.

## CLASS ACTION ALLEGATIONS

29.     In addition to, and in the alternative to, commencing this action in their individual capacities, Plaintiff Abbey brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and all others similarly situated, as members of the proposed Plaintiff class defined as follows:

> All persons employed by the SFPD who, as a result of the Navy's 1996 leases of HPNS property to the SFPD, worked at HPNS at any time from 1996 to the present and who submitted a Federal Tort Claim to the United States Navy alleging exposure to toxic substances at HPNS

30.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

11
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

a.      **Numerosity**: Although the exact number of Class members is uncertain and can only be ascertained through discovery, the Class is so numerous that their individual joinder in this case is impracticable. The disposition of the Class's claims in a single action will provide substantial benefits to all parties and to the Court. Upon information, belief, and reasonable research, hundreds or thousands of individuals have suffered losses, injuries, and damages due to Defendant's legal fault as alleged herein. Moreover, Class members are readily ascertainable from information and records kept by the SFPD. Class members may be notified of the pendency of this action by mail and/or electronic mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

b.      **Commonality**: Common questions of law and fact exist as to Plaintiffs and all other Class members and predominate over questions affecting only individual Class members. These questions, which arise from Defendant's common course of conduct, include what Defendant knew and should have known, and did and failed to do, about the risk of Plaintiffs' exposure to carcinogens, whether Defendant misled the City, SFPD, regulators, and members of the public; and whether Defendant tried to cover up the existence and severity of their failures as alleged herein. Among these questions of law and fact are:

i.      Whether Defendant's acts and omissions were a legal/proximate cause of Plaintiffs' injuries.

ii.     Whether Defendant's conduct constitutes violation of the laws asserted herein.

c.      **Typicality**: Plaintiff Abbey's claims are typical of the other Class members' claims and arise from Defendant's uniform course of conduct with respect to misrepresenting and failing to warn about the risk of carcinogenic and other toxic exposures as alleged herein. The relief Plaintiff Abbey seeks individually is typical of the relief sought for the other Class members.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

12
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1          d.    **Adequacy**: Plaintiff Abbey will fairly and adequately protect the

2    interests of the other Class members. Plaintiff Abbey's interests do not conflict with

3    the interests of the other Class members he seeks to represent. Plaintiff Abbey and

4    Plaintiffs generally have retained counsel experienced in complex class litigation,

5    and Plaintiffs intend to vigorously prosecute this action. The interests of the Class

6    members will be fairly and adequately protected by Plaintiff Abbey and Plaintiffs'

7    counsel.

8          e.    **Superiority**: Plaintiff Abbey and the other Class members have

9    all suffered and will continue to suffer harm and damages as a result of Defendant's

10   unlawful and wrongful conduct. A class action is superior to other available means

11   for the fair and efficient adjudication of the claims of the Class members. While

12   substantial, the damages suffered by each individual Class member do not justify the

13   burden and expense of individual prosecution of the complex and extensive litigation

14   required by Defendant's conduct. Further, it would be extremely burdensome for

15   Class members to individually and effectively redress the wrongs done to them. Even

16   if Class members themselves could afford individual litigation, the court system

17   could not. Individualized litigation presents a potential for inconsistent or

18   contradictory judgments. Individualized litigation increases the delay and expense to

19   all parties and the court system presented by the complex legal and factual issues of

20   this case. By contrast, the class action device presents far fewer management

21   difficulties, and it provides the benefits of single adjudication, economy of scale, and

22   comprehensive supervision by a single court. Moreover, the litigation and trial of

23   Plaintiff Abbey's and other Class members' claims is manageable.

24                                         **PARTIES**

25       31.    Group A Plaintiffs are individual employees and former employees of

26   the SFPD who are listed on Exhibit A hereto. Each Group A Plaintiff worked at

27   HPNS for some duration between 1997 and the present, whether in a full-time, part-

28   time, or intermittent capacity, and each was exposed to hazardous substances there.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

32.     Group B Plaintiffs are the lawful spouses and domestic partners of Group A Plaintiffs, as specified within Exhibit B. Exhibit B, which identifies each Group B Plaintiff, is incorporated herein by this reference. Group B Plaintiffs, and each of them, have sustained a loss of consortium as a result of the Group A Plaintiffs' injuries.

33.     Group C Plaintiffs are surviving family members or personal representatives of deceased former employees of the SFPD who worked at HPNS for some duration between 1997 and the present, whether in a full-time, part-time, or intermittent capacity, and who were exposed to hazardous substances there.

34.     At all relevant times, Defendant United States of America was the owner of the Subject Leased Property (defined below in paragraphs 82 through 86).

35.     At all times herein mentioned, the Navy and its agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and joint venture, and have ratified and approved the acts of each of the other.

## JURISDICTION AND VENUE

36.     Subject matter jurisdiction against Defendant exists pursuant to United States Constitution, article III, section 2, subdivision 2, and Title 28 United States Code §§ 1331 & 1346 (the Federal Tort Claims Act).

37.     Pursuant to the provisions of the Federal Tort Claims Act, within two years of the accrual of the cause of action and prior to the filing of this Complaint, Plaintiffs presented written claims and lodged them with the appropriate agency of Defendant, specifically the Navy, setting forth the events and circumstances complained of herein. Claims were presented to the Navy on or about February 5, 2020. On August 5, 2020, the claims presented were deemed rejected by operation of law under 28 U.S.C. § 2675.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

38.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the Navy transacts business in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

## FACTUAL ALLEGATIONS

**A.     Hunters Point Naval Shipyard Administrative Background (1869-Present)**

39.     The property that is referred to in this complaint as HPNS, but which has been known by other names as well, is a 965-acre former naval base (half of which is underwater), located in southeast San Francisco on a peninsula that extends eastward into the San Francisco Bay.

40.     In about 1869, HPNS began to be used as the first west coast drydock facility. It was operated by the California Drydock Company, with construction subsidized by the Navy, for the purpose of docking both private and Navy ships.

41.     In 1939, the Navy purchased HPNS, and leased the subject base to Bethlehem Steel Company.

42.     In 1941, days after the United States entered World War II in response to the attacks on Pearl Harbor, the Navy took possession of HPNS. To support the war effort, the Navy constructed numerous buildings, and excavated surrounding hills to expand the shoreline into the Bay. During this time, HPNS was used for the accelerated production of Liberty ships for use in World War II, as well as the modification, maintenance, and repair of Navy ships and submarines.

43.     For 23 years, from 1946 to 1969, the Naval Radiological Defense Laboratory ("NRDL") operated at HPNS.

    a.     The NRDL existed for the primary purposes of decontaminating radioactive ships, and broadly studying the nature and effects of ionizing radiation.

    b.     For the first 8 years, the NRDL operated under the command of the Shipyard Commander, with no regulatory oversight.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1          c.      Beginning in September 1955, the NRDL became a separate Navy

2  command.

3          d.      Beginning in approximately 1958, the NRDL came under

4  regulation by the Atomic Energy Commission ("AEC"), which subsequently became

5  the Nuclear Regulatory Commission ("NRC").

6          44.     In 1974, the Navy decommissioned HPNS as part of the Navy's broader

7  Department of Defense Shore Establishment Realignment Program, and designated

8  the base an "industrial reserve."

9          45.     In 1976, the Navy leased over 80% of HPNS to Triple A Machine Shop

10  Incorporated ("Triple A"), a commercial ship repair company, for a five-year term,

11  which was extended in 1981 for a second five-year term. Triple A Machine Shop

12  vacated the shipyard in mid-1987.

13         46.     In 1984, the Navy initiated site investigations as part of the Navy's

14  Internal Assessment and Control of Installation Pollutants ("NACIP") program,

15  subsequently renamed the Installation Restoration (IR) program, which is the Navy's

16  internal regulatory scheme designed to identify and control environmental

17  contamination from past hazardous materials use and disposal activities. In October

18  1984, pursuant to NACIP, the Navy released its Initial Assessment Study ("IAS")

19  Report, identifying twelve sites at HPNS where hazardous materials were disposed

20  of or spilled.

21         47.     In 1985, the Navy announced its intention to reopen the base and

22  homeport the USS Missouri at HPNS. The Navy resumed operation of the shipyard

23  in 1986.

24         48.     From 1985 through 1988, the Navy received multiple remedial action

25  orders and site cleanup orders from the California Department of Health Services

26  ("DHS"), now the California Department of Toxic Substance Control ("DTSC"), and

27  the California Regional Water Quality Control Board ("CRWQCB"), ordering

28  investigation and remediation by both the Navy and Triple A.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

16
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

49.     On November 21, 1989, based on the recent assessments and findings by the Navy, DHS, and CRWQCB, the U.S. EPA placed HPNS on the National Priorities List ("NPL"), as a designated "Superfund" site governed by CERCLA as amended by the Superfund Amendments and Reauthorization Act ("SARA").

50.     Navy shipyard operations were permanently terminated on December 29, 1989.

51.     In about 1991, the Department of Defense Base Realignment and Closure Commission selected HPNS for closure under the Base Closure Act of 1988, Public Law [PL] 100-526, and the Defense Base Closure and Realignment Act of 1990, PL 101-510; 10 U.S.C. § 2687, as amended, 1991 ("DBRCA").

52.     On January 22, 1992, the Navy entered into a Federal Facilities Agreement ("FFA") with the U.S. EPA, DTSC, and CRWQCB. The purpose of the agreement was to "ensure that the environmental impacts associated with past and present activities at [HPNS] are thoroughly investigated and appropriate remedial action taken necessary to protect the public health, welfare and the environment." The FFA established a procedural framework and schedule for cleanup actions, and defined the HPNS base's five parcels (A through E), which could be remediated and transferred individually.

53.     Pursuant to the 1992 FFA and federal regulation, prior to disposal or transfer (including lease or sale) of HPNS or any of its parcels, the Navy was and is required to meet the CERCLA requirements, and to comply with the Defense Authorization Amendments, the National Environmental Policy Act ("NEPA"), the DBCRA, the FFA, and other laws, regulations, and conditions.

54.     On January 21, 1994, the City and Navy executed a Memorandum of Understanding establishing a process allowing for the parcel-by-parcel transfer, as remediation of each parcel was completed and approved by the U.S. EPA, of HPNS to the City for redevelopment.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

17

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

55.     In February 1999, the U.S. EPA deemed Parcel A to be fully remediated, removed it from the NPL and cleared it for purchase. The City purchased Parcel A in December 2004.

56.     At present, in the year 2020, the Navy is still engaged in investigation and remediation activities, through its contractors, in an attempt to meet the CERCLA requirements for the remaining four parcels at HPNS.

57.     For the past 28 years, from 1992 to 2020, the Navy (directly and through its contractors) has been attempting to conduct an environmental cleanup that meets the CERCLA and other applicable requirements, so that it can deed each parcel of HPNS to the City. The City, for the past 28 years, has been waiting to purchase HPNS from the Navy.

**B.      For Decades, Large Quantities of Hazardous Substances Were Released Throughout Hunters Point Naval Shipyard**

58.     From 1946 to 1989, the Navy owned HPNS and caused, allowed, and recorded in its agency files the widespread release of large quantities of radiological and non-radiological hazardous substances throughout HPNS. Specific releases of hazardous substances include but are not limited to the following.

**1.      Release of Radiological Contamination by the Naval Radiological Defense Laboratory (1946-1969)**

59.     In 1946, the United States conducted a pair of nuclear weapon tests (known as Operation Crossroads) at Bikini Atoll, to investigate the effects of nuclear weapons on warships. A fleet of 95 ships was assembled at Bikini Lagoon, and two nuclear weapons were detonated there. The extent of contamination was unforeseen. Almost the entire target fleet was drenched by falling water, and contaminated beyond redemption. The extent of radioactive fallout caused chemist Glenn Seaborg of the AEC to call the Bikini Atoll detonation "the world's first nuclear disaster."

60.     In 1946, the United States Navy established its NRDL at its San Francisco base, HPNS.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

61.     The original purpose of the NRDL was to manage the testing, decontamination, and disposition of ships contaminated in the Operation Crossroads nuclear disaster.

62.     For its first approximately 12 years, from 1946 to 1958, the NRDL operated under the command of the Shipyard Commander, with no regulatory oversight, with safety equipment consisting entirely of two Geiger counters. During this unregulated time period, NRDL engaged in activities that resulted in the widespread release of numerous hazardous materials throughout HPNS.

63.     From at least 1946 to 1951, the Navy engaged in unregulated efforts to clean up radioactive ships, including but not limited to the following activities:

a.     The Navy brought the 79 "most heavily contaminated ships" from the Bikini Atoll tests back to HPNS. At least 100 different radionuclides were brought back to HPNS in this manner.

b.     The Navy used deck swabs, sandblasting, acid, steam-cleaning, and other materials and methods in an attempt to clean the ships at HPNS. The fine sand and dust created by sandblasting were initially airborne and were blown by the wind throughout the HPNS base.

c.     Since radioactivity cannot be neutralized, "decontamination" in practical effect meant merely moving contaminated material from the radioactive ships to the air, soil, and other materials at HPNS.

d.     The Navy burned more than 600,000 gallons of radioactively contaminated fuel oil that it had removed from the ships at HPNS. Again, the effect was not to destroy the radioactivity, but rather to move it from the fuel oil to the air and soil at HPNS.

e.     Navy records indicate that the NRDL decontamination processes were overseen and conducted by a "small band" of "junior Navy officers," who "carried out decontamination on a sort of trial and error basis." They formed "the first such

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

19

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1   [Radiological Safety] group ever organized." "[T]heir equipment consisted of one

2   coffee pot and six Geiger counters, only two of which worked."

3        f.       The efforts to decontaminate affected ships proved largely futile.

4   All but 9 of the original 95 ships eventually had to be destroyed.

5        64.      The NRDL's focus shifted in approximately 1950. From 1950 to 1958,

6   the NRDL at HPNS participated in every nuclear weapons test carried out by the

7   United States during that time period. Large amounts of highly radioactive nuclear

8   weapons debris were brought to HPNS from these A- and H-bomb tests, resulting in

9   widespread release of hazardous radioactive materials throughout HPNS. These pre-

10  1958 activities were performed without any regulatory oversight.

11       65.      From 1946 to 1969, the Navy used the HPNS site for the broad purpose

12  of studying nuclear contamination, and for the first 8 to 9 years, this work was

13  unregulated. The NRDL nuclear research resulted in the widespread release of

14  hazardous radioactive materials throughout HPNS. Among other things, the NRDL:

15       a.       Conducted a wide variety of radiation experiments on materials

16  and animals at its HPNS laboratory buildings.

17       b.       Intentionally raised animal colonies on site, then intentionally

18  irradiated, studied, and disposed of tens of thousands of mice, rats, dogs, goats,

19  mules, and pigs, among other animals, at HPNS.

20       c.       Intentionally spread radioactive material at the HPNS base, as if

21  it were fertilizer, to practice decontamination.

22       d.       Conducted human experiments at HPNS, including requiring

23  people to drink radioactive elements.

24       e.       Constructed and used a cyclotron (a type of particle accelerator)

25  at HPNS for use in radiation experiments, which generated radiation and charged

26  particles.

27       f.       Received and stored radiological waste from the University of

28  California at Berkeley and Lawrence Livermore Laboratories.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

20
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

66.     Additionally, the Navy manufactured radioactive sources on site. For example, the Navy used large quantities of radium-226, strontium-90, tritium and promethium-147 for radioluminescent devices and deck markers. On-site radioactive paint shops produced these radioluminescent instruments, with radioactive wastes poured down drains and leaking into soil from breaks in sewer lines. An estimated 6,000 pounds of radioluminescent dials and knobs were disposed of at the HPNS landfill site, and also strewn about the base.

67.     The Navy disposed of HPNS radioactive waste by placing irradiated animal carcasses and 55-gallon drums of radioactive waste on a barge, until the barge was full, then towing it out to the Farallon Islands (a National Marine Sanctuary) and sinking the waste there (sometimes by shooting holes in the drums to help them sink). AEC researcher Arnold Joseph estimated that 47,500 barrels of radioactive waste were processed in this manner.

68.     In 1958, the NRDL became a regulated facility licensed by the AEC.

69.     Pursuant to the NRDL's licenses with the AEC:

a.      The licensed amount of strontium-90 was sufficient to contaminate ten trillion tons of soil at or above the U.S. EPA's preliminary remediation goals ("PRGs").

b.      The licensed amount of uranium was enough to contaminate about 200 million tons of soil at or above U.S. EPA's PRGs.

c.      The AEC allowed the NRDL to use 2,000 grams of plutonium-239, a hazardous substance known to cause lung cancer if only one millionth of an ounce is inhaled.

**2.      Release of Non-Radiological Hazardous Substances by the Navy (1941-1974)**

70.     From approximately 1942 to 1974, the Navy as part of its (non-NRDL) shipyard operations, used, released, and stored numerous hazardous substances

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA   94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1   throughout HPNS. These releases include but are not limited to the following specific

2   instances of contamination.

3      71.   From 1942 to 1977, sandblasting operations in the dry dock area

4   discharged blasting grit, paint scrapings, metal rust, and other debris from cleaning

5   ships (including nuclear-powered ships) into the Bay and throughout HPNS.

6      72.   From at least 1942 to 1977, the shipyard had a combined sanitary and

7   storm sewer system. Industrial shop wastewater was discharged to this system and

8   was pumped to the City's sewage collection system and treatment plant.

9      73.   In periods of high storm water runoff, which occurred about 9 to 12

10  times annually, diversion structures would direct the flow into the San Francisco

11  Bay, including via overflow outlets near Berth 15 and southwest of Mahan and

12  J Street.

13     74.   In 1975, a lawsuit filed by the Bay Area Water Quality Control Board

14  was brought against the U.S. Navy's Supervisor of Shipbuilding, Conversion and

15  Repair ("SUPSHIP") division, seeking to prohibit the ongoing direct discharge of

16  sanitary and industrial wastes into the San Francisco Bay. In response to the 1975

17  lawsuit, the Navy conducted a project to separate storm drains from sanitary sewers

18  at HPNS. This project was completed in 1977.

19     75.   From 1947 to 1973, the Navy operated a 120,000 square foot Pickling

20  and Plate Yard on the north end of Hussey Street between Building 411 and 402. The

21  operation of the Pickling and Plate Yard involved dipping steel plates into acid tanks,

22  then drying the plates on racks and painting them with zinc chromate-based

23  corrosion resistant primer. Sodium dichromate, sulfuric and phosphoric acids, and

24  zinc chromate were used on site. Most of the structures were coated with acid and

25  zinc chromate.

26     76.   The Navy created and used a succession of coal- and oil-fired power

27  generation facilities which resulted in the release of hazardous substances

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

22

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1    throughout HPNS, both from smokestack effluvium and leftover byproducts that

2    were dumped in the vicinity. Former Building 521 was a power plant.

3            **3.      Release of Hazardous Industrial Substances by Triple A
                        Machine Shop (1976-1987)**
4

5            77.     From 1976 to 1987, while HPNS remained under the Navy's ownership

6    and control, Triple A conducted commercial ship repair operations at HPNS that

7    resulted in widespread releases of hazardous substances, including instances of

8    illegal dumping of hazardous wastes at more than 20 locations throughout HPNS.

9            78.     In 1986, the San Francisco District Attorney's Office charged Triple A

10   with illegally disposing of hazardous wastes. In 1992, Triple A's management was

11   convicted of five counts of illegal hazardous waste disposal at HPNS.

12           79.     In 1986, when the lease expired, Triple A refused to vacate. The Navy

13   began legal proceedings which forced Triple A to vacate the facility in mid-1987.

14           80.     In 1988, following the discovery of PCB-contaminated waste oils at the

15   southeast portion of Building 606, the Navy conducted an emergency removal action,

16   removing about 1,255 cubic yards of soil with PCBs at concentrations exceeding 25

17   mg/kg. Excavation was conducted to depths ranging from 3 to 10 feet below the

18   ground surface within an area measuring 50 by 150 feet.

19           81.     In 1984, an Initial Assessment Study team concluded that the Bay

20   bottom sediments found immediately below the shipyard shoreline were

21   contaminated with heavy metals and other hazardous pollutants.

22           **C.      The Transfer of the Subject Leased Property to the City
                        (Beginning in 1996)**
23

24           82.     In 1996, and on other dates thereafter, the Navy transferred to the City

25   real property at HPNS ("the Subject Leased Property," which includes but is not

26   limited to the Building 606 Property and the Helipad Property, all defined

27   hereinbelow), via lease contracts, knowing and intending that the Subject Leased

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

23

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  Property would be used by the City as work facilities for SFPD employees, including

2  Group A Plaintiffs and Group C Decedents and each of them.

3       83.    This 1996 transfer was accompanied by false statements from the Navy

4  and Tetra Tech, under the Navy's negligent supervision, on which the City relied,

5  misrepresenting the history of HPNS, and misrepresenting the type and quantity of

6  hazardous substances released at and about the Subject Leased Property, as

7  described in more detail below.

8       84.    The SFPD, from 1997 to the present, has leased and occupied an 89,600

9  square foot steel-construction industrial building (Building 606) at HPNS, along with

10  approximately 33,000 square feet of land surrounding Building 606 (collectively

11  referred to as the "Building 606 Property").

12       85.    The Building 606 Property is bordered by 3rd Avenue to the north,

13  Hussey Street to the east, H Street to the west, and the radiologically impacted sites

14  of Former Buildings 507 and 508 to the south.

15       86.    The SFPD, from 1999 to 2007, also leased and occupied a 3.30-acre

16  vacant lot adjacent to Building 606 for use as a helicopter landing pad ("Helipad

17  Property").

18      **D.**    **Before It Could Transfer the Subject Leased Property to the**
   **City, the Navy Was Required by Statute to Disclose to the City**
19              **the Type and Quantity of Hazardous Substances Released at and**
   **Around Building 606**
20

21       87.    In 1996, pursuant to the FFA, CERCLA, and other regulations and

22  agency policies, the Navy was required to (i.e. was under a mandatory duty to)

23  accurately disclose, before leasing out the Subject Leased Property, the type,

24  quantity, and timing of any prior release of hazardous substances at the Subject

25  Leased Property, to the extent such information was available on the basis of a

26  complete search of Navy files. These regulations and statutes include but are not

27  limited to section 120(h)(1) of CERCLA, which reads in pertinent part:

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

24

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1

2

3

4

5

6

> [W]henever any department, agency, or instrumentality of the United States enters into any contract for the sale or other transfer of real property which is owned by the United States and on which any hazardous substance was stored for one year or more, known to have been released, or disposed of, the head of such department, agency, or instrumentality **shall include in such contract notice of the type and quantity of such hazardous substance and notice of the time at which such storage, release, or disposal took place, to the extent such information is available on the basis of a complete search of agency files**.

7   42 U.S.C. § 9620(h)(1) (emphasis added).

8       88.    The Navy is and was at all relevant times a department of the United

9   States.

10      89.    At all relevant times, the Navy owned the Subject Leased Property.

11      90.    HPNS and the Subject Leased Property are real property.

12      91.    The Building 606 Property was, at all relevant times, real property on

13  which hazardous substances were known to have been released and disposed, and

14  where hazardous substances had been stored for one year or more.

15      92.    The Helipad Property was, at all relevant times, real property on which

16  hazardous substances were known to have been released and disposed, and where

17  hazardous substances had been stored for one year or more.

18      **E.    Beginning in or About 1996, the Navy Negligently**

19      **Misrepresented the Type and Quantity of Hazardous Materials Released at the Subject Leased Property, Causing the City to Enter into the Subject Lease Agreements**

20

21      93.    In, about, and after 1995-1996, the Navy, both directly and through its

22  negligent supervision of Tetra Tech EM, Inc. and Tetra Tech EM, Inc.'s predecessor

23  corporation PRC, made false, misleading, and incomplete disclosures to the City, and

24  failed to warn the City and its employees, related to and regarding the release and

25  use of hazardous substances at the Subject Leased Property.

26      94.    In, about, and after 1995-1996, the Navy, both directly and through its

27  negligent supervision of Tetra Tech EM, Inc. and PRC, failed to provide notice and

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  warning of the type, quantity, and time of each release, storage, and/or use of

2  hazardous materials at the Subject Leased Property.

3       95.    In January 1996, the Navy, both directly and through its negligent

4  supervision of Tetra Tech EM, Inc. and PRC, published a Draft Basewide

5  Environmental Baseline Survey for HPNS, which was later published as the June 3,

6  1996, Final Basewide Environmental Baseline Survey ("1996 Basewide EBS").

7       96.    The stated purpose of the 1996 Basewide EBS was in part to facilitate

8  the transfer of the HPNS base, and to fulfill the requirements of CERCLA as

9  amended by the Community Environmental Response Facilitation Act of 1992

10  (CERFA).

11       97.    The 1996 Basewide EBS stated that it was intended to support

12  conclusions that portions or subparcels of the base, although not CERFA clean, are in

13  such a condition that the Navy may issue deeds to transfer the property on the basis

14  that "no remedial action is required."

15       98.    The Navy, both directly and through its negligent supervision of Tetra

16  Tech EM, Inc. and PRC, stated in the 1996 Basewide EBS that:

17       a.    Former Building 503 had never been used for past storage or use

18  of hazardous materials, and had no known history of hazardous materials, hazardous

19  waste, or radiological contamination.

20       b.    Building 606 had no history of hazardous material, hazardous

21  waste, or radiological contamination.

22       c.    Whereas virtually all other property at HPNS was "Category 6,"

23  indicating that additional work was needed, Building 606 alone was placed in

24  Category 4, classified as an "area where . . . all remedial actions have been taken"

25  and "remedial actions are complete . . . ."

26       99.    On February 7, 1996, pursuant to contract 7609-0012, the Navy, both

27  directly and through its negligent supervision of Tetra Tech EM, Inc. and PRC,

28  prepared a Property Specific Environmental Baseline Survey for Building 606

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

26

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  ("Building 606 EBS") and a Finding of Suitability to Lease for Building 606

2  ("Building 606 FOSL") and the surrounding area.

3      100.   The purpose of the Building 606 EBS was to provide a basis for the

4  Building 606 FOSL, to provide a basis for any recommended use restrictions for the

5  Building 606 Property, to establish the current physical and environmental

6  conditions of Building 606, and to comply with the Navy's obligations under section

7  120(h)(1) of CERCLA, 42 U.S.C. § 9620(h), to disclose the full history of the release of

8  hazardous substances at the Building 606 Property.

9      101.   The Building 606 EBS included numerous material misrepresentations

10  and failures to warn regarding the release of hazardous substances at and including

11  but not limited to the following:

12        a.   "[T]here are no known health risks" associated with the use of

13  Building 606 for office administration and staging by the SFPD.

14        b.   Former Building 503, which was on the Building 606 site, "did not

15  have uses consistent with the storage or use of hazardous materials."

16        c.   During the NRDL years, HPA was used for "limited radiological

17  operations."

18        d.   As part of the disestablishment of NRDL all sites were surveyed

19  for radiological contamination and decontaminated if necessary. No radiological

20  hazards are expected.

21        e.   The IR-08 PCB spill area was "previously remediated."

22        f.   "[R]emedial actions are complete" at the Building 606 Property.

23        g.   The condition of all the spaces [in Building 606] is excellent with

24  no signs of the use, storage, or spillage of hazardous materials or petroleum products.

25        h.   "There are no potential interior sources" of hazardous exposure in

26  Building 606.

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

27

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

i.      Known contamination of Parcel D steam lines with TPH-gasoline, oil, grease, and mercury is not of concern at Building 606 because "[t]here are no steam lines indicated in or around Building 606."

102.    The February 7, 1996, Building 606 FOSL was written in explicit reliance on the Building 606 EBS. It contained no additional information regarding the release of hazardous substances at the Building 606 Property, beyond that information contained in the Building 606 EBS. It concluded that the "lease does not present a risk to human health of the future lessee or the environment if the restrictions and requirements as detailed above are followed."

103.    On December 30, 1996, in reliance upon the Building 606 EBS and the Building 606 FOSL, the Redevelopment Agency of the City of San Francisco ("SFRA") entered into lease contract N6247497RPOOP45 ("Subject Lease") for the transfer (lease) of real property, specifically the Building 606 Property, with the stated intention that it would be subleased to the SFPD. The leased premises were described therein as follows:

> Government does hereby lease, rent, and demise to Lessee and Lessee does hereby hire and rent from Government, Building 606 and adjacent parking areas to be used to house the following units of the [SFPD]: Field Operations Bureau, which includes the Canine Unit; Muni Detail Unit; Tactical Squad Unit; Property Control Unit; Narcotics Unit; and the Police Department's Crime Lab.

104.    The Subject Lease was accompanied by the Building 606 FOSL and Building 606 EBS.

105.    Together, the lease and its attachments failed to accurately represent and warn regarding the type and quantity of hazardous substances released at and about the Building 606 Property, and contained numerous other material misrepresentations related to the hazards associated with occupancy and use of the Building 606 Property.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

28

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

106.    The Subject Lease, along with the Building 606 FOSL and Building 606 EBS, were created with the intention that they would be sent to, and relied upon by, the SFPD in deciding whether to sublease and use the Building 606 Property.

107.    The Subject Lease, along with the Building 606 FOSL and Building 606 EBS, were in fact sent to, and relied upon by, the SFPD in deciding whether to sublease and use the Building 606 Property.

108.    On May 1, 1997, the SFPD, in reliance on the Navy's direct and vicarious misrepresentations, failures to warn, and concealment, subleased the Building 606 Property from the SFRA, and began stationing SFPD employees, including Group A Plaintiffs and Group C Decedents at and about the Building 606 Property.

**F.    Before 1996, a Complete Search of the Navy's Files Would Have Revealed That Voluminous Hazardous Substances, Including Radionuclides, Were Known to Have Been Released at and Around the Subject Leased Property and That the Navy's Lease Representations Were False**

109.    The Navy negligently failed to research, discover, investigate, inspect, and provide notice and warning to the City of the type and quantity of hazardous substances released at the Building 606 Property, which information was available from a complete search of agency files.

110.    In the Subject Lease, the Navy and Tetra Tech/PRC, under the Navy's negligent supervision, negligently and materially misrepresented and failed to warn about the history of HPNS and the Building 606 Property.

111.    The radiologically-impacted site of Former Building 503 is fully incorporated within the footprint of Building 606.

112.    The Building 606 Property includes within it the radiologically-impacted sites of Former Buildings 501, 502, 503, and 504, as well as radiologically-impacted steam lines, sewer lines, and storm drain lines.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

29

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

113.    The statement in the Building 606 EBS that Former Building 503 "did not have uses consistent with the storage or use of hazardous materials," was false when made, and contrary to existing records.

a.      The 500-series buildings, of which Former Building 503 was a central building, constituted the first site of the NRDL at HPNS, during the period of heaviest radioactive cleanup activity, and lowest regulatory oversight.

b.      Pre-1996 Navy records stated that, during operation of the NRDL, radioactivity in the area of the 500-series buildings (which include Building 503) was such that the Navy found it could not continue carrying out biological medical research work in Building 506 since it was, according to a November 1948 Navy report, "located among a group of chemistry laboratories where prevailing levels of radioactivity render the delicate detection incident to the biological investigations impossible."

c.      Former Building 503 was used from approximately 1946 to 1955 as a radioactive laundry, where harsh chemicals including sodium hypochlorite were used to repeatedly clean radioactive clothing and protective apparel.

d.      A series of memoranda in 1946 document that a new laundry was being installed in Building 503, jointly by "Crossroads" (the NRDL project) and by SUPSHIP.

e.      A 1949 HPNS map, shows that, during that time period of peak radioactive activity, Building 503 was the base's only laundry facility.

f.      A January 4, 1952, NRDL Bulletin referred to Building 503 as the "NRDL laundry."

g.      An April 10, 1953, Navy document described the "U.S. Naval Radiological Defense Laboratory Clothing Decontamination Procedure." Under the procedure, all clothing was assessed for excessive radiological contamination. Any clothing found to be excessively contaminated was to be washed using 1/2 pound of Versene Soap and 1/2 pint of sodium hypochlorite, along with hot water, for 30

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

30
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

minutes, rinsed in hot water, washed again with 1/4 pound of Versene soap for another 20 minutes, and transferred to the extractor to remove all water possible. This procedure was repeated three times, upon which any clothing that still did not meet tolerance levels would be "either stored until the radioactive decay reduces the intensity to this level or it must be disposed of as radioactive waste."

h.      A February 1, 1955, special report from the Commanding Officer of the NRDL to the Chief of SUPSHIP, declassified in 1991, stated:

> The San Francisco Naval Shipyard has, pending completion of Building 815, allowed NRDL personnel to use the space and equipment in Building 503 . . . . Clothing and apparel accepted at the subject facility is limited to items that have been exposed to radioactive contamination, and the sole purpose is to reduce the radiological contamination to the accepted safe level. . . . All SFNS "hot" clothing received at the subject facility is monitored, processed, re-monitored, and returned to SFNS for laundering and pressing as required. . . . This clothing decontamination facility is housed in one room of SFNS Building 503 . . . . The service consists of reducing the level of contamination in Navy-owned protective wearing apparel to the point where it can safely be sent to a Navy-operated or commercial laundry . . . . The equipment used consists of two industrial-type washing machines, two extractors, and one dryer.

i.      Two grease traps related to the radioactive laundry facility were located south and west of Building 503 until the 1980s.

j.      Building 503 was also reportedly used, from approximately 1946 to 1955, to house a small animal (radioactive) exposure facility.

114.    The statement in the Building 606 EBS that known contamination of Parcel D steam lines with TPH-gasoline, oil, grease, and mercury is not of concern at Building 606 because "[t]here are no steam lines indicated in or around Building 606" was false when made, and contrary to existing records.

115.    In fact, pre-1996 Navy records showed that a steam line near Building 503 had been used by Triple A in the 1970s and 1980s to transport waste oils containing PCBs, that during construction activities near Building 503 in the early 1980s, a section of this line broke, spilling an unknown quantity of waste oils and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1   PCBs directly onto the Building 606 Property; and that the spill was not fully

2   remediated at any point prior to 1996.

3       116.    Pre-1996 Navy records showed that Polynuclear Aromatic Hydrocarbons

4   ("PAHs") had been discovered at or near the southeast corner of the Building 606

5   Property. However, this was not disclosed to the City in connection with the Subject

6   Lease.

7       117.    Pre-1996 Navy records showed that electrical transformers containing

8   PCB oil were located on power poles north and south of Former Building 503 until

9   1988. These transformers were removed from service by American Environmental

10  Management Corporation ("AEMC") and the Navy Public Works Department in

11  1988. However, this information was not disclosed to the City in connection with the

12  Subject Lease.

13      118.    The statement in the Building 606 EBS that "the condition of all the

14  spaces [in Building 606] is excellent with no signs of the use, storage, or spillage of

15  hazardous materials or petroleum products" was false when made, and contrary to

16  existing records.

17          a.      In fact, a walk-through of Building 606 in 1996, as described in

18  the 1996 Basewide EBS, revealed evidence of recent use of hazardous materials in

19  Building 606, including a "large stain in northwest section of shop," "stained

20  cardboard run[ning] from southeast rollup door to outside drain," as well as "six 30-

21  gallon black Nalgene drums (four on east side, two on west; PVC pipes run from

22  building and drop into these drums)."

23      119.    The statement in the Building 606 EBS that, during the NRDL years,

24  HPA was used for "limited radiological operations," was false when made and

25  contrary to existing records, which showed that HPA had been used for some of the

26  most extensive radiological operations in history, as described hereinabove.

27      120.    The statement in the Building 606 EBS that, as part of the

28  disestablishment of NRDL, "all sites were surveyed for radiological contamination

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

32

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  and decontaminated if necessary," was false when made and contrary to existing

2  records.

3      121.    In fact, the Navy's pre-1996 records demonstrate that Building 503 was

4  never decontaminated or remediated.

5          a.    In 1955, the NRDL began consolidating most of its facilities from

6  the 20 widely-separated HPNS buildings to its own new Building 815, a 6-story

7  windowless structure of reinforced concrete, and Building 816, which housed the 2-

8  million electron volt Van de Graaff accelerator, as well as 250 Kev x-ray machines

9  and eight-curie cobalt source.

10         b.    In 1955, using the limited radiological detection equipment

11  available at the time and in an era before the development of survey or

12  decontamination procedures, the NRDL conducted its own surveys of NRDL

13  Buildings 313, 313A, 322, 351, 351A, 366 (formerly known as 351B), 506, 507, 508,

14  and 510 and, despite noting evidence of contamination of the sewer systems and

15  drain lines, released these buildings for unrestricted use.

16         c.    The 1955 cleanup did not include remediation of soil and

17  groundwater.

18         d.    The 1955 cleanup did not include Building 503 or the surrounding

19  area.

20         e.    The consolidation of activities in Building 815 did not include all

21  activities of the NRDL. Buildings 364, 365, 506, 529, 707, 816, 820, 821, 830, 831,

22  and ICW 418 were also used by the NRDL until it closed in 1969.

23         f.    In April 1969, the Navy's Chief of Naval Material issued an

24  announcement that the NRDL would be disestablished (closed).

25         g.    In the nine months between April 1969 and January, 1970, the

26  NRDL Health Physics Division engaged in efforts, using then-existing standards,

27  methods, and equipment, to decontaminate Buildings 364, 506, 529, 707, 815 and

28  816.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

33

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1        h.     The 1969 cleanup effort used guidelines that are unsafe by

2 modern standards.

3        i.     The 1969 cleanup did not include remediation of soil and

4 groundwater.

5        j.     The 1969 cleanup did not include Building 503 or the surrounding

6 area.

7        k.     Between 1969 and 1979, it became known to AEC scientists that

8 the radiation standards of 1969 were inadequate and unsafe.

9        l.     In 1979, in recognition that the 1969 decommissioning standards

10 were unsafe by 1979 standards, the Navy conducted a second effort at radioactive

11 decontamination. These 1979 decontamination efforts, conducted by the Navy

12 SUPSHIP, in consultation with the Navy Radiological Affairs Support Officer of the

13 Naval Nuclear Power Unit, included only buildings 364, 815, and 816.

14        m.    The 1979 cleanup did not include any base-wide remediation of

15 soil and groundwater.

16        n.     The 1979 cleanup did not include the Building 503 site or the

17 surrounding area.

18        o.     In or about the 1970s, Building 503 was demolished. On

19 information and belief, no original records related to the demolition of Building 503

20 have been found, and the demolition of Building 503 was not associated with any

21 radiological remediation. On information and belief, the foundation of Building 503

22 was left in place at the time of its demolition. A 21,000-gallon AST used to store fuel

23 oil was also associated with Building 503 and was also reportedly demolished at an

24 unknown time.

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA   94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

p.      In approximately 1989, Building 606 was built on top of the site of Former Building 503. On information and belief, this construction caused a steam line beneath the Building 606 Property to break, causing a spill of hazardous PCB oil into the Building 606 Property. In or about 1989, soil excavated from beneath Former Building 503 was spread around Former Buildings 507 and 508, as well as in the "laydown" area depicted in the following image. (In the following image, Building 606 is outlined in red, Former Building 503 is filled in yellow, and the laydown area is depicted as a series of light blue squares.)



122.    Additionally, pre-1996 records showed that, in fact, the soil, steam lines, storm drains, and sanitary sewer that were known to be radiologically contaminated during the NRDL's operation had never been systematically decontaminated.

123.    Pre-1996 Navy records showed that the storm drain lines throughout HPNS, including at the Building 606 Property, were contaminated, including with radionuclides Cs-137, Ra-226, and Sr-90. In the 1940s, the system had been built as a combined sanitary and storm sewer system using the same conveyance piping. During storm events, storm water flows would overwhelm the pump at Building 819 and much of the sewage and storm water was diverted to various existing outfalls in the Bay. Despite a series of separation projects, complete separation of the combined

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1    systems was never achieved. Due to the evolutionary nature of the separation

2    process, radiological contamination from the same source could have impacted the

3    piping and other components of both systems.

4        124.    The statements in the Building 606 EBS that "[n]o radiological hazards

5    are expected," that "there are no known health risks associated with the use of

6    Building 606 for office administration and staging by the SFPD," that Building 606

7    belonged in category 4, and that there are "no potential interior sources" of

8    hazardous exposure in Building 606 were negligently made.

9        a.    The Navy's 1996 lease of the Building 606 Property to the City

10   occurred after the 1975 lawsuit by the Bay Area Water Quality Control Board for

11   illegal discharges of waste, after the 1984 Initial Assessment Study identifying 12

12   contaminated sites, after the DHS and CRWQCB remedial action orders demanding

13   cleanup in the mid-1980s, after the EPA's 1989 order listing HPNS as an NPL

14   Superfund site, after the 1992 criminal convictions of Triple A for illegal dumping,

15   and after the 1992 FFA ordered thorough investigation and remedial action.

16       b.    As of 1996, the Building 606 Property was the site of numerous

17   releases of hazardous substances, both known to the Navy and unknown.

18       c.    As of 1996, the presence of hazardous substances at and about the

19   Building 606 Property were never thoroughly studied, and future studies were

20   known by the Navy to be needed.

21       d.    Among other things, as of 1996, internal sources of contamination

22   that had not been studied at Building 606 included the water supply, the sanitary

23   sewer (which was connected to the storm drain system and was known to back up

24   into Building 606), and the large rollup doors which allowed free communication with

25   external airborne contamination.

26       e.    As of 1996, the Building 606 Property was not remediated.

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

f.      The Navy's transfer of the Building 606 Property to the City occurred before the responsive CERCLA remediation had been completed or approved.

**G.      After 1996, While Plaintiffs Were Working at Hunters Point Naval Shipyard, the Navy Continued to Misrepresent the True Extent of Hazardous Contamination Affecting Plaintiffs' Safety, and Negligently Supervised the Investigation and Remediation Work Performed by Its Contractor, Tetra Tech**

125.    From 2003 through 2014, the Navy entered into a series of contracts with Tetra Tech, including its predecessor company Foster Wheeler Environmental Corporation, as well as Tetra Tech EC, Inc. and Tetra Tech, Inc. to provide remediation services at HPNS ("Remediation Contracts"). These contracts required Tetra Tech, among other things, to investigate radiological contamination of soil and buildings, remediate and remove waste as necessary, and provide status reports to the Navy.

126.    The stated objective of the Remediation Contracts was to achieve "free-release" of radiologically impacted areas by testing soil and buildings in those areas, and remediating as necessary until test results demonstrated that radiation levels were below applicable release criteria and regulatory limits.

127.    During the performance of the Remediation Contracts at HPNS, the Navy and Tetra Tech, under the Navy's negligent supervision, continued to make false representations to the City and the SFPD regarding contamination, lack of contamination, health, and safety.

128.    During the performance of the Remediation Contracts at HPNS, the Navy and Tetra Tech, under the Navy's negligent supervision, continued to negligently and/or fraudulently conceal the true extent of contamination at HPNS.

129.    During the performance of the Remediation Contracts at HPNS, the Navy, and Tetra Tech under the Navy's negligent supervision, reassured the City that HPNS in general, and the Subject Leased Property in particular, remained safe for the City's continued use during the remediation, and that the City's employees

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  (including Group A Plaintiffs and Group C Decedents) were not being exposed to

2  hazardous substances.

3      130.   The Navy and Tetra Tech knew or should have known that these

4  representations were false when made.

5      131.   The Navy and Tetra Tech knew or should have known that the City and

6  its employees, including Group A Plaintiffs and Group C Decedents, were using the

7  Subject Leased Property for outdoor training, dirt-biking, biking, running, crawling,

8  drilling, police helicopter use, and other activities that brought them into contact

9  with contaminated soil, air, and water, and the Navy and Tetra Tech knew or should

10 have known that, even when indoors, Group A Plaintiffs and Group C Decedents had

11 to keep windows and roll-up doors open for ventilation and were not protected from

12 external contamination and dust.

13     132.   The City, in reliance on the Navy's and Tetra Tech's representations

14 regarding safety, continued to use and occupy the Subject Leased Property and the

15 roadways and other land at HPNS.

16     133.   By way of example (and as will be discussed in more detail below),

17 under the Navy's negligent supervision, Tetra Tech misrepresented the source of soil

18 samples submitted to the laboratory for testing, manipulated data from radiological

19 testing of buildings, and reported false results from the radiological soil and building

20 tests.

21     134.   At all relevant times, Tetra Tech knew and intended that its fraudulent

22 representations regarding its findings at HPNS would be communicated to the City

23 (including to the SFRA and the SFPD) both directly by Tetra Tech and indirectly

24 through the Navy. And the Navy did, in fact, negligently convey these

25 misrepresentations to the City (including the SFRA and the SFPD), despite knowing

26 or having reason to know, at all relevant times, that they were false.

27     135.   At all relevant times, the Navy knew that these misrepresentations

28 regarding the findings at HPNS were being relied upon by the City (including the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

38

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1   SFRA and the SFPD) in deciding to renew the lease of Building 606, and to continue

2   conducting SFPD business at the HPNS base.

        **1.**       **Tetra Tech's Widespread Fraud and Criminal Convictions**

4        136.    Tetra Tech whistleblowers, in declarations that were originally

5   submitted under seal in False Claims Act litigation, and in declarations that were

6   submitted to the Nuclear Regulatory Commission, admitted to systematic fraudulent

7   activity by Tetra Tech at HPNS, including but not limited to the following:

8           a.    For radiological scans of buildings throughout HPNS, Tetra Tech

9   manipulated and falsified building scan data, rather than providing actual radiation

10  detection results from a full building survey. Duplicated strings of data have thus far

11  been discovered in the results of surveys conducted in 14 of 28 buildings.

12          b.    In or about July 2006, Tetra Tech began speeding up (to a speed

13  of 6 to 9 times the approved speed) a conveyor belt system that was used to run

14  potentially contaminated soil through a radiation scanner in order to decrease

15  identification and remediation of radiological contamination of the soil, taken from

16  the PCB Hot Spot and IR-02. Tetra Tech also took actions to cripple the conveyor belt

17  system's ability to detect radiation by intentionally disabling its radiation detection

18  alarm.

19          c.    When Tetra Tech sampled contaminated soil and found that it

20  was too contaminated to be released, Tetra Tech intentionally and fraudulently

21  collected soil from different areas known to have lower radioactivity, and represented

22  that those samples had come from the location being investigated.

23          d.    Tetra Tech falsified chain-of-custody forms to support the false

24  sample collection information.

25          e.    Samples, data, and analytical results were discarded when the

26  results were above the release criteria.

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

f.      During the screening of soil at RSYs, Tetra Tech pulled the towed array (scanning device) at speeds much higher than proper procedure dictated, in order to intentionally reduce the probability of radiation detection.

g.      Tetra Tech intentionally used handheld detectors improperly to reduce the probability of radiation detection.

h.      Tetra Tech blocked the shipment of samples to an offsite lab if there was a high chance that the release criteria would be exceeded.

i.      Tetra Tech watered down soil before scanning it to reduce the probability of radiation detection.

j.      At the portal monitors designed to detect high levels of gamma radiation in trucks leaving HPNS, Tetra Tech decreased the sensitivity of scanners, wetted the soil, and scanned through the steel sides of the trucks rather than over the top of the soil, all in order to decrease the probability of radiation detection.

k.      In a December 1, 2017, Draft Radiological Data Evaluation Findings Report for Parcel E Soil, the Navy found evidence of potential data manipulation or falsification at 26 out of 57 trench units, evidence of biased sample collection (to avoid the highest gamma scan measurements) at 64 out of 96 fill units, and evidence of potential data manipulation or falsification at 61 out of 102 building site survey units.

137.    The whistleblower allegations have been corroborated with findings that indicate widespread fraud in the HPNS remediation efforts, including but not limited to the following findings:

a.      The December 1, 2017, Draft Radiological Data Evaluation Findings Report for Parcel E Soil specifically found evidence of fraudulent investigation, including but not limited to sample collection, gamma scanning techniques, and data manipulation, at Trench Survey Units 300, 309, 310, 311, which include Former Building 503 Site Survey Units 12, 15, 16, 18, 23, 24, 31, 34, 35.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

b.     On December 27, 2017, in reviewing the Draft Radiological Data Evaluation Findings Reports for Parcels B and G Soil, the U.S. EPA acknowledged that 97% of survey units in Parcel B were suspect.

c.     The U.S. EPA found signs of falsification in 100% of Parcel D-2 sampling data, 100% of UC-1 sampling data, 95% of UC-2 data, 97% of UC-3 data, 90% of Parcel B radiological data, 97% of Parcel G radiological data.

138.   According to Whistleblower Bowers, "soil that was contaminated with non-radiological contamination, such as oils, PCBs, or asbestos, once processed on the RSY pads and cleared, went through a portal monitor and was shipped off Hunters Point to third-parties. Soil that did not have these other forms of contamination, once processed through the RSY pad and the samples approved by the lab, were returned to Hunters Point and used as backfill for the trenches on site. It was much less expensive for Tetra Tech to have the soil falsely cleared for use as backfill, than to have the soil repeatedly subjected to remediation of radiological contamination, and the associated time and expense of separating the non-impacted soil from portions with elevated radioactive contaminants that would have to be shipped to a low level rad waste infill."

139.   According to Whistleblower Bowers, "very, very high percentages" of the soil removed from Hunters Point were deemed "cleared," and used as backfill into the Hunters Point trenches.

140.   On March 15, 2017, Tetra Tech manager Stephen Rolfe pleaded guilty to destruction, alteration, or falsification of records in violation of 18 U.S.C. § 1519. Rolfe admitted that he had instructed other Tetra Tech employees to get "clean dirt" from areas known to be clean and taken from outside the marked Survey Unit areas to be used as substitute samples for the dirt from the Survey Unit, and that he falsified chain of custody forms.

141.   On May 18, 2017, Tetra Tech manager Justin Hubbard pleaded guilty to destruction, alteration, or falsification of records in violation of 18 U.S.C. § 1519, and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

41

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  admitted substantially the same fraudulent conduct that Stephen Rolfe had

2  admitted.

3      142.   On May 3, 2018, Tetra Tech supervisors Justin Hubbard and Stephen

4  Rolfe were sentenced to eight months in federal prison for falsifying records. Both

5  admitted that they were repeatedly ordered by supervisors to "get the hell out" of

6  contaminated areas and to "get clean dirt." They admitted that, in response to this

7  pressure, they substituted 5-gallon buckets of clean soil for potentially contaminated

8  soil at HPNS, and then filled out fraudulent chain of custody forms, which were

9  submitted to the Navy as evidence that the soil was free of harmful radiation.

10     143.   Tetra Tech's widespread fraud was perpetrated under the Navy's

11 supervision and oversight. At all relevant times, the Navy was charged with and

12 responsible for remediation at HPNS, including compliance with applicable statutes,

13 regulations, guidance documents, and policy manuals that outline specific, technical,

14 and procedural requirements that the Navy was required to implement and follow at

15 HPNS. Such sources of mandatory duties include, but are not limited to, the FFA,

16 Federal Acquisition Regulations, the Construction Quality Management Program

17 Manual, the Environmental Readiness Program Manual, and Base-Wide Radiological

18 Work Plans, Sampling Plans, and Quality Assurance Project Plans ("QAPPs"). The

19 Navy failed to comply with these mandatory duties in supervising Tetra Tech's

20 investigation and remediation work. The Navy's mandatory duties with respect to

21 overseeing, supervising, and ensuring the quality of Tetra Tech's work included, but

22 were not limited to, (1) ensuring that sampling and field work was performed in

23 accordance with work plans, sampling plans, and quality assurance project plans; (2)

24 inspecting all work in progress and at completion; (3) conducting ongoing field

25 inspections to verify that all work was in compliance with contract and technical

26 specifications; and (4) comparing radiological data with the requirements of the work

27 plan, task specific plans, and sampling plans to ensure that all proper conditions

28 have been met. These are only a few of the applicable duties that the Navy breached,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

42

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1   and Plaintiffs' discoveries in this regard are ongoing. Regardless, had the Navy

2   properly discharged those mandatory duties that have already been identified, it

3   would have discovered what the U.S. EPA would later call "red flags of multiple

4   types" in Tetra Tech's work. Instead, due to the Navy's negligence and breach of its

5   mandatory duties, the Navy missed these "red flags" time and time again.

6         **2.**      **The Navy's Mandatory Duties Under the Federal Facilities**

7                 **Agreement**

8         144.    For example, under the FFA (described above, at paragraphs 52 and 53),

9   the Navy was required to "designate a Quality Assurance Officer (QAO) who will

10  ensure and document that all work is performed in accordance with approved work

11  plans, sample plans, and [Quality Assurance Project Plans ('QAPPs')]." (FFA § 20.1.)

12        145.    In contravention to this mandatory duty, the Navy QAO failed to ensure

13  and document that all work at HPNS was performed in accordance with approved

14  work plans, sampling plans, and QAPPs. Specifically, the Navy QAO failed to ensure

15  and document that (1) Tetra Tech complied with the chain of custody requirements;

16  (2) all soil samples were transported to the laboratory; (3) soil samples were collected

17  properly; (4) survey units that exceeded release criteria were investigated and

18  remediated; (5) survey units were 100 percent gamma surveyed; and (6) survey scans

19  were conducted properly. All of these requirements related to sampling and field

20  work are set forth in detail in the work plans, sampling plans, and QAPPs applicable

21  to HPNS.

22        146.    Similarly, under the FFA, the Navy's Remedial Project Manager

23  ("RPM") "shall be responsible on a daily basis for assuring proper implementation of

24  the RI/FS and the RD/RA in accordance with the terms of the Agreement." (FFA

25  § 18.4.) To accomplish this, Section 18.4 of the FFA states that "[t]he authority of the

26  RPMs shall include, but is not limited to (a) Taking samples and ensuring that

27  sampling and other field work is performed in accordance with the terms of any final

28  work plan and QAPP." In addition, Section 18.6 of the FFA states that "[t]he RPM for

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

the Navy shall be responsible for day-to-day field activities at the Site. The Navy RPM or other designated employee of Hunter Point Annex Environmental Program shall be present at the Site or reasonably available to supervise work during all hours of work performed at the Site pursuant to this Agreement." Thus, the Navy RPM had a specific and mandatory duty to ensure that sampling, field work, and other day-to-day activities were performed in accordance with final work plans and QAPPs.

147.    On information and belief, the Navy RPM breached this mandatory duty in this case. Specifically, Plaintiffs allege on information and belief that the Navy RPM did not monitor sample collection at HPNS, nor was the Navy RPM "present . . . or reasonably available to supervise" Tetra Tech's work during all hours that it was being carried out.

### 3.    The Navy's Mandatory Duties Under the Construction Quality Control Program Manual.

148.    The NAVFAC serves as the Navy's facilities, installation, and contingency engineers. NAVFAC's duties include oversight of contractors hired to accomplish Navy facilities construction and redevelopment goals, including the investigation and remediation of former Navy installations. The requirements for carrying out those duties are established by NAVFAC's Construction Quality Management Program Manual ("the Construction Manual"), NAVFAC 0525-LP-037-7202. The Navy's operations at HPNS are required to comply with the duties set forth in the Construction Manual, and that manual applies to Tetra Tech's work at HPNS.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

44
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

149.    Section 3.3.1 of the Construction Manual states that the Navy's Quality Assurance Representative ("QA Rep") "must daily review all Contractor reports and inform his supervisors of any errors or omissions."[1]

150.    The Construction Manual also describes, in detail, *how* the Navy QA Rep should "review" all contractor reports:

> The QA Rep should check the following when reviewing reports: phases of construction (preparatory, initial, and follow-up) under way on the day of the report, and the specific location of the work performed. Results of quality control procedures and inspections, including the nature of deficiencies observed and the corrective action proposed by the Contractor. This should include dimensional checks and validation of work elements along with safety violations and the location of such inspections . . . . Test results, including failures and remedial action to be taken. When test results cannot be completed by the time the report is submitted, a notation should be made that the test was performed, and the approximate date results will be available. Delayed test results should be submitted with the report on the date received.

(Construction Manual § 3.4.2.)

151.    Furthermore, in reviewing the Quality Control Reports, the QA Reps are required to "note any disagreement or question regarding the accuracy and completeness of the report," which "must be returned to the Contractor for resolution and appropriate reporting in subsequent Contractor reports or by another acceptable method." (Construction Manual § 3.4.1.1.) And to the extent the QA Reps identify "[i]ncorrect or erroneous information," they are required to comment on that information and take appropriate follow-up action. (*Id*., § 3.4.2.) "Failure to take exception to incorrect information contained in the report constitutes constructive acceptance of the Contractor's version of events." (*Id*.)

152.    Accordingly, the Navy QA Reps had a mandatory and specific duty to review all Contractor Production and Quality Control Reports immediately upon

---

[1] Under Section 2.15.1 of the Construction Manual, contractors are required to submit daily reports to the Government, including a "Contractor Production Report" and a "Contractor Quality Control Report."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

45
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

receipt to ensure their accuracy and completeness, comment and follow-up on incorrect or erroneous information, and inform supervisors of errors or omissions.

153.   On information and belief, the Navy's QA Reps did not "immediately upon receipt" review all of Tetra Tech's Production and Quality Control Reports to ensure their accuracy and completeness, did not comment and follow-up on incorrect and erroneous information, did not take exception to incorrect information contained in the Reports, and did not inform their supervisors of any errors or omissions.

154.   There were several inaccuracies in Tetra Tech's Production and Quality Control Reports that the QA Reps would have identified had they (1) properly reviewed the reports and (2) done so "immediately upon receipt."

155.   For example, Tetra Tech's daily Production and Quality Control Reports did not completely or accurately describe the work being performed, the location of work performed (such as soil collection locations), and results of quality control procedures and inspections. Many building scans were manipulated and falsified, and the actual radiation detection activities reported did not occur. This is evident from the duplicative data in the survey results. The data indicates that Tetra Tech's daily reports for at least half of all buildings surveyed would have been inaccurately reporting that these buildings were being scanned and completed, when they were not. Similarly, daily reports on the location and completion of soil sampling activities likewise were not accurate. Daily reports on soil sampling and testing activities also could not have been complete without including the unapproved collection of soils outside designated survey units.

156.   Furthermore, based on information and belief, the Navy QA Reps did not comment upon (let alone correct) numerous forms of incorrect and erroneous information contained in Tetra Tech's Production and Quality Control Reports related to the hundreds, perhaps thousands, of instances of data falsification and manipulation.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

46

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

157.   In addition, the Construction Manual imposed certain "specific duties" on the QAP Reps to accomplish the following tasks on a routine basis, both pre- and post-award. Those "specific duties" include:

> Observing enforcement of safety provisions during normal site visits;

> Making or arranging for inspections to be performed by the Government;

> Inspecting critical items and monitoring specific testing;

> Making sufficient site visits to determine adequacy of QC System performance, which includes spot-checking workmanship and observing testing procedures;

> Obtaining and reviewing the daily QC and Production reports in a timely manner and taking necessary action;

> Preparing Construction Contract Non-compliance Notices; and

> Witnessing final tests and making final inspections for acceptance.

(Construction Manual § 3.3.1.1.)

158.   The Construction Manual further states at Section 3.3.1.1 that "on most contracts, the QA Rep should visit the work site each day. At a minimum, he must visit the work site once a week to maintain awareness of the project status."

159.   On information and belief, the Navy failed to adhere to these duties, including the duty to visit the site at least once per week to maintain awareness of project status.

160.   Had the Navy QA Reps visited the site at least once a week to maintain awareness of project status; conducted pre-final and final inspections; conducted sufficient site visits to determine the adequacy of the Quality Control System; witnessed final tests and made final inspections for acceptance; spot checked workmanship on a routine basis; observed testing procedures on a routine basis; and inspected critical items and monitored specific testing as required under Section 3.3.1.1 of the Construction Manual, then Tetra Tech's widespread, years-long

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

47
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  deficient and fraudulent investigation and remediation efforts would have been

2  easily detected.

3          **4.     The Navy's Mandatory Duties Under Work Plans, Sampling Plans, and QAPPs.**

4

5          161.    Additionally, the Navy Radiological Site Manager ("RSM") failed to

6  implement and comply with requirements under Navy-approved and adopted

7  sampling plans and QAPPs.

8          162.    Sampling plans and QAPPs required the Navy RSM to: (1) "perform[]

9  on-site reviews of all radiological site operations including the on-site laboratory;"

10  (2) "perform[] quality reviews on [chains of custody] to ensure samples are collected

11  in accordance with the Work Plan and SAP"; (3) "ensur[e] that all necessary sample

12  results are provided and consistent with proposed radiological actions;" (4) "ensur[e]

13  that the radiological data reported is consistent with the intent for which the data

14  was provided;" (5) "compar[e] radiological data with the requirements of the Work

15  Plan, Task-specific Plans, and SAP to ensure that all proper conditions have been

16  met to implement the action requested;" and (6) "review[] radiological laboratory data

17  on a routine basis." (*See Final Sampling Plan and Quality Assurance Project Plan*

18  (Oct. 2007) at Table B.2-1; *Final Sampling Plan and Quality Assurance Project Plan:*

19  *Base-Wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 28.)

20          163.    On information and belief, the Navy RSM failed to comply with any

21  these mandatory requirements and, consequently, failed to discover patent

22  deficiencies in Tetra Tech's work.

23          164.    Additionally, while remediation activities were ongoing, the Navy

24  intentionally transferred Building 606 from Parcel D to Parcel E to delay its

25  investigation and remediation.

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

**H.     As a Result of the Foregoing, Plaintiffs Were Exposed to Hazardous Substances and Injured**

165.    Group A Plaintiffs and Group C Decedents, and each of them, were exposed via inhalation, ingestion, and dermal exposure, as well as other exposure routes, to radiological and non-radiological contamination at HPNS, resulting in cellular, immunologic, acute, and chronic injuries to them.

**1.     Extensions and Expansions of the Subject Lease**

166.    The Subject Lease was originally set to expire June 30, 1998.

167.    On July 1, 1998, as a proximate and legal result of the City's original lease of the Building 606 Property, the Subject Lease was extended for an additional six-month period expiring December 31, 1998 (1998 Amended Lease).

168.    On February 1, 1999, as a proximate and legal result of the City's lease of the Building 606 Property, the Subject Lease was amended to add to the scope of the lease a 3.3-acre vacant lot area east of Building 606 and across Hussey Street (the Helipad Property), labeled "Proposed HLP Area" in the map below, for construction and use as a helicopter landing facility. (This February 1, 1999, lease is hereafter referred to as the 1999 Amended Lease.) The 1999 Amended Lease was for a term originally set to expire June 30, 2002. The 1999 Amended Lease also extended the lease term for the Building 606 Property through June 30, 2002.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA   94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD



169.   On September 30, 2002, as a proximate and legal result of the original Subject Lease, the Lease Agreement N6247497RPOOP45 was amended a fourth time so that it would continue to automatically extend on a month-to-month basis.

170.   Effective February 1, 2007, the 1997 Lease of the Helipad Property terminated and the SFPD no longer leased that 3.3-acre vacant lot area east of Building 606.

171.   As a direct and legal result of the ongoing lease of the Subject Leased Property by the SFPD, the SFPD also conducted training activities (during the same time period) near the Subject Leased Property as well as in Parcel A, with the Navy and Tetra Tech's approval and consent. In June 1998, pursuant to Navy contract number N62474998RP00P79, the Navy granted the SFPD authority to use Parcel A for training exercises.

172.   Most but not all of Group A Plaintiffs and Group C Decedents were relocated off base by 2009.

173.   SFPD's lease of the Building 606 Property is continuing, and some Group A Plaintiffs have continuing exposure.

**2.      Hazardous Substances Present at the Building 606 Property**

174.   Building 606 had been built in 1989 as a Shore Intermediate Maintenance Facility. It is an 89,600 square foot steel-construction industrial building. The front part (north end) of the building includes an entry lobby and 2

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

50

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  stories of office and conference room spaces. The rear of the building (south portion)

2  is a 2-story high bay open area with concrete flooring.

3       175.   Building 606 was at all relevant times the site of dangerous

4  radionuclides, given that it had been the location of a radioactive laundry that had

5  discharged radioactive waste into the soil and groundwater under and immediately

6  around Building 606, and given that there had never been remediation of that

7  radioactive waste.

8       176.   Building 606 was at all relevant times the site of contamination,

9  including PCB oil, from on-site transformers.

10       177.   Sampling at Building 606 discovered volatile organic compounds

11  (VOCs), semi-volatile organic compounds (SVOCs), total petroleum hydrocarbons

12  (TPHs), total organic gasses (TOGs), and metals detected in soil.

13       178.   Polyaromatic hydrocarbons (PAHs) were discovered in the groundwater

14  at Building 606.

15       179.   A soil pit at the southeast corner of Building 606 was the site of a PCB

16  spill and, at all relevant times, of continuing PCB contamination that had not been

17  fully remediated.

18       180.   During Building 606's operation as the radioactive laundry, it had been

19  the site of a solvent (trichloroethane) spill.

20       181.   While Group A Plaintiffs and Group C Decedents were working at

21  Building 606, the roll-up bay doors and windows were often left open, allowing free

22  communication of outdoor air with the indoor spaces where Group A Plaintiffs and

23  Group C Decedents worked.

24       182.   When Group A Plaintiffs and Group C Decedents began working at

25  Building 606, some of them were initially drinking the tap water, and drinking from

26  the drinking fountain, in Building 606.

27       183.   Water sampling in Building 606 identified and verified elevated levels of

28  an unidentified petroleum product in the hot water system, as well as from the water

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

51

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1    main supplying the building; identified trihalomethane concentrations in excess of

2    state Maximum Contaminant Levels (MCLs) in both the hot and cold portions of the

3    Building 606 water system; and identified intermittent lead concentrations in excess

4    of State MCLs, in both the hot and cold portions of the Building 606 water system.

5         184.   Although bottled water was eventually provided to Group A Plaintiffs

6    and Group C Decedents, they at all relevant times brushed their teeth, showered,

7    and washed their hands in the Building 606 water.

8         185.   Contamination was, at all relevant times, present in the drain piping for

9    Building 606.

10        186.   Samples collected in the storm water drain to the northwest of Building

11   606 identified vinyl chloride and Aroclor-1260 at concentrations above levels of

12   concern for human health.

13        187.   Water samples collected from the Parcel D sewer lines indicated the

14   presence of arsenic, lead, and manganese at concentrations above levels of concern to

15   human health.

16        188.   The drain pipes in and immediately outside Building 606 would

17   frequently overflow, causing Group A Plaintiffs and Group C Decedents to be directly

18   exposed to contamination from within old sanitary sewer and storm drain pipes.

19        189.   Sampling of the steam lines in Parcel D indicated the presence of

20   contaminants. Total Petroleum Hydrocarbons (TPH)-gasoline, total oil and grease,

21   and mercury were detected in Parcel D steam lines at concentrations above levels of

22   concern to human health.

23        190.   The landfill near Building 606 was at all times emitting methane gas, to

24   which Group A Plaintiffs and Group C Decedents were exposed.

25        191.   The landfill near Building 606 was at all times emitting chlorine gas

26   from underground cylinders, to which Group A Plaintiffs and Group C Decedents

27   were exposed.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

52

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1

 3. **Hazardous Substances Present at the Helipad Property**

2       192.   During the operation of NRDL, the Helipad Property, unlike much of

3  HPNS, was unpaved soil. It was in a location downwind of most of the sandblasting

4  and other radioactive cleanup activities while the NRDL was in operation.

5       193.   The Helipad Property is adjacent to a "Former NRDL Site" on Mahan

6  Street, which was hand drawn on a 1949 map and annotated "Buildings Now

7  Occupied by NRDL." The site is approximately 300 feet north-northwest of Berth 21.

8  It was used for unknown radiological activities.

9       194.   The Helipad Property was at all relevant times contaminated by Cs-137

10 and Ra-226 exceeding release limits.

11      195.   Groundwater from IR-44 and IR-70 flows toward and into the Helipad

12 Property, causing contamination of its soil and groundwater with multiple hazardous

13 substances.

14      196.   The SFPD constructed an approximately 144,000 square-foot paved

15 helicopter takeoff and landing pad. The helicopter conducted approximately two

16 routine flights per day, plus eight to ten additional emergency response flights each

17 month.

18      197.   Effective September 3, 2002, the Helipad started to be used for

19 emergency medical aircraft.

20      198.   When helicopters would take off and land at the Helipad Property, their

21 rotors would stir up dust and fling rocks, creating increased exposure to Group A

22 Plaintiffs and Group C Decedents.

23       4. **Hazardous Substances Present Around the Building 606**
             **Property**

24

25      199.   The Building 606 Property was, at all times prior to about March of

26 2005, included as part of Sub-parcel S-41 within Parcel D.

27      200.   The Building 606 Property was, after about March of 2005, moved into

28 and considered a part of Parcel E.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

53

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

201.   The Building 606 Property is now part of Redevelopment Block MU-2 within Parcel E, at the edge of reuse area EOS-4, and at the edge of Parcel G and Parcel D-1. It is involved in IR sites IR-08 and IR-38.

202.   EOS-4, where Building 606 is located, is also the site of Building 521, Triple A Sites 6, 7, 12, and 13, former NRDL buildings 506, 509, 510, 510A, 517, and 529, which were used for oily liquid waste disposal, incineration of unknown industrial materials (Triple A Site 12), waste pond area (Triple A Site 13) steam generating power plant in Building 521.

203.   EOS-4 used to store PCB-containing liquid waste that was dumped along the shoreline, and was the site of a former burn disposal area.

204.   EOS-4 also contained IR-73, consisting of removed ASTs (former asphalt manufacturing plant) and storage drums containing unidentified oily liquids.

205.   The Building 606 Property is at the epicenter of the cluster of buildings that initially were the NRDL, and which were known to have been highly radioactive, and known to have released radionuclides into the surrounding soil and drains.

206.   Building 606 is either on or immediately adjacent to the sites of former buildings used by NRDL including the following:

        a.   An electrical substation (Building 527, IR-40, EOS-4).

        b.   A radioactive chemistry laboratory (Building 509).

        c.   A radioactive physics laboratory (Buildings 510 and 510A).

        d.   A radioactive biomedical facility (Building 517).

        e.   Radioisotope storage and Cockroft-Walton accelerator (Building 529).

        f.   Radioactive biomedical laboratory (Building 507).

        g.   Radioactive health physics office (Building 508).

207.   Other nearby buildings include Building 707, which had a pole-mounted transformer and was used by the NRDL for animal research; Building 708, which

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

54
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

was a Biomedical facility (IR-39); Building 406, which was the site of a groundwater plume involving trichloroethene ("TCE"), 1,4-DCB, carbon tetrachloride, 1,2-DCE, PCE, and vinyl chloride; Building 413, which showed elevated chemical concentrations of metals, SVOCs, and TPH; and a landfill containing known benzene, chlorine, radium dials, and methane.

208.   During the time that Group A Plaintiffs and Group C Decedents worked at HPNS, the Navy implemented several Time Critical Removal Actions ("TCRAs") to remove PCB spills in the immediate vicinity of Building 606. Along the western excavation sidewall, one sample had a PCB concentration of approximately 12,000 milligram per kilogram (mg/kg) and another sample had a TPH concentration of 34,120 mg/kg.

209.   The steam line system (IR-45) which crosses through MU-2 and EOS-4 was used by Triple A for transporting waste oil from Berth 29 in Parcel D and Dry Dock 4 in Parcel C to Building 521 and former AST S-505.

210.   The fuel distribution lines (IR-47) were used by Triple A for waste oil transportation from Berth 29 in Parcel D and Dry Dock 4 in Parcel C to Building 521 and former AST S-505, and to the former oil reclamation ponds.

211.   The soil in the immediate vicinity of and directly in and on the Subject Leased Property was at all relevant times contaminated by numerous hazardous substances, some of which are still unknown. These substances include but are not limited to arsenic, chloroform, beryllium, benzene, hexavalent chromium, trichloroethylene, vinyl chloride, tetrachloroethylene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, 4,4'-DDE, 4,4'-DDD, Aroclor-1260, Aroclor-1254, petroleum hydrocarbons, oil and grease, 3,3'-dichlorosbenzidine, 4-nitrophenol, 4, aldrin, alpha-BHC, antimony, Aroclor-1254, bis(2-ethylhexyl)phthalate, cadmium, carbazole, copper, dibenz(a, h)anthracene, dieldrin, gamma-BHC, heptachlor epoxide, indeno(1,2,3-cd)pyrene, iron, lead, manganese, mercury, n-nitroso-di-n-propylamine, n-nitrosodiphenylamine, naphthalene, pentachlorophenol, thallium, vanadium, zinc,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1   copper, iron, lead, manganese, mercury, and xylene, PCB, TPH, cesium-137, radium-

2   226, and strontium-90, as well as numerous other radionuclides of concern.

3       212.    In 2013, the Navy's internal reports acknowledged that there was an

4   elevated risk. It specifically acknowledged the following (grossly understated) risks:

5           a.      Even using Tetra Tech's fraudulently understated test results,

6   and even using a "recreational" scenario that assumed people would be on the land

7   no more than 1 to 2 hours per day, 2 days per week, for 100 days, the recreational

8   radiological cancer risk estimate for EOS-4 was 7 in 1,000 (meaning that there is a

9   probability that 7 in 1,000 people using the land for such light recreational purposes

10  would get cancer as a result of this exposure), and for MU-2, it was 9 in 10,000).[2]

11          b.      Using the same assumptions, the pre-cleanup residential cancer

12  risk from breathing indoor air from shallow groundwater in MU-2 was estimated as 1

13  in 1,000.

14          c.      Using the same assumptions, the pre-cleanup residential cancer

15  risk from showering with deep groundwater in MU-2 was estimated as 4 in 10,000.

16          d.      Even using Tetra Tech's fraudulently understated test results,

17  and even using a "recreational" scenario, the non-radiological chemical cancer risk for

18  MU-2 was 3 in 1,000, and for EOS-4 was 3 in 10,000.

19          e.      Even using the understated findings, the pre-cleanup recreational

20  hazard index (for non-cancer disease) was 54 for MU-2 (i.e., 54 times the maximum

21  permissible hazard level of 1) and 9.6 for EOS-4 (i.e., 9.6 times the maximum

22  permissible hazard level of 1).

23      213.    On or about August 16, 2000, a 14-acre landfill near Building 606

24  ignited and burned for at least six hours. Several areas of landfill continued to

25  smolder, creating smoke, for at least one month. Group A Plaintiffs and Group C

26

27  _____

[2] For comparison, the U.S. EPA considers a cancer risk of 1 in 1 million to be the
maximum permissible cancer risk level for a resident.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1   Decedents, and each of them, were exposed to this smoke. On information and belief,

2   the landfill fire caused the release of underground vapors including methane gas,

3   arsenic, chloroform, trichloroethylene, tetrachloroethylene, benzene, and vinyl

4   chloride, which Group A Plaintiffs and Group C Decedents inhaled and which caused

5   them harm.

6       214.   During remediation activities, the levels of airborne particulate matter

7   (dust) became so severe that Group A Plaintiffs and Group C Decedents complained

8   about dust levels, and were awarded free car washes for their vehicles. However, the

9   Navy and Tetra Tech, under the Navy's negligent supervision, continued to reassure

10  the City that the dust, which Plaintiffs carried home on their personal vehicles and

11  clothing, was non-hazardous and did not present any health risk. This was untrue,

12  and the particulate matter that Group A Plaintiffs and Group C Decedents

13  inadvertently inhaled, ingested, and dermally contacted was hazardous and caused

14  them injury.

15      215.   During the time that Group A Plaintiffs and Group C Decedents worked

16  at Building 606, the majority of them developed acute symptoms, which

17  predominantly included rashes and other skin conditions, adult-onset asthma, other

18  respiratory complaints, headaches, and fatigue. At the time, based on the Navy's and

19  Tetra Tech's misrepresentations to the City regarding the levels of known and

20  suspected contamination, Group A Plaintiffs and Group C Decedents were reassured

21  that their symptoms could not possibly be a result of any hazardous exposure at

22  HPNS.

23      **I.      Concealment and Delayed Discovery**

24      216.   As a result of the Navy's negligence, negligent supervision of Tetra

25  Tech, fraudulent concealment, and misrepresentations, Group A Plaintiffs and Group

26  C Decedents were kept ignorant and unaware of the Navy's wrongdoing until at least

27  July 26, 2018, or later. Their discoveries in this regard are ongoing.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

57
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

217.   As a result of the Navy's negligence, fraudulent concealment, and misrepresentations, Group A Plaintiffs and Group C Decedents were kept ignorant and unaware of their own exposure to hazardous materials until at least July 26, 2018, or later. Their discoveries in this regard are ongoing.

218.   As a result of the Navy's negligence, fraudulent concealment, and misrepresentations, Group A Plaintiffs and Group C Decedents were kept ignorant of the true causation of their diseases, injuries, and conditions until at least July 26, 2018, or later. Their discoveries in this regard are ongoing.

## FIRST CAUSE OF ACTION

**(Negligent Undertaking, Negligent Failure to Warn, Negligent Supervision, Negligence Per Se, and Negligent Misrepresentation)**

219.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

220.   Pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), and § 2674, et seq., the United States is liable in tort to the same extent as a private individual under the law of the place where an injury occurs.

**Negligent Undertaking to Investigate, Inspect, and Provide Notice and Warning of Hazardous Substances in 1996; Negligent Failure to Warn; and Negligent Supervision**

221.   The Navy undertook to and did, both directly and through the negligent supervision of its contractors, prepare Environmental Baseline Surveys and Findings of Suitability to Lease for the express purpose of providing the legally required lease notifications, warnings, and disclosures to the City in connection with the lease of the Subject Leased Property.

222.   The Navy, both directly and through the negligent supervision of its contractors, undertook to review all available records and information regarding the Subject Leased Property, survey the condition of the Subject Leased Property, inspect and investigate the property, determine the nature, magnitude, and extent of any contamination of the Subject Leased Property, and provide notice to the City as

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1  required under § 120(h) of CERCLA of the type, quantity, and time frame of any

2  storage, release, or disposal of a hazardous substance on the property.

3       223.   The Navy, both directly and through the negligent supervision of its

4  contractors, undertook to identify, obtain, and review all data, documents, and

5  records relevant to determining the potential for present and past contamination of

6  the Subject Leased Property, including a review of historical records, and other

7  available documents to ascertain prior uses of the Subject Leased Property that may

8  have involved hazardous substances or otherwise contaminated the Subject Leased

9  Property.

10      224.   The Navy, both directly and through the negligent supervision of its

11  contractors, undertook to notify the City of any known release of hazardous

12  substances at the Subject Leased Property.

13      225.   The Navy, both directly and through the negligent supervision of its

14  contractors, undertook to provide an accurate and thorough review of the past use

15  and current condition of the Subject Leased Property and the HPNS Base, as of 1996,

16  and to accurately and thoroughly communicate that past use and current condition to

17  the City.

18      226.   In preparing the Subject Lease, the Building 606 EBS, and the Building

19  606 FOSL, the Navy was performing its duty owed to third party transferees and

20  tenants at HPNS—in this case, the City and its employees, including Group A

21  Plaintiffs and Group C Decedents.

22      227.   The Navy, both directly and through the negligent supervision of its

23  contractors, rendered investigation services for the City, and knew or should have

24  realized that these services were of a kind that were needed for the protection of the

25  City and its employees, including Group A Plaintiffs and Group C Decedents, as they

26  prepared to receive and occupy the Subject Leased Property.

27      228.   In compiling and reviewing its records regarding the Subject Leased

28  Property, publishing disclosures regarding the Subject Leased Property for the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

59

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1   benefit of the City in and about 1996, and supervising the work of its contractors in

2   connection with these tasks, the Navy failed to exercise reasonable care and failed to

3   reasonably warn the City regarding the historical and current conditions of the

4   property.

5        229.   The Navy's failure to exercise reasonable care in investigating the

6   Subject Leased Property, researching the Subject Leased Property, warning about

7   the Subject Leased Property, publishing its disclosures regarding the Subject Leased

8   Property, and supervising its contractors in connection with this work, added to the

9   risk of harm to Plaintiffs, and each of them.

10        230.   As a direct and legal result of the Navy's failure in investigating the

11   Subject Leased Property, researching the Subject Leased Property, warning about

12   the Subject Leased Property, publishing its disclosures regarding the Subject Leased

13   Property, and supervising its contractors in connection with such tasks, Plaintiffs,

14   and each of them, sustained damages as set forth herein.

15   **Violation of 42 U.S.C. § 9620(h)(1) (Negligence Per Se)**

16        231.   Pursuant to 42 U.S.C. § 9620(h)(1),

17   > [W]henever any department, agency, or instrumentality of
18   > the United States enters into any contract for the sale or
19   > other transfer of real property which is owned by the United
   > States and on which any hazardous substance was stored for
   > one year or more, known to have been released, or disposed
20   > of, the head of such department, agency, or instrumentality
   > shall include in such contract notice of the type and quantity
21   > of such hazardous substance and notice of the time at which
   > such storage, release, or disposal took place, to the extent
22   > such information is available on the basis of a complete
   > search of agency files.

23        232.   At all relevant times, the Navy owned and controlled the Subject Leased

24   Property.

25        233.   At all relevant times, the Navy knew or, in the exercise of reasonable

26   care, should have known that hazardous substances, including but not limited to

27   radionuclides, had been released at the Subject Leased Property.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

234.   Prior to 1996, the Navy was aware, or should have been aware from a complete review, inspection, and investigation of its own agency records, of past releases of hazardous substances at the Subject Leased Property.

235.   In or about 1996, the Navy was transferring the Subject Leased Property to the City, knowing that it would be used as a workplace by SFPD employees (including Group A Plaintiffs and Group C Decedents).

236.   In or about 1996, through the Subject Lease, the Building 606 EBS, and the Building 606 FOSL, the Navy was obligated to warn and notify the City and its employees, including Group A Plaintiffs and Group C Decedents, of any known release of hazardous substances at the Subject Leased Property.

237.   As of and after 1996, hazardous substances were still present at the Subject Real Property.

238.   At all relevant times, the history of past releases of hazardous substances at the Subject Leased Property, and the continuing presence of hazardous substances at the Subject Leased Property, were hidden and latent dangers from the perspective of the City and Plaintiffs.

239.   In or about 1996, the Navy violated 42 U.S.C. § 9620(h)(1) by failing to provide notice of the type and quantity of hazardous substances known to have been released at the Subject Leased Property, and of the time at which such release took place, to the extent that information was available on the basis of a complete search of agency files.

240.   The Navy's failure to provide notice of the type and quantity of hazardous substances known to have been released at the Subject Leased Property, and of the time at which such release took place, was a proximate cause of injury to Plaintiffs, and each of them as set forth hereinabove.

241.   Plaintiffs belong to the class of persons 42 U.S.C. § 9620(h)(1) was intended to protect.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

61
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

242.   Plaintiffs' injuries resulted from the type of occurrence 42 U.S.C. § 9620(h)(1) was designed to prevent.

**Negligent Misrepresentations in 1996**

243.   In or about 1996, the Navy negligently failed to warn the City and its employees, including Group A Plaintiffs and Group C Decedents, of the known release of hazardous substances, including radionuclides and other substances, at the Subject Leased Property.

244.   At all relevant times, the Navy negligently misrepresented facts regarding the Subject Real Property, and surrounding property at HPNS.

245.   These misrepresentations include, but are not limited to, the Navy's statements to the City, in the 1996 Building 606 EBS, that:

a.   "[T]here are no known health risks associated with use of Building 606."

b.   Former Building 503, which was on the Building 606 site, "did not have uses consistent with the storage or use of hazardous materials."

c.   During the NRDL years, HPA was used for "limited radiological operations."

d.   "As part of the disestablishment of NRDL all sites were surveyed for radiological contamination and decontaminated if necessary."

e.   PRC "placed building 606 in category 4, since remedial actions are complete, and the building was recently leased by the movie industry."

f.   The "condition of all the spaces [in Building 606] is excellent with no signs of the use, storage, or spillage of hazardous materials or petroleum products."

g.   "There are no potential interior sources" of hazardous exposure in Building 606.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

      h.     Known contamination of Parcel D steam lines with TPH-gasoline, oil, grease, and mercury is not of concern at Building 606 because "[t]here are no steam lines indicated in or around Building 606."

246.    The Navy's representations to the City were not true.

247.    The Navy had no reasonable grounds for believing these representations were true when it made them.

248.    When the Navy made these representations, it intended that the City rely on them in exposing its employees to the Subject Leased Property, and surrounding property and hazardous materials.

249.    The City, in exposing its employees to the Subject Leased Property and surrounding property and materials, reasonably relied on the Navy's representations.

250.    As a result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, were harmed in that they sustained acute physical injuries at or near the time of their exposure (including, for example, rashes and other skin conditions, adult onset asthma, other respiratory complaints, fatigue, and headaches).

251.    As a further legal result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, were also harmed in that they suffered from past and future chronic illnesses and diseases both diagnosed and undiagnosed, and known and presently unknown (including, for example, immune compromise, cellular dysfunction, lung cancer, melanoma, basal cell carcinoma, squamous cell carcinoma, thyroid cancer, lymphoma, reproductive cancer, thyroid disease, heart disease, blood disorders, and other chronic medical conditions related to environmental exposure).

252.    As a further legal result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, were also harmed in that they are at an elevated risk of developing future illnesses and diseases (including, for example, immune compromise, cellular dysfunction, lung cancer, melanoma, basal cell

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

carcinoma, squamous cell carcinoma, thyroid cancer, lymphoma, reproductive cancer, thyroid disease, heart disease, blood disorders, and other chronic medical conditions related to environmental exposure).

253.   As a further legal result of their exposure at HPNS, Group A Plaintiffs and Group C Decedents, and each of them, have suffered past and future pain and suffering, including fear of cancer, mental suffering, anxiety, emotional distress, loss of enjoyment of life, and physical impairment.

254.   As a further legal result of their exposure at HPNS, Group A Plaintiffs, and each of them, have incurred past and future expenses for medical monitoring and diagnostic services; past and future expenses for medical care and related treatment; and past and future wage loss and loss of earning capacity.

255.   The City's reliance on the Navy's representation was a substantial factor in causing Plaintiffs' harm as set forth hereinabove.

## SECOND CAUSE OF ACTION

### (Public Nuisance)

256.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

257.   The Navy, by its representations to the City, by its sponsored remediation activity, and by its negligent supervision of the investigation and remediation work performed by its contractors, increased the proximity of hazardous substances, including but not limited to radiation and toxic dust, to the Group A Plaintiffs and Group C Decedents.

258.   The Navy thereby created a condition that was harmful to health, and interfered with Plaintiffs' comfortable enjoyment of life and property.

259.   The condition the Navy created affected a substantial number of people at the same time.

260.   An ordinary person would be reasonably annoyed or disturbed by the condition the Navy created.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

261.    The seriousness of the harm the Navy created outweighs the social utility of its conduct.

262.    Group A Plaintiffs and Group C Decedents, by virtue of their presence at HPNS in the epicenter of the remediation activities, suffered harm that was different from the type of harm suffered by the general public.

263.    The Navy's conduct was a substantial factor in causing Group A Plaintiffs and Group C Decedents' harm.

264.    As a direct and legal result of the Navy's negligent cleanup and negligent representations, Group A Plaintiffs and Group C Decedents, and each of them, sustained damages as set forth hereinabove.

## THIRD CAUSE OF ACTION

### (Loss of Consortium)
### (By Group B Plaintiffs)

265.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

266.    Each Group B Plaintiff was and is at all relevant times the lawful spouse or domestic partner of a Group A Plaintiff, as set forth in Exhibit B, which is incorporated herein by this reference.

267.    Each Group B Plaintiff was harmed by the injury to his or her spouse or domestic partner.

268.    As a direct and legal result of the conduct of Defendants, and each of them, as set forth hereinabove, and of the injuries to the Group A Plaintiffs, each Group B Plaintiff suffered a loss of consortium, including but not limited to the loss of his or her spouse or domestic partner's companionship, comfort, care, assistance, protection, affection, society, and support.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA   94108
(415) 981-7210

65
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

# FOURTH CAUSE OF ACTION

## (Wrongful Death)
## (By Group C Plaintiffs)

269.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

270.    This cause of action is brought on behalf of Group C Plaintiffs.

271.    By reason of the premises, and as a direct and legal result of the Navy's acts and omissions as set forth above, Group C Decedents, whose identities are stated in Exhibit C, were exposed at HPNS to hazardous substances and radiation, which were a substantial factor in causing each of them to suffer from fatal diseases.

272.    Group C Plaintiffs are those surviving family members of Group C Decedents, who have standing to bring a wrongful death action, as well as personal representatives of the estates of Group C Decedents, who have standing to bring a wrongful death action on behalf of the surviving family members.

273.    As a direct and legal result of the Navy's acts and/or omissions as set forth above, Group C Plaintiffs and each of them, have been deprived of the companionship, comfort, care, assistance, protection, affection, society, and support of their loved ones, as set forth in Exhibit C.

274.    As a further direct and legal result of the Navy's actions and/or omissions, Group C Plaintiffs, and each of them, have incurred medical, funeral and burial expenses in an amount to be shown according to proof at trial.

275.    As a further direct and legal result of the Navy's actions and/or omissions, Group C Plaintiffs, and each of them, have suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

66
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CAUSE OF ACTION**

**(Negligent Infliction of Emotional Distress—Fear of Cancer)**

276.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

277.    As the direct and legal result of the Navy's negligence, carelessness, and other culpable acts and/or omissions, Plaintiffs were exposed to carcinogenic and additional toxic substances at HPNS from 1996 to the present.

278.    Plaintiffs were kept ignorant of their exposure to these carcinogenic and additional toxic substances until at least July 26, 2018, or later, due to the Navy's negligence and carelessness.

279.    As a direct and legal result of the Navy's negligence and carelessness, Plaintiffs have suffered serious emotional distress from a fear that they will develop various forms of cancer as a result of their exposure to carcinogenic substances at HPNS. Plaintiffs' serious emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, and shock.

280.    Plaintiffs, as a result of the Navy's conduct, and upon learning of their increased risk of cancer, suffered emotional distress so serious that an ordinary person would be unable to cope with it.

281.    Reliable medical or scientific opinion can and will confirm that Plaintiffs' risks of developing cancer and additional maladies were significantly increased by the exposure and has resulted in an actual risk of cancer that is significant in nature.

282.    The Navy's negligence, carelessness, and other culpable actions and/or omissions were a substantial factor in causing Plaintiffs' serious emotional distress upon learning of their heightened risks of cancer due to exposure to known radiation at HPNS.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

67

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1

2

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

3      283.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

4   forth herein.

5      284.    The Navy, at all relevant times, knew that its misrepresentations,

6   concealment, and failure to comply with its statutory duty to investigate were likely

7   to cause harm to Plaintiffs, whom the Navy knew were spending time at HPNS by

8   virtue of their employer's (the City's) reliance on the Navy's representations.

9      285.    The Navy and Tetra Tech, under the Navy's negligent supervision,

10   intentionally misrepresented the true levels of radioactive contamination at HPNS,

11   knowing that Plaintiffs would continue to be exposed to increasing levels of

12   contamination by virtue of their employer's (the City's) reliance on those

13   misrepresentations.

14      286.    The Navy knew that Plaintiffs were present at HPNS when this conduct

15   occurred, and the Navy knew that Plaintiffs would probably suffer emotional distress

16   as a result of the Navy's conduct, including its negligent supervision of Tetra Tech.

17      287.    The Navy's conduct described herein was a substantial factor in causing

18   Plaintiffs, and each of them, to suffer severe emotional distress.

19

## PRAYER FOR RELIEF

20      WHEREFORE, Plaintiffs, and each of them, demand and pray that judgment

21   be entered in their favor against Defendants, and each of them, as follows:

22      A.    For noneconomic damages according to proof at trial;

23      B.    For economic damages according to proof at trial;

24      C.    For costs of suit and attorneys' fees to the fullest extent permitted by

25   law;

26      D.    For pre-judgment and post-judgment interest according to law;

27      F.    For such other and further relief as the Court may deem proper.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

68

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1  Dated: April 22, 2022                 Walkup, Melodia, Kelly & Schoenberger

2

3                                        By: _____

4                                             KHALDOUN A. BAGHDADI
                                              SARA M. PETERS
5                                             KELLY L. GANCI
                                              Attorneys for PLAINTIFFS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
Walkup, Melodia, Kelly
& Schoenberger
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD

1

**DEMAND FOR JURY TRIAL**

2          Plaintiffs hereby demand a jury trial.

3

4   Dated:  April 22, 2022              WALKUP, MELODIA, KELLY & SCHOENBERGER

5

6                                       By:  _____
7                                            KHALDOUN A. BAGHDADI
8                                            SARA M. PETERS
                                             KELLY L. GANCI
9                                            Attorneys for PLAINTIFFS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

70
SECOND AMENDED COMPLAINT FOR DAMAGES – CASE NO. 3:20-cv-06443-JD